IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


CAMPAIGN FOR SOUTHERN EQUALITY, ET AL.            PLAINTIFFS

VS.                              CIVIL NO. 3:14CV818-CWR-LRA

PHIL BRYANT, IN HIS OFFICIAL CAPACITY
AS GOVERNOR OF THE STATE OF MISSISSIPPI, ET AL.      DEFENDANTS


**ARGUMENT ON MOTION FOR PRELIMINARY INJUNCTION AND
CONTINGENT MOTION FOR STAY PENDING APPEAL**


BEFORE THE HONORABLE CARLTON W. REEVES
UNITED STATES DISTRICT JUDGE
NOVEMBER 12TH, 2014
JACKSON, MISSISSIPPI


REPORTED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR
Mississippi CSR #1253
_____

501 East Court, Ste. 2.500
Jackson, Mississippi  39201
(601) 608-4187

```
 1                        APPEARANCES

 2   FOR THE PLAINTIFFS:

 3     MR. ROBERT B. MCDUFF
       MS. ROBERTA A. KAPLAN
 4     MR. JOSHUA D. KAYE
       MS. SIBYL C. BYRD
 5     MS. DIANNE H. ELLIS
       MS. DIANE E. WALTON
 6

 7   FOR DEFENDANTS PHIL BRYANT AND JIM HOOD:

 8     MR. JUSTIN L. MATHENY
       MR. PAUL E. BARNES
 9

10   FOR DEFENDANT BARBARA DUNN:

11     MR. PIETER TEEUWISSEN
       MR. ANTHONY R. SIMON
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

TABLE OF CONTENTS

Motion for Preliminary Injunction  .....................5

     Argument by Ms. Kaplan  ...........................5

     Argument by Mr. Matheny  .........................50

     Rebuttal Argument by Ms. Kaplan  ................103

Motion for Stay Pending Appeal  .....................116

     Argument by Mr. Barnes  ..........................116

     Argument by Mr. Teeuwissen  ......................138

     Argument by Ms. Kaplan  ..........................150

     Rebuttal Argument by Mr. Barnes  .................162

     Rebuttal Argument by Ms. Kaplan  .................169

```
 1          (COURT CALLED TO ORDER)

 2              THE COURT:  You may be seated.

 3              THE COURTROOM DEPUTY:  Before the court this morning

 4     is Campaign for Southern Equality, et al. v. Phil Bryant,

 5     et al, civil action number 3:14cv818CWR-LRA.

 6              THE COURT:  Good morning.

 7          (ALL RESPONDED "GOOD MORNING")

 8              THE COURT:  Welcome to the Southern District of

 9     Mississippi.  It's nice to have a full courtroom.  Are we ready

10     to proceed?

11              MR. McDUFF:  We are, your Honor.

12              THE COURT:  All right.  I'll have you introduce

13     yourselves to the court, I guess, to make sure I know everybody

14     who's here.

15              MR. McDUFF:  Good morning, your Honor.  Robert McDuff

16     of Jackson, along with Roberta Kaplan and Joshua Kaye from

17     Paul, Weiss firm in New York, Sibyl Byrd from my firm, Dianne

18     Ellis from Ocean Springs, and Diane Walton from Asheville,

19     North Carolina, for the plaintiffs.

20              THE COURT:  All right.

21          (PAUSE)

22              MR. MATHENY:  Your Honor, Justin Matheny and Paul

23     Barnes with the Mississippi Attorney General's Office for the

24     State defendants.

25              THE COURT:  Okay.
```

```
 1              MR. TEEUWISSEN:  Good morning, your Honor.  Pieter

 2    Teeuwissen, board attorney for Hinds County Board of

 3    Supervisors representing Barbara Dunn.  Also with me is Anthony

 4    Simon, special counsel to the legal counsel for the board.

 5              THE COURT:  All right.  Ms. Kaplan, are you ready to

 6    proceed?

 7              MS. KAPLAN:  Yes, your Honor.

 8         (COURT REPORTER EQUIPMENT MALFUNCTION)

 9         (RECESS)

10              THE COURT:  You may be seated.  I've been told that

11    it's at least working right now.  So I won't ask you to speak

12    real fast.  So we may -- you can begin, Ms. Kaplan.

13              MS. KAPLAN:  Good morning, your Honor.  May it please

14    the court.  It's good to be down here in Mississippi.  I was

15    going to start by explaining that I actually grew up -- I was

16    born and raised in Cleveland, Ohio, but everyone thinks that I

17    was born and raised in New York because I have a tendency to

18    speak very, very fast, which may be a good thing today,

19    although, typically, it's not a good thing.

20              THE COURT:  No, it's never a good thing for our court

21    reporter.  So --

22              MS. KAPLAN:  Exactly.  So if I'm -- if for any

23    reason -- I'm going to try to go very slow; but if for any

24    reason I'm going too fast and you can't follow me, please let

25    me know and I'll slow it down.
```

1          We are here this morning because every single day my

2    clients and gay couples like them throughout the state are

3    suffering harm solely because they are gay.  Indeed, solely

4    because they are gay, they are being deprived of all the many

5    rights, benefits, protections and responsibilities that come

6    with marriage under Mississippi law.

7          My clients Becky Bickett and Andrea Sanders, Joce

8    Pritchett and Carla Webb are all here today with their

9    families.  All they want is to be treated like everyone else.

10   What they want for themselves and their children is a right

11   that most people take for granted.  By treating straight

12   families one way and gay families another way as if they were

13   inferior or second class, the State of Mississippi

14   discriminates against gay people and their families; and the

15   consequences of that discrimination are profound.

16          For example, if, God forbid, one of my clients were to

17   get critically sick tomorrow, it is not at all clear that her

18   spouse or partner would be able to visit her in the hospital or

19   to make important medical decisions about her treatment if she

20   is unable to do so.  When it comes time for my clients to pay

21   their taxes, they have to go to the trouble and expense of

22   preparing two sets of returns.  And they cannot get, of course,

23   the tax deductions that are available to straight married

24   couples in Mississippi.

25          And perhaps most obviously and most importantly, Becky

```
 1   and Andrea's 15-month-old twin boys and Joce and Carla's

 2   children, a six-year-old girl and a two-year-old boy, do not

 3   have two legal parents who are married under the laws of the

 4   state in which they live.  That's important because of the many

 5   concrete rights and benefits that children enjoy when their

 6   parents are married.

 7          But it's also important in another sense, namely, in

 8   the sense that the dignity and self-worth of these kids is

 9   demeaned or, in the words of Justice Kennedy, humiliated daily

10   by having to grow up in a state that tells them through its

11   laws that their family is inferior.  To use a fancy legal

12   phrase from New York City, that's just plain wrong.

13          Because the parties agree that the most important

14   issue before the court is likelihood of success on the merits

15   and because the other issues will be discussed in connection

16   with the State's motion -- contingent motion for a stay, I'd

17   like to focus my arguments on the merits or likelihood of

18   success.  I want to start with Baker v. Nelson.

19          THE COURT:  Well, let's start with another principle

20   first.  You mentioned your clients, the individuals.  What

21   about the Campaign for Southern Equality?  I just want to make

22   sure, that is a party as well.  Right?

23          MS. KAPLAN:  Absolutely, your Honor.  Campaign for

24   Southern Equality -- I apologize.

25          THE COURT:  No, no.
```

1          MS. KAPLAN:  Campaign for Southern Equality is an

2     organization in Mississippi that represents gay couples

3     throughout Mississippi, all of whom want to share -- who have

4     the same interests that the individual plaintiffs do here.

5     Want to get married, want to have the rights and benefits under

6     Mississippi law.

7          THE COURT:  Now, are the children parties to this

8     action?

9          MS. KAPLAN:  They're not, your Honor.

10          THE COURT:  The children are not.

11          MS. KAPLAN:  In fact, they're back with their

12     babysitter today.

13          THE COURT:  So how does Southern Equality -- Campaign

14     for Southern Equality, how can they bring this action?

15          MS. KAPLAN:  Well, the laws on institutional

16     standing -- the case on institutional standing in certain

17     causes of actions have gone both ways, where if you look at the

18     precedents, the post-Windsor precedents, some of the courts

19     have upheld institutional standing for groups like the

20     Campaign; some have not.

21          We believe that here the Campaign, since it's a group

22     that clearly represents gay couples in Mississippi who want

23     exactly the same thing as individual plaintiffs, they are an

24     appropriate plaintiff under the institutional standing rules.

25     And, in fact, the State hasn't contested that.

1            THE COURT:  I understand.  Okay.  So *Baker v. Nelson*.

2            MS. KAPLAN:  So *Baker v. Nelson*.  So for the reasons

3    stated in our reply brief, *Baker v. Nelson*, a one-sentence

4    unsigned opinion from 42 years ago, does not apply.  The

5    Supreme Court has made it very clear -- one thing we can all

6    agree is that the Supreme Court has made it very clear that

7    summary dispositions are not binding when doctrinal

8    developments indicate otherwise, subsequent doctrinal

9    developments.  Here there's been a sea change both in the

10   doctrine and in reality.  And let me explain the latter first.

11           In 1972 when *Baker v. Nelson* was decided almost

12   everyone who was gay, with the obvious exception of the *Baker*

13   couple, but almost everyone who was gay was in the closet.  My

14   client Edie Windsor was completely in the closet in 1972.

15   Obviously, today, given the people here and my clients, the

16   world is totally different.  So not only were there legal -- a

17   sea change in legal developments, which I'll explain now, but

18   there was an incredible sea change in the world for gay people

19   in a way that has to be I think taken into account when

20   considering *Baker.*

21           Now, in terms of the doctrinal developments, they're

22   pretty clear.  When *Baker* was decided in 1972, sex was not a

23   suspect or a quasi-suspect classification.  *Baker* was actually

24   a case brought solely on grounds of sex discrimination.  They

25   didn't even have any conception at that time to bring a case

1   based on discrimination based on sexual orientation.

2        Two, the Supreme Court had not yet decided that a

3   classification of gay people undertaken for its own sake, which

4   was the issue in *Romer*, lacked a rational basis.  Three, the

5   Supreme Court had not yet decided -- and this is something we

6   will talk about later in other context -- that persons in a

7   homosexual relationship may seek autonomy for these purposes

8   just as heterosexual persons do, in other words, that laws that

9   criminalize being gay, criminalize gay relationships were

10   unconstitutional.  That's *Lawrence v. Texas*, 2003.

11        And, of course, finally, in 1972 the Supreme Court had

12   not yet decided as they did a year ago that treating gay

13   couples' marriages differently from straight couples demean the

14   couple whose moral and sexual choices the Constitution

15   protects.  That's *United States v. Windsor*.

16        Defendants attempt at page five of their brief to cite

17   *Baker* based on the reasoning of the Minnesota Supreme Court is

18   actually improper.  Another thing that is very clear about

19   summary dispositions is they cannot be cited for the reasoning

20   of the court below.  And, in addition, the equal protection

21   holding of the Minnesota Supreme Court on sexual discrimination

22   grounds has been totally superseded by the law that I just

23   cited.

24        THE COURT:  But hasn't the Supreme Court had the

25   opportunity now with all of these cases coming before it,

1   assuming that each of these cases has raised *Baker* in some

2   context -- I know the dissents have argued it and I know that

3   other people have argued it.  Doesn't the Supreme Court have an

4   obligation to step in and say that either *Baker* is a

5   precedential value or not?

6           MS. KAPLAN:  Well, two things on that, your Honor.

7   First of all, in *Windsor*, which is the court they did decide --

8   the case they did decide, *Baker v. Nelson* was raised, of

9   course, as a defense.  It was analyzed by Chief Judge Dennis

10  Jacobs in the Second Circuit in his opinion, and that opinion

11  was then affirmed by the Supreme Court.  And there's no mention

12  whatsoever in the Supreme Court's decision that they were in

13  any way troubled by *Baker*.  So if they -- presumably, if they

14  had been troubled by *Baker*, if that was an issue, they would

15  have mentioned it in *Windsor*.

16          Moreover, at the oral argument of the *Perry* case --

17  that was the Proposition 8 case that happened the day before.

18  So it's March 26, 2013 -- Justice Ginsburg, at least, in her

19  questioning of Chuck Cooper made it very, very clear that in

20  her view *Baker* has been totally superseded by subsequent

21  doctrinal developments.

22          THE COURT:  But she could have written a concurring

23  opinion saying that.  Right?

24          MS. KAPLAN:  She could have.  They also could have

25  written an opinion about heightened scrutiny and they didn't do

1    that.

2              THE COURT:  Okay.

3              MS. KAPLAN:  And although I agree with the State you

4    have to be very careful about citing denial of cert, the

5    Supreme Court's decision to deny cert, I do have to mention the

6    fact that the recent denial of cert in the cases that came up

7    from the Fourth, the Seventh and the Tenth Circuits were all

8    decisions in which *Baker* again had been raised and again had

9    been cited by the Circuits as no longer binding.  So, again,

10   perhaps -- I can't say that they made a decision; but perhaps

11   if they were incredibly troubled by that, they might have taken

12   cert in one of those cases.

13             As for the two opinions that are cited by the State --

14   actually, it's only one case.  It's two opinions, but one's the

15   magistrate judge and one's the district court affirming.  It

16   was a pro se case brought by a gay prisoner.  First he argued

17   that the Mississippi sodomy law was unconstitutional.  Then he

18   argued that there should be a right to marry -- for gay people

19   to marry in Mississippi.  He lost both of those arguments.

20             But I don't think that there can be any dispute that

21   the way that those cases were litigated as a pro se prisoner

22   and the issues that were raised are very, very different not

23   only than the circumstances here but the circumstances in

24   *Baker*, and they're really -- they're not binding on your Honor,

25   in any event, but I don't even think they're persuasive

1   authority.

2          THE COURT:  And that prisoner even asked the court to

3   appoint him a lawyer.  Right?

4          MS. KAPLAN:  Yes, and it was denied.

5          THE COURT:  It was denied.  Yeah.

6          MS. KAPLAN:  Finally, the State's argument that

7   *Windsor* and *Baker* are somehow consistent with each other really

8   makes no sense to me at least.  The Supreme Court stated over

9   and over again, as we said in our moving brief in *Windsor*, that

10  state limitations on the right to marry must still comply with

11  the United States Constitution.

12         What *Windsor* does is affirm the equal dignity of gay

13  people.  *Baker* by not even considering the issue a substantial

14  federal question in 1972 does exactly the opposite.

15         If it's okay with your Honor, I'm going to move on.  I

16  don't know if you have any other questions about *Baker*, but I'm

17  going to move on to heightened scrutiny.

18         THE COURT:  Okay.

19         MS. KAPLAN:  So what we believe, as we set forth in

20  our moving brief -- and I apologize.  Let me correct myself.

21  The cases that we just talked about were actually not in our

22  reply brief, a number of them.

23         THE COURT:  I understand.

24         MS. KAPLAN:  I apologize.  As we set forth in our

25  moving brief, however, we believe that heightened scrutiny

1    applies here for at least two independent reasons.  First and

2    arguably most importantly, we believe that laws that

3    discriminate against gay people as these laws do must be

4    scrutinized more closely by the courts.

5            The standard law on this is that the court should look

6    at four factors:  One, whether there's been a history of

7    discrimination against the group; two, whether being a member

8    of the group has anything to do with the person's ability to

9    contribute or participate in society; three, whether that

10   someone who was a member of the group either whether they can

11   change or should have to change, as Dennis Jacobs put it in the

12   Second Circuit, in order to not to be subject to

13   discrimination; and, four, whether the group has so much

14   political power that they don't need the courts.  They can get

15   anything they want done in the legislature.

16           Now, I'll note and I will talk about this later that

17   the State does not engage with us on any of these four factors.

18   I'm going to go through them very briefly now because I

19   think -- to quote my eight-year-old son, Jacob, I think the

20   answer to almost all of them is "doi."

21           For history of discrimination, again, I don't think

22   there's ever any serious dispute.  Even the House Republicans

23   in *Windsor* did not dispute that there's been a horrible history

24   of discrimination against gay people in this country.

25           Two --

```
1              THE COURT:  What about in Mississippi?

2              MS. KAPLAN:  As well as in Mississippi, your Honor.

3              THE COURT:  What evidence do we have?

4              MS. KAPLAN:  Well, we have the law that we're -- the

5    laws that are currently at issue here.  We have the fact that

6    gay people cannot adopt together.  That's one of the issues

7    that would, hopefully, be resolved by this case.  We have the

8    articles that we cite for the legislative history of the two

9    statutes where legislators are saying things that are really --

10   I don't think people would say about most other minority groups

11   today.  So there's no question that that history of

12   discrimination exists and, frankly, it continues.

13             THE COURT:  And with respect to -- since you did

14   mention what the legislators have said, how much value should

15   the court put into specific statements from specific

16   legislators who might vote -- should the court treat the

17   statute any different from the constitutional referendum -- we

18   may get to that later --

19             MS. KAPLAN:  Right.

20             THE COURT:  -- but should it treat it any

21   differently --

22             MS. KAPLAN:  Yeah.  They should -- the next question

23   there is whether you can consider statements of legislators for

24   determining whether a statute was motivated by improper animus

25   in the context of *Romer* and *Windsor*, and I believe you can.
```

1          First of all, as I understand it, there is no

2   legislative history for these statutes.  So we have to rely on

3   something.  And what we rely on are the statements of the

4   governor himself who signed it and legislators themselves who

5   voted for it.  So it's pretty -- it's as close as you can get

6   to legislative history, particularly when none exists.

7          But, most importantly, if you look at what Justice

8   Kennedy did and find the impermissible animus in DOMA, he

9   relied only on two things.  First, he relied on the wording,

10  the name of the statute itself, the so-called Defense of

11  Marriage Act.  He said the fact that it was called the Defense

12  of Marriage Act showed that there was improper animus.  And,

13  two, he relied on one sentence in the House report that said

14  that it was being passed based on moral disapproval of

15  homosexuality.  That's all he needed in *Windsor* to make that

16  conclusion.

17         So I don't think -- and he did nothing in *Windsor*

18  about trying to get into the minds of the President, who signed

19  the bill, or the members of Congress who voted for it.  So,

20  clearly, for this perspective -- and I'm not saying in any

21  other perspective, but it's clearly in terms of determining

22  animus against gay people, which has now kind of formed its own

23  jurisprudence under constitutional law, clearly, that is

24  enough.  And I think the record here is overwhelming.

25         THE COURT:  Okay.

1          MS. KAPLAN:  So I did the history of discrimination.

2   The second factor is is there anything about being gay that has

3   anything to do with one's ability to contribute to society.

4   Again quoting my son, "doi".  I don't think anyone would argue

5   that being gay has anything to do with anyone's ability to be a

6   doctor, to be a dentist, like one of my clients, to be an

7   engineer, like another of my clients, to be a lawyer -- there

8   are gay federal judges -- to be a judge.  Clearly, that

9   question -- that factor is satisfied.

10          Third, should you have to --

11          THE COURT:  What about to be a parent?

12          MS. KAPLAN:  Or to be a parent, your Honor.  We can

13   talk about that in depth, but, yes, to be -- and I -- and

14   surely to be a parent.  The evidence on being a parent shows --

15   and the -- and you can look at the district court's decision in

16   Michigan, which was overruled, but not on this issue.  It

17   was -- Judge Sutton said nothing about this issue in his

18   opinion.

19          The court went through all the evidence.  There was

20   live testimony.  And the court concluded that all the

21   overwhelming weight of I would say even the -- not overwhelming

22   weight.  All the scientific evidence that has been amassed over

23   the last 30 years suggests that gay parents function just as

24   well as straight parents in terms of raising kids.  The two

25   experts that the State of Michigan had proposed he said were

1  incredible and not worthy of serious consideration.

2          And, in fact, the -- I have to admit this.  The

3  evidence actually shows that there's some evidence that

4  suggests that lesbian moms are actually a little better than

5  straight parents in terms of scientific outcomes, but I don't

6  think your Honor needs to make any findings on that.

7          The next factor for heightened scrutiny is whether you

8  should have to change being gay.  Again, I think that's pretty

9  obvious.  I don't think people can change being gay.  Again,

10 the scientific evidence is very strong.

11         Perhaps the best evidence of that is the evidence of

12 my client Edie Windsor in the *Windsor* case who shortly after

13 graduating college in the early 1950's actually got married to

14 a guy.  That's how she gets the name Windsor.  And shortly

15 after her marriage, she told her husband that she couldn't

16 really love him the way he deserved to be loved and that he

17 deserved something else and so did she.  She essentially came

18 out to him in the early '50s.  And the other side in *Windsor*

19 tried to show that that marriage was somehow evidence that Edie

20 could change.

21         The fact of the matter is that Edie Windsor's marriage

22 shows that she couldn't change.  If she could change who she

23 was, she'd still be married to that guy in Philadelphia living

24 in Philadelphia today.  The fact is that gay people can't

25 change who they are.  And even if they could, they shouldn't

1   have to change who they are in order not to be discriminated

2   against.

3            And the final factor is political power.  Again, I

4   think the crucial issue here is to compare gay people to the

5   other groups that get heightened scrutiny, women most notably.

6   At the time the Supreme Court decided *Frontiero* -- in *Frontiero*

7   that women would get heightened scrutiny, women had far more

8   political power than gay people do today.  They still have far

9   more political power than gay people today.  They are, after

10  all, the majority of the electorate.

11           And that didn't stop the Supreme Court from deciding

12  that women should get heightened scrutiny.  So it shouldn't

13  stop any court from concluding the same with respect to gay

14  people.  And, again, Dennis Jacobs in the Second Circuit

15  reached that conclusion, as well as the Ninth Circuit.

16           THE COURT:  What about the argument that because of

17  how -- I think Judge Posner mentions that things have happened

18  over the last 10 or 11 years that sort of suggest that they at

19  least have power in the legal sense because the landscape has

20  changed dramatically, even in the last two to three years.

21           So how can you say they don't have power to change

22  when, in fact, civil rights, African Americans, you know, went

23  through the Reconstruction, went through Jim Crow, and 1965

24  Civil Rights Act -- '64 Civil Rights Act, '65 Voting Rights

25  Act, still a question of whether it's necessary still, whether

```
 1   they have risen to the power that they've had at least since

 2   Reconstruction, but this -- the gay rights movement, if you

 3   will, has moved ahead light years at a pace much greater than

 4   women, many greater than African Americans?

 5           MS. KAPLAN:  I agree with you about that, your Honor.

 6   I mean, the truth of the matter is I can't deny that, that

 7   gay -- that gay civil rights movement has moved faster probably

 8   than any other civil rights movement in U.S. history.  And that

 9   is true.

10           I would respond to what you're saying by really three

11   things.  First of all, the Supreme Court has said that of those

12   four factors, by far the most two important are history of

13   discrimination and ability to contribute to society.  And we

14   clearly meet those.

15           Two, if you think about heightened scrutiny kind of as

16   a whole, what courts are really looking at is whether

17   legislatures should be in the business of passing laws that

18   treat that group differently.  All right.  And the courts have

19   concluded, as they should, that legislatures should not be in

20   the business of treat -- of passing laws that treat African

21   Americans differently; they should not be in the law -- in the

22   business of passing laws that treat women differently, with

23   very limited exceptions.  And I think the same thing is true

24   for gay people.

25           With respect to Judge Posner, his opinion on this,
```

1   which is very interesting, he and a lot of legal theorists have

2   the view that this framework, which is old framework for

3   heightened scrutiny, should no longer be the legal framework.

4   The fact of the matter is the Supreme Court has not overruled

5   that framework.  It is still the law.

6          It may be that no other group ever enters this group,

7   but it seems to me that gay people are so close, with obvious

8   exceptions, are close enough in kind of how it feels to the way

9   women have been treated under the law, the way African

10  Americans, unfortunately, were treated under the law, that they

11  surely should fit within this rubric.  And, again, that's what

12  Dennis Jacobs, a very conservative judge -- I think DOMA was

13  the first statute he ever held was unconstitutional.  That's

14  what he concluded in the Second Circuit.

15         Now, let me talk about this *Baker v. Wade* issue.  And

16  I actually -- I'm lucky that we're here in Mississippi

17  resolving this issue because the situation in the Fifth Circuit

18  actually is very different on this than any other circuit.  And

19  the reason that is is that *Baker v. Wade* was a case challenging

20  the Texas sodomy law that criminalized the gay people --

21  intimacy between gay people.

22         It was actually the same statute that was then -- that

23  was at issue in the *Bowers* case a year later, actually, in

24  1986, and then overruled by the Supreme Court in the *Lawrence*

25  case.  So unlike the other Circuits, the Sixth Circuit most

1    recently where they say that they have precedent on the books

2    that binds them, prior precedent on this heightened scrutiny

3    point, here the only the precedent -- the precedent on the

4    books is a case upholding the very statute that the Supreme

5    Court overruled could not be clearer in *Lawrence*.  And, in

6    fact, the Supreme Court said in *Lawrence*, quite unusually, that

7    *Bowers* was wrong today when they decided *Lawrence* and wrong

8    when it was decided.

9           And every one of the subsequent -- I have --

10   unfortunately have to get back to the pro se prisoner area, but

11   every one of the subsequent cases to *Wade* cited pro se prisoner

12   cases raising issues about treatment of prisoners, which are

13   understandably important issues, but not fully raising the

14   issues in which the court is just saying that *We don't give*

15   *heightened scrutiny to gay people, Baker v. Wade*.

16          I don't see, given my understanding of the law, how

17   *Baker v. Wade* can still be good law today.  It just makes no

18   sense to me.  It's the exact same statute in *Bowers* and

19   *Lawrence*.

20          THE COURT:  But is this court required to follow Fifth

21   Circuit precedent even though it may be wrong?

22          MS. KAPLAN:  I don't think it's wrong.  I think it's

23   been overruled.  I don't think -- yes, if the Supreme Court --

24   this court is required to follow Fifth Circuit precedent even

25   if it's wrong.  And that was the situation -- that would be the

1   situation for a district court, arguably, in the Sixth Circuit.

2       But this is an unusual situation because here the

3   precedent -- I don't think anyone reasonably can consider it to

4   be good law.  It's the same case that the Supreme Court said

5   that *Lawrence* overruled when they overruled *Bowers.*  So I

6   don't -- maybe I'm missing something, but I don't think it's

7   good law.  I think you have to follow law you may disagree

8   with, but I don't think you have to follow a decision of the

9   circuit court that has been overruled.

10      THE COURT:  And the circuit has not spoken at all in

11  the -- on any other issue with respect to scrutiny that is to

12  be applied in the --

13      MS. KAPLAN:  All -- all it has done is -- subsequent

14  to *Wade*, there are three or four prisoner cases cited by the

15  State in which it says, essentially as an aside, you know,

16  *We're not giving heightened scrutiny to gay people, Baker v.*

17  *Wade*.  That's the state of the law.  They never -- there's no

18  case in which they analyze the issue post *Lawrence* or post --

19  even post *Romer* and actually analyze it and look at the issues

20  and conclude as a matter of reasoned authority since *Baker* that

21  gay people shouldn't get heightened scrutiny.

22      Now, the State is correct that the Supreme Court

23  itself has never decided that heightened scrutiny applies to

24  laws that discriminate against gay people.  But, importantly,

25  the Supreme Court has never decided that it does not either.

1    And if you look at the cases of *Romer, Lawrence* and *Windsor*,

2    the Supreme Court made it very clear that it didn't need to

3    decide that question because the court was deciding the case on

4    independent alternative grounds.  In *Romer* and *Windsor*, that

5    the laws did not even satisfy the lowest form of review of

6    rational basis, and *Lawrence* was a due process case.

7              Now, the other ground for heightened scrutiny is that

8    laws that prevent a class of people from exercising a

9    fundamental right, here the right to marry, are also subject to

10   a higher form of scrutiny.  And here, of course, I actually

11   agree with the State about this.  The issue is really how you

12   frame the question.

13             The State would argue that there's only a fundamental

14   right to marry a person of the opposite sex.  We contend that

15   the fundamental right to marry involves precisely the kinds of

16   personal autonomy discussed in *Lawrence*, which, again, was a

17   due process case, where the Supreme Court explained that when

18   sexuality finds overt expression in intimate conduct with

19   another person, that conduct can be but one element in a

20   personal bond that is most enduring.  The liberty protected by

21   the Constitution allows homosexual persons to make -- the right

22   to make that choice.  "A personal bond that is more enduring,"

23   that sounds to me like what our courts are talking about when

24   they're talking about marriage.

25             And on top of that, with all due respect, the Supreme

Court has said that prisoners serving long terms in prison and deadbeat dads have the right to marry.  What I mean by deadbeat dads is fathers who won't pay child support.  If those groups of people have the right to marry, my clients who are law-abiding citizens should have that right too.

Now, when heightened scrutiny applies, a court must determine whether the unequal treatment has an exceedingly persuasive justification.  And the court can only look at genuine rationales that were actually stated at the time.  It can't come up with post hoc rationalizations.  It can't speculate.

THE COURT:  Well, let's go back to what *Windsor* said about it, if anything.  *Windsor* made the distinction that -- it sort of disclaimed any intent to get into what other states -- what states might have been doing.  *Windsor* was about what New York had done in expanding the rights and the federal government coming in to pass DOMA and sort of restricting that right.

But the decision in *Windsor* says, *But we're not going to -- I think -- I mean, my reading of it says that We're -- We're not going to make any attempt at this point to resolve what other states might be doing with respect to either expanding the rights or restricting the rights.*  That's one question.

Obviously, states interfere with the right to marry

1     all the time.  They prescribe who you can't marry.

2     For example, in the state of Mississippi I think they say your

3     first cousin, your stepmother, step -- you could probably marry

4     your in-law, I don't know, but your stepparents, your -- what's

5     the difference if the state can come in and say you can't marry

6     a relative and you can't marry certain other individuals?  If

7     it -- doesn't the state have that right?

8              MS. KAPLAN:  Yeah.  The state clearly has the right --

9     by the way, in New York, your Honor, first cousins can get

10    married, just in case you were interested.

11             THE COURT:  That's New York.

12             MS. KAPLAN:  Exactly.  But, of course, the states have

13    the right.  They have the police power right -- and this is

14    where the federalism thing comes in -- to set limitations on

15    marriage.  And those limitations can be based on age, based on

16    consanguinity, et cetera.  The limitation that exists is that

17    whatever limitations the states set have to comply with the

18    Constitution.  That's a pretty easy test to follow.

19    Limitations based on marrying your first cousin or marrying an

20    uncle or age of consent, obviously, are all going to pass the

21    Constitution.

22             THE COURT:  And what about multiple -- I think in Utah

23    people at one time at least --

24             MS. KAPLAN:  Yes.

25             THE COURT:  -- polygamy.

1              MS. KAPLAN:  Two answers to that.  So, first of all,

2     polygamy, I'm not aware -- you know, in this situation we're

3     talking about discrimination based on sexual orientation.   In

4     polygamy you're talking maybe about discrimination based on

5     people who want to -- on marriage -- the number of people who

6     are getting marriage.  People in polygamist relations clearly

7     can marry one person; they just can't marry 20 people.  And so,

8     clearly, I think that would satisfy -- it certainly would

9     satisfy equal protection standards.

10             Under due process standards, which is a higher

11    level -- first of all, let me again say two things.  First of

12    all, since I've been litigating these issues now for a very

13    long time, people have made this argument to suggest that

14    there's going to be this huge groundswell of litigation about

15    polygamy if we win.  And it's never happened and it, frankly,

16    never will happen.

17             But even if it were to happen, your Honor, it's my

18    understanding -- and I'm no expert on this -- that there has

19    been sufficient evidence adduced that women and children in

20    polygamist marriages -- and, typically, polygamist marriages

21    are multiple wives, of course -- suffer.  And for that reason I

22    think a legislature could easily conclude and could satisfy the

23    heightened scrutiny standards that those laws were

24    constitutional.

25             No one's making any argument here that the women --

1   the lesbians or the gay men in gay relationships suffer.

2   Indeed, they concede to the contrary and the same for their

3   children.

4          The other night -- I was actually thinking about this.

5   And last night I actually went back and I reread *Loving*.  And

6   there's a couple of sentences which if you don't mind, your

7   Honor, I'd like to read to you.  They really stuck out to me

8   because they really go directly to this question.

9          *Loving*, of course, was litigated in 1967.  And here is

10  what the Supreme Court said:  "While the state court is no

11  doubt correct in asserting that marriage is a social relation

12  subject to the State's police power" -- exactly what we were

13  just talking about -- "the State does not contend in its

14  argument before this court that its powers to regulate marriage

15  are unlimited notwithstanding the commands of the Fourteenth

16  Amendment.  Nor could it do so, in light of *Meyer v. State*" --

17  "*Meyer v. Nebraska* and *Skinner v. Oklahoma.*"

18          So what's incredibly amazing actually about this

19  passage is that in 1967 the states were -- how should I put

20  it? -- more limited in the arguments they were making about

21  federalism than they are today; but the Supreme Court made it

22  clear that even if they had made the argument that the State of

23  Mississippi is making today, that it has unlimited or exclusive

24  authority to regulate marriage, they couldn't make that

25  argument.  That's what the Supreme Court said in *Loving* in

1   1967.

2          THE COURT:  But with respect to *Loving* and the

3   Fourteenth Amendment and the *Meyer* case, *Skinner* case, the

4   undercurrent in each of those cases, though, is -- the fact of

5   the matter is is that certainly in 18 -- whenever the

6   Fourteenth Amendment was passed, the conception -- and I think

7   that the *Meyer v. Nebraska* case is one from 1880-something --

8   the conception of same-sex marriage wasn't thought about,

9   conceptualized in anything about liberty or anything else.  I

10  mean, do you disagree with that statement?

11         MS. KAPLAN:  No question, your Honor.  No question

12  that the drafters of the Fourteenth Amendment had no concept

13  that probably either -- either that gay people existed or that

14  gay people could get married.  I don't dispute that at all.

15  And I want to be very careful about this because I think the

16  distinctions are important.

17         I'm not arguing -- we are not arguing in any way that

18  the discrimination suffered by gay people is in any way

19  equivalent to the discrimination suffered by African Americans.

20  There has been violence against gay people, clearly, but it

21  doesn't arise even close to the levels of the violence that

22  existed in the South, sadly, many years ago against gay (sic)

23  people.

24         THE COURT:  But the State's argument is, in fact, that

25  in all these cases that talk about marriage and how it is a

1    right that is just broader than any other right and, you know,

2    the honor, the privilege of getting married and --

3              MS. KAPLAN:  Right.

4              THE COURT:  -- raising children and all of that --

5              MS. KAPLAN:  Right.

6              THE COURT:  -- that in the -- only until *Romer*

7    possibly did you even think in the concept of same-sex

8    marriage.

9              MS. KAPLAN:  Yes.  But let me go to that, because it's

10   the same point.  Again, I don't think the distinctions are the

11   same.  Thurgood Marshall when he litigated these cases as a

12   young man was literally worried every day he was going to get

13   killed.  I'm not aware of any attorney litigating any civil

14   rights case who has faced anything like that.

15             However, this is where the analogy I think is

16   appropriate, because one thing that we know is clear is that

17   the drafters of the Fourteenth Amendment totally had no concept

18   that there would be desegregation in public facilities, in

19   schools, that white people in *Loving* would be able to marry

20   black people.

21             And so the Supreme Court has made it very clear since,

22   particularly on the Fourteenth Amendment -- I think the

23   argument for originalist interpretation of the Fourteenth

24   Amendment is weaker than for an originalist interpretation of

25   the Second Amendment because the whole point of the Fourteenth

1    Amendment was to make it clear that when the people -- when

2    this country started the Constitution, its conception of race

3    in American and of equality in American was wrong.  And even

4    that conception has changed in time since the drafting of the

5    Fourteenth Amendment.

6            So, again, I understand -- I don't concede -- I

7    concede freely that the drafters of the Fourteenth Amendment

8    had no conception of gay marriage.  I'll concede that in 1967

9    when they passed *Loving* -- I was a year old -- they had no

10   conception of gay marriage.  But that doesn't change the law.

11   It doesn't change the commandments of equal protection and due

12   process.  And it's consistent with the court's precedent on

13   equal protection and due process under the Fourteenth

14   Amendment.

15           So the standard -- if it's either a fundamental right

16   or if there's heightened scrutiny for sexual orientation or --

17   I'm not going to argue this today -- heightened scrutiny for

18   gender discrimination, the standard that the court looks at is

19   whether the unequal treatment has an exceedingly persuasive

20   justification.

21           As I said before, the State doesn't even attempt to

22   meet that standard.  None of the -- very few of the parties in

23   any of these cases have attempted to meet that standard.  They

24   didn't attempted to do it in *Windsor* either.  And that's

25   clearly because they cannot.  Again, as I'm about to go on, I

1    don't even think they can meet rational basis.  So let me turn

2    now to rational basis.

3          While the State cites the *Beach Communications* case

4    for its articulation of an extremely deferential standard of

5    review, in the context -- and this is what I was referring to

6    earlier -- in the context of laws that discriminate against gay

7    people, several things are clear.  First, if a law is

8    motivated, either in whole or in part, by either moral

9    disapproval or by a fear or dislike of people who appear to be

10   different, then at a minimum the law requires more careful

11   consideration.  We cited in our moving brief Justice Kagan in

12   argument in *Windsor* when she said it "sends up a pretty good

13   red flag."  I think it's the same point.

14          As I said before, the court doesn't have to get in --

15   in this particular context, it's clear from the Supreme Court

16   precedents that the -- a judge does not have to get into the

17   hearts or minds of the legislators.  It can look simply at

18   statements that were made.  And I referred to earlier on DOMA

19   it was enough that it was called the Defense of Marriage Act

20   and the single statement from the House report.

21          Here, as we talked about, while there is no

22   legislative history for this law or any laws as I understand at

23   that point in time, that can't mean that the court can't

24   consider whether or not there was impermissible animus in this

25   context.  And here there's more than sufficient evidence

1  because the evidence that we cited were actually statements

2  made by the legislators.

3          So we cited in our brief a statement from the governor

4  at the time saying, "Same-sex relationships are perverse," that

5  "For too long in this freedom-loving land cultural subversives

6  have engaged in trench warfare on traditional family values."

7  The senate judiciary chairman at the time was talking about the

8  law and saying there's more symbolism than substance to it.  If

9  a law has more symbolism than substance, then clearly -- it

10 clearly was a law being cast based on this kind of animus.

11         THE COURT:  Is it important to look at the chronology

12 of when all these -- when the legislation came and when the

13 constitutional amendment process was begun?  I presume it was

14 after the Hawaii and Massachusetts case and may have been after

15 Congress passed DOMA.

16         MS. KAPLAN:  Yes.

17         THE COURT:  So if it was after Congress passed DOMA,

18 could we look at the DOMA debate and what might have been going

19 on when enacting that to sort of transpose to what might have

20 been going on here in Mississippi and other states passing the

21 mini DOMAs?

22         MS. KAPLAN:  Absolutely, your Honor.  In fact, the two

23 laws here are precisely -- you can figure it out very easily.

24 So 1997 the statute was passed, clearly at the same time as

25 DOMA -- DOMA was 1996 -- and was based, of course, on kind of

1   this fear out of the Hawaii Supreme Court decision that was

2   since vacated that gay people are going to go to Hawaii and

3   then go through all the rest of the country and kind of invade

4   other states.  You kind of hear that in the statements.

5         And the constitutional amendment was from 2003, as I

6   recall -- do I have the year right?  I believe that year is

7   right -- which, again, is right after the first case that came

8   down in Massachusetts, the *Goodridge* case, allowing gay people

9   to marry.  So there's no question what was motivating both of

10   these statutory provisions at issue.  And I think it's totally

11   appropriate for the court to look at that.

12         THE COURT:  Now, with respect to DOMA itself,

13   though --

14         MS. KAPLAN:  Sure.

15         THE COURT:  -- the landscape changed by the time DOMA

16   got to the Second Circuit or the Supreme Court.  By that time,

17   the president who signed it disavowed it.

18         MS. KAPLAN:  Sure.

19         THE COURT:  The president who was authorized to

20   enforce it said he wasn't going to enforce it.  The

21   representative who sponsored the legislation disavowed it.  And

22   everybody -- well, not everybody, but a lot of people in

23   Congress who pass -- who voted on the law said now times have

24   changed and it's wrong.

25         MS. KAPLAN:  Yes.

1          THE COURT:  Do we have that situation here in

2   Mississippi where people are in leadership positions disavowing

3   either their statements, their votes or the law or the

4   constitutional provision?

5          MS. KAPLAN:  Let me say two things.  So, first of all,

6   in DOMA, you're absolutely right.  In fact, President Clinton

7   wrote an op-ed -- I think it was two or three weeks --

8   President Clinton signed DOMA about two or three weeks before

9   the argument in which he said, essentially, that the law was

10  passed based on exactly this kind of impermissible animus.

11          Let me clear -- be clear about this for a second.

12  Impermissible animus in this context does not mean that

13  someone's a homophobe.  You don't have to be a homophobe or a

14  bigot to have the kind of animus that the court has found.

15  Again, in DOMA, just saying that the law was called Defense of

16  Marriage and it passed by moral disapproval was enough.

17          And what President Clinton said in his op-ed is that

18  when he signed DOMA, he did it based on a misunderstanding of

19  who gay people were and what their relationships were.  And

20  that's why he has now come to realize that the decision was

21  wrong.

22          Now, of course, I think what your Honor is suggesting,

23  there were arguments made at the time of *Windsor* -- and if you

24  look at the oral argument, you hear this in the questioning by

25  the chief justice -- that the fact that times have changed --

 1   and there clearly has been a sea change with respect to gay

 2   people -- should be enough, that the court shouldn't have to

 3   intervene because everything will just get done in the

 4   legislative process.

 5           Well, I'm no expert on the legislative process in

 6   Mississippi, but I can tell you that at least with respect to

 7   Congress, in which I assume there's probably greater support

 8   for a repeal of DOMA bill than there would be repealing any of

 9   these laws in Mississippi, that was not enough to stop the

10   Supreme Court from deciding that DOMA was unconstitutional.

11           So that's the best I can offer.  I doubt that the

12   prospects are -- in Mississippi are very high.  But even if

13   they were as good as they were in Congress with DOMA, that

14   would not be enough.

15           The other thing -- the other way that courts look at

16   this, the second factor that courts look at, again, with laws

17   discriminating against gay people -- this hasn't been applied

18   yet in any other area -- is that the laws require more careful

19   consideration if the effect of the law is to impose a broad and

20   undifferentiated disability on a single group.  That language

21   comes from *Romer*.  Again, given the enormous impact, the broad

22   impact from taxes to benefits to, frankly, responsibilities

23   like antinepotism and anti-conflict statutes, it's clear that

24   the marriage laws do exactly that.

25           And one more point about rational basis.  While the

1   State argues that we somehow wrongfully suggest that many

2   courts have found that state laws fail to establish a rational

3   basis, they don't disagree with any of the citations we raise.

4   And in their case three of the five cases they cite predate

5   *Windsor*, some by as much as ten years.  That's footnote 8 on

6   page 24.

7           Now, the State only offers really two rationales, and

8   I'm going to get back to them -- I'm going to get to them right

9   now.  The first rationale they offer -- well, let me back up.

10  So when you're doing rational basis review, whether it's the

11  more careful consideration kind that I just talked about or

12  plain vanilla rational basis review, there are at least two

13  things that have to be satisfied.  One, the objective has to be

14  a legitimate governmental objective; and, two, there has to be

15  a rational relationship between that legitimate governmental

16  objective on the one hand and the classification that's made in

17  the statute.

18          The first of the two rationales that the State offers,

19  which is an argument somehow that it's okay to discriminate

20  against gay people because we want to wait and see how things

21  pan out or because we want to exercise caution about the

22  supposed negative impacts of gay marriage, that's not a

23  legitimate objective in the first place.

24          At best wait and see is a policy objective -- is not a

25  policy objective -- excuse me -- it's a political philosophy.

1    There are no cases which I am aware of other than the recent

2    Sixth Circuit decision by Judge Sutton that have upheld in any

3    context it is okay under rational basis to treat a group of

4    people differently simply by virtue of the fact that that's

5    always the way they've been treated.

6           Actually, it's not an independent objective at all.

7    What this argument is is because things have already been done

8    this way, they should continue to be always be done this way.

9    That's not a policy objective.  That's --

10          THE COURT:  What's your response to *Brown v. Board of*

11   *Education* and the Supreme Court putting a proviso in that in

12   *Brown I* or *II* all deliberate speed and that sort of reined in

13   states from doing anything from 1954 until decades later

14   because the Supreme Court decided that they would implement

15   *Brown* with all deliberate speed?

16          MS. KAPLAN:  Yeah.  That was clearly done by the

17   Supreme Court at a time out of a fear, whether legitimate or

18   not, probably legitimate, that there would be so much social

19   unrest.  I don't know if they were right or not, that if it

20   didn't -- they didn't do it with, quote, unquote, all

21   deliberate speed that there would be a problem.

22          In this context there's no issue.  Gay people have

23   been married in Massachusetts now for ten years.  Now, I

24   agree -- I concede that the Commonwealth of Massachusetts is

25   different than the State of Mississippi.  But there's been no

1    rioting on the streets of Massachusetts.  There's been no

2    social unrest in the state of Massachusetts.  Indeed, as we

3    cited in our reply brief, rates of divorce in Massachusetts

4    have gone down over the last ten years.

5           And, again, look at the other states.  We don't have

6    to use Massachusetts as an example.  Look at states recently

7    that have allowed gay marriage to happen:  Utah, Oklahoma,

8    Virginia, North Carolina.  I haven't seen any news reports of

9    social unrest in any of those states.  So while I understand

10   what the Supreme Court's concerns were in *Brown*, I just don't

11   think they apply here.  And I think we've seen that over the

12   last several years.

13          THE COURT:  Thank you.

14          MS. KAPLAN:  Moreover, I think the fundamental

15   problem, as we put it in our brief, is that there's no limiting

16   principle on this supposed objective.  When is wait and -- have

17   we waited enough?  What's the answer?

18          I think that people who make this argument

19   fundamentally are saying that there never -- there will never

20   come a time in which we've waited long enough.  And I think

21   what that suggests is that this objective really is not about

22   waiting or caution; it's about a fear of people who appear to

23   be different, precisely the kind of thing that the court was

24   worried about in *Romer* and in *Windsor*.

25          There's really only one other rationale that the State

proffers here and that is that the discrimination against gay

people and marriage is justified because it, quote -- and I'm

reading from their brief -- promotes opposite sex marriage to

encourage biological parents to establish and maintain stable

family relationships.

Here the problem is not the objective.  I totally

agree with the State that that's a legitimate, indeed, as a

parent, a very good governmental objective.  We should want to

encourage stable family relationships.  The problem here is

that there is no connection between that objective and

discriminating against gay people.

First of all, most -- the vast majority of the

benefits and protections that come with marriage have nothing

whatsoever to do with children.  Paying your taxes, conflict of

interest rules, ability to visit a spouse in the hospital, have

nothing to do with whether the couple has children.

And there is no reason to believe that any straight

couple, any young woman who accidentally gets pregnant -- and

it happens.  I don't deny that -- will decide to get married

because gay people can't.  That's a degree of logic or supposed

logic that just goes beyond what I think anyone can rationally

consider.

Judge Posner made this point quite wittily when he was

discussing Indiana's marriage ban.  He said, "Indiana's

government thinks that straight couples tend to be sexually

1   irresponsible...and so must be pressured to marry, but that gay

2   couples are model parents...so [they] have no need for

3   marriage.  Heterosexuals get drunk and pregnant, producing

4   unwanted children; their reward is to be allowed to marry.

5   Homosexual couples do not produce unwanted children; their

6   reward is to be denied the right to marry.  Go figure."

7           THE COURT:  Is there any credence to the notion that

8   the State -- part of its rationality would be to encourage

9   heterosexual activity, heterosexual marriages?  Is that a basis

10  on which it could claim that it's rational?

11          MS. KAPLAN:  Yeah, again, it's the same problem as the

12  accidental procreation argument.  Again, I think the State can

13  and should want to encourage straight couples who are in

14  relationships to get married even if they don't have children.

15  But it's, again, impossible really to presume that any straight

16  couple is going to make a decision about whether to get

17  married, throw a party, buy a wedding dress, all this stuff

18  that you do, based on the fact that gay people can't.

19          I mean, here the issue is not -- straight people

20  should have marriage.  We totally agree with that.  We like

21  marriage.  The issue here is whether gay people should have it

22  too.

23          And to be clear, no one is arguing that gay people

24  should have the right to marry under any religious institution

25  whatsoever.  We are in federal court.  This is a country that

1    has separation of church and state.  We are only arguing for

2    the rights and privileges of marriage under state law.

3    Churches can and should continue to follow whatever their

4    religious beliefs are in terms who they want to marry or not.

5          The law, of course, does actually have an impact here.

6    We've -- I've already established I think it has no impact on

7    straight people.  But it does have an impact on people and

8    those are gay people.  It adversely impacts the thousands of

9    gay couples who have kids who live in Mississippi.  And here,

10   interestingly enough, Mississippi presents perhaps the most --

11   the strongest case for this because Mississippi has the highest

12   percentage of gay couples raising children in the nation.

13         Although -- and I mentioned this before -- as Justice

14   Kennedy explained in *Windsor*, laws that discriminate against

15   gay couples humiliate the children being raised by same-sex

16   couples.  I really can't overexaggerate that point.  Up until

17   *Windsor*, all the litigation that happened on this was whether

18   or not gay people, as your Honor discussed earlier, made bad

19   parents.  And those issues were certainly briefed before the

20   Supreme Court in *Windsor*.  Most of the amicus briefs, frankly,

21   were devoted to that issue with -- on the other side with gay

22   people are bad parents.

23         The Supreme Court not only did not mention that, in

24   fact, even the dissenters did not mention that; but instead of

25   mentioning that, they change it from an issue about whether gay

1    people are bad parents to it being an issue about the harm to

2    children who have gay parents and don't get these benefits.

3    It's a complete shift in paradigm.

4           Finally, if the Supreme Court -- I mean, excuse me --

5    if the State of Mississippi had truly wanted to preserve

6    marriage for straight biological parents, then there are a lot

7    of other things they could do that would make a hell of a lot

8    more sense instead of excluding gay people and having this

9    discrimination.

10           It could prevent the elderly from getting married.

11    They can't have biological kids.  It could prevent the

12    infertile from getting married.  As the Ninth Circuit said in

13    *Latta*, it could criminalize certain kinds of assisted

14    reproductive technologies or adoptions.  It hasn't done any of

15    those things.  And, of course, it's not going to do any of

16    those things.

17           And what that suggests, again, is that this

18    justification is not really a justification about helping

19    families or helping stable families.  It's a justification that

20    really has to do with excluding gay people, which, again, is

21    exactly what the Supreme Court in *Windsor* and *Romer* has said a

22    state cannot do.

23           So I think I've covered all the arguments.  If there's

24    any questions your Honor has, I'm happy to answer them.  I

25    apologize again to the court reporter for speaking too quickly.

```
1   I need to slow down my brain wiring and I will try.

2         THE COURT:  Well, let me ask you an issue that was not

3   raised.  I think one of these couples is married and was

4   married in a state that allowed same-sex marriage.

5         MS. KAPLAN:  Right.

6         THE COURT:  And Mississippi does not recognize that.

7   I don't know if the briefs really address the full faith and

8   credit sort of issue, but what about the state not -- having

9   the option of choosing what marriages it will recognize?  Does

10  it -- for example, a person from New York who's married to a

11  first cousin, when they come to Mississippi, are they still

12  married in Mississippi?

13        MS. KAPLAN:  Right.  So the law on this in most

14  states -- and I assume in Mississippi it's the same -- is that

15  Mississippi will recognize out-of-state marriages that could

16  not be performed in Mississippi as long as those marriages are

17  not -- as long as there's not a statute that says those

18  marriages are void under Mississippi law or the -- there's a

19  Mississippi statute or it's clear that the marriage is so

20  contrary to Mississippi public policy stating its laws that

21  Mississippi wouldn't recognize it.

22        So that -- and, in fact, it's interesting.  So if a

23  first-cousin marriage -- couple moves from New York to

24  Maryland, Maryland would hold that marriage to be void, believe

25  it or not.  I don't think that they've ever enforced it, but,
```

1 technically, the marriage would be void.

2        Here given the existence of these statutes, the

3 question about whether the marriage -- I think the Maine

4 marriage should be recognized in Mississippi really collapses

5 into the question of whether those statutes are constitutional.

6 So for that reason we cannot independently brief it.  I think

7 the issues become the same.

8        THE COURT:  We do have a couple that's here that's

9 married that are plaintiffs in this case.  I guess if the court

10 strikes down --

11        MS. KAPLAN:  Exactly --

12        THE COURT:  -- the court strikes down the statute and

13 the Constitution says that that's unconstitutional, then by the

14 mere fact of the court striking that down, that their marriage

15 becomes legitimate.

16        MS. KAPLAN:  Exactly.  There have been, your Honor --

17 and I'll try to get directly to what you're asking.  There have

18 been people who have raised this issue under full faith and

19 credit.  Some authority would suggest full faith and credit is

20 really about judgments rather than marriage licenses.  There

21 are other people who disagree with that.

22        Again, I think if it was litigated, this recognition

23 issue, in Mississippi state court, it could come down to

24 whether Mississippi statutes are constitutional or not.  And

25 that's exactly the issue that we're litigating here, if that's

```
 1   helpful.
 2          THE COURT:  With respect to if the court were to
 3   recognize same-sex marriage as a fundamental right under the
 4   rubric of marriage -- I'm not sure if the State raised what
 5   some might raise, a parade of horribles, that is, extending --
 6   or blessing that right, if you will, or expanding it to other
 7   things, for example, would they have a fundamental right --
 8   for example, I think in the Ninth Circuit that there was this
 9   issue about jury service and how Batson would apply in that
10   context.  What about jury service?  What about employment
11   discrimination?  What about housing discrimination?  If the
12   court were to sanction this and says that it is a fundamental
13   right --
14          MS. KAPLAN:  Right.
15          THE COURT:  -- I know Mississippi has this Religious
16   Restoration Act or something like that that they just passed
17   recently where business owners can choose not to serve or -- I
18   guess, persons who are homosexuals.  If the court finds that --
19   that they have a fundamental right --
20          MS. KAPLAN:  Right.  Or I think what your Honor is
21   also getting at is if the court finds there's heightened
22   scrutiny.
23          THE COURT:  Heightened scrutiny.
24          MS. KAPLAN:  Yeah, if you'll let me finish it.  Look,
25   this --
```

1        THE COURT:  You said it much better.

2        MS. KAPLAN:  Those issues -- those issues aren't

3   before this court, obviously, and we're not challenging -- I

4   think it's called the Religious Freedom Restoration Act here.

5        Clearly, if this court concludes, as I think it

6   should, that gay people should get heightened scrutiny, there

7   will be serious challenges to any laws that on their face in

8   Mississippi treat gay people differently.  I think those laws

9   won't be constitutional.  I don't think they are constitutional

10  today.

11        The Religious Freedom Restoration Act, as I

12  understand, is state -- as it's stated is a neutral law.

13  Doesn't apply just to gay people, even though there's some

14  evidence to suggest that that was what was behind it.  So that

15  would have to be litigated in each context.

16        Clearly, I don't think the State of Mississippi

17  itself, the government, if we win under heightened scrutiny can

18  fire someone solely because they're gay.  I, frankly, don't

19  think the State of Mississippi even today has any intention of

20  doing that.  But that is -- basically, in giving a group

21  heightened scrutiny, you're saying that the legislature should

22  rarely, rarely, if ever, be in the business of treating them

23  differently.

24        And if you look at women, which is probably the most

25  appropriate context, for the most part you can't treat women

```
 1   differently.  In certain context you can.  There's the Justice
 2   Kennedy opinion about pregnancies and whether you can treat
 3   women differently when they're pregnant, in pregnancy, and he
 4   said you could, with dissents by Justice Ginsburg and others.
 5   So it really depends on the circumstances.
 6            But I certainly agree that the conclusion your Honor
 7   makes, which I think, frankly, is the commonsense conclusion
 8   today, believe it or not, of most Mississippians, certainly
 9   most young Mississippians, is that the legislature should not
10   be in the business of passing laws that treat gay people one
11   way and straight people another.
12            THE COURT:  Well, what about -- and that takes me to
13   the question about the constitutional amendment.  Should the
14   court look at that process any different from the statutory
15   process?
16            MS. KAPLAN:  I think I forgot to mention this.  I'm
17   glad your Honor raised it.  I think the fact that this was a
18   constitutional amendment really belies the State's argument
19   that they were exercising caution.  Essentially enshrining
20   discrimination by constitutional amendments, so taking it away
21   from the legislature completely and setting it in stone unless
22   there's another statewide popular referendum, makes it clear
23   that's not caution.  Caution would be allowing the normal
24   democratic process to continue, allowing legislatures to make
25   decisions.  That's setting discrimination in stone.  So I think
```

the fact there's a constitutional amendment is relevant to
that.

I also think, as your Honor pointed out, that it's
relevant to the likelihood that the State of Mississippi today
is somehow going to change things on its own, that even though
attitudes about gay people clearly have changed, that there's
so much political power that gay people have that they can
change a constitutional amendment.

I'm not aware -- I'm scanning in my head.  I'm not
aware of any suit in this country that has overturned by
election or by popular referendum a state constitutional
amendment discriminating against gay people.  There was
legislative success in New York and in others states, but there
was not constitutional amendments on the books.  I'm going to
double check that, but that's my understanding.

THE COURT:  Okay.  Now, and you want the court to say
that there's heightened scrutiny.  So I assume, then, there is
no rational reason under rational basis that the State can
argue today, tomorrow or yesterday about this -- there's
nothing that would pass rational basis scrutiny?

MS. KAPLAN:  Yeah.  If you think about the decision
tree your Honor has in front of you, you could do heightened
scrutiny.  We think your Honor should.  But I think it's in
certain ways the kind of -- it goes to the heart of what's
really going on here.  But the court doesn't have to do that.

```
 1              And like the Supreme Court and many other courts, you

 2     could say that I don't need to reach the heightened scrutiny

 3     question, putting aside Baker v. Wade, because it's clear that

 4     these laws don't even meet rational basis.

 5              And, again, we only have two rationales.  The first is

 6     caution, and that's not a real rationale, to begin with.  It's

 7     not a legitimate government objective.  And the second is this

 8     stuff about parents and children.  And there, while helping

 9     parents and children is definitely a legitimate governmental

10     objective, it's not in any way connected to excluding gay

11     people from marriage, even rationally.  So I think your Honor

12     could do it under heightened scrutiny or fundamental rights.

13     It could also easily decide, as many, many courts have, under

14     rational basis.

15              THE COURT:  Thank you, Ms. Kaplan.

16              MS. KAPLAN:  Thank you, your Honor.

17              THE COURT:  At this time the court is going to take a

18     15-minute break.

19        (RECESS)

20              THE COURT:  You may be seated.  I apologize for the

21     delay.

22              MR. MATHENY:  May it please the court, your Honor.

23              THE COURT:  You may proceed.

24              MR. MATHENY:  Your Honor, I have to say at the outset

25     that one thing that's important about this is the lens that
```

1   we're looking at this case through in terms of preliminary

2   injunctive relief.  That's the question, the legal standard

3   that's before the court.

4          And I got to thinking about it and it was -- it had

5   dawned on me that in my -- in my prior private practice, the

6   only few times that I had ever dealt with preliminary

7   injunctive relief was when I was actually litigating against my

8   current client with Jim Craig on some issues.  Since I've gone

9   to the AG's Office, preliminary injunctive relief comes up much

10  more often, and the standards are important.  So I'll be

11  talking about that throughout my argument here this morning.

12         Another thing about this particular kind of case --

13  and I would add that it's unlike -- certainly unlike any that

14  I've ever had ever and certainly unlike any at the Attorney

15  General's Office, but one thing that jumps out at -- about this

16  case and this kind of litigation that's been going on around

17  the country is that there's an important theme in how courts

18  approach the questions and the orderly process that occurs.

19  It's both within the case and I think it touches other issues

20  in it.

21         Counsel had mentioned you have to look at this with

22  kind of like a decision tree.  I think that -- that's right and

23  we're on the same page there.  There's an orderly process here

24  that's involved.  So my argument's going to address the

25  arguments that counsel made in the order that it was taken up.

1   And I think the most important place to start with that is the

2   *Baker v. Nelson* case.

3          There's no doubt that *Baker v. Nelson* decided the

4   issues that we're talking about.  I think what the real

5   question about *Baker v. Nelson* is is what does it mean now.

6   Whether you're talking in terms of what is its precedential

7   value or what weight do you put on it, that's the real question

8   is what does it mean today.

9          And that's something that was kind of hard for me to

10  grapple with at first because it followed a practice that at

11  least since I've been practicing law the Supreme Court hasn't

12  done which is, as we know, before the law changed in 1988,

13  whenever there was a case that was decided by a state -- the

14  highest court of the state that raised federal issues, there

15  was an automatic right of appeal to the Supreme Court.

16         So they had -- they had to take those cases and either

17  address them on the merits by taking them up the way we think

18  of cases going up today or summarily affirming or dismissing

19  for want of a substantial federal question.  So we don't see

20  many of those kinds of rulings anymore because the law has

21  changed.

22         But there's no question that when the court -- back

23  before the law changed when they decided a case in that manner,

24  that it was a decision on the merits and it's a precedential

25  value of the court -- a decision with precedential value of the

1   court.  Sorry.  And that precedent -- that highlights this

2   orderly process I'm talking about.

3           I think it undergirds the principle that when there is

4   a change in a controlling precedent, that that precedent should

5   come from the court that set the precedent.  It was even

6   mentioned in the argument before the break, you know, that

7   lower courts are required to follow Supreme Court precedent

8   even if it's wrong.  And that's what gets us into this

9   doctrinal developments argument that has been spoken about and

10  written about in the briefs and appears in all the cases that

11  have addressed *Baker* all over the country.

12          About the doctrinal developments, I mean, one thing we

13  know is I think that there's pretty solid evidence that when

14  the Supreme Court decided *Romer* and when the Supreme Court

15  decided *Lawrence* that that did not explicitly, certainly not,

16  or even implicitly overrule the *Baker v. Nelson* precedent.

17  Lots of courts looked at that issue.  The Eighth Circuit had

18  said that it -- that it didn't -- and even some as we cite in

19  the brief and we know recently the Sixth Circuit and the

20  district judge in Puerto Rico even before and after *Windsor*

21  have said that the doctrinal developments didn't displace *Baker*

22  *v. Nelson*.

23          We also in the earlier argument and as we attached to

24  our brief -- it was actually kind of news to me because it was

25  an unreported opinion, but as soon as it was decided that I was

1    the one that was going to have to come over here and argue the

2    case, somebody had mentioned to me that Judge Sumner and

3    Judge Lee had looked at the issue.

4         And, yeah, it's true that it was a pro se prisoner

5    case, but a couple of points about that.  One, Judge Lee said

6    in his order that adopted Judge Sumner's report and

7    recommendation.  He said that the court is concerned about this

8    and has done its own research into the issue and that the law

9    is clear on that, on this point.

10        The other thing about it is --

11        THE COURT:  That decision was from 2006?

12        MR. MATHENY:  That's correct, your Honor.

13        THE COURT:  And so from 2006, though, to 2014 what

14   all -- even if we looked at that window, what all has happened

15   with respect to how many times *Baker* has been cited to or

16   asserted in these briefs before the Supreme Court?  What I'm

17   concerned about is that the issues -- and I understand we're in

18   a different position when we talked about the cases that the

19   Supreme Court denied cert on back in October, but the *Baker v.*

20   *Nelson* thing was placed at the Supreme Court's steps time and

21   time and time again with *Windsor* and even after, and they've

22   refused to mention it.

23        MR. MATHENY:  Well -- and, your Honor, that's correct.

24   They have not mentioned it by name.  And it gets me to where my

25   next point was.  My point with the other was simply that prior

1    to 2006, after *Romer* and *Lawrence* had been decided, it was not

2    accepted that those were doctrinal developments that changed

3    the precedential issue.

4           THE COURT:  I mean, the Second Circuit in *Windsor* said

5    "Even if *Baker* might have resonance in 1971, it does not

6    today."  How clearly is that to a message to the Supreme Court

7    that *What you said in Baker does not apply to us, we believe,*

8    *on the Second Circuit with respect to Windsor*?  And that seems

9    to me that's a repudiation -- flat repudiation of what *Baker v.*

10   *Nelson* says.  And the Supreme Court, again, it has -- has the

11   authority at least to tell the Second Circuit, *No, it does have*

12   *some resonance,* but they didn't.

13          MR. MATHENY:  That's correct, your Honor.  I think I

14   would say that it's also equally true that another way to look

15   at that would be that when the Supreme Court took up the Second

16   Circuit's decision and didn't address that issue and didn't

17   feel the need to address that issue because from *Windsor* itself

18   it -- I think it's pretty clear that they're basing their

19   decision on the basis of other issues.  So they didn't feel the

20   need to address *Baker*.

21          I mean, it's hard to guess why the Supreme Court did

22   or didn't do something in any instance and particularly here

23   where, like counsel said, it's an issue that the BLAG or how --

24   Bi -- I don't know what it stands for -- B-L-A-G that was

25   defending the law after the President had decided not to, they

1   raised that issue in their briefs.  It seems to me that if the

2   court thought that that had anything to do with the case, then

3   they would have raised the issue in the opinion.

4          THE COURT:  Should this court look at the denial of

5   certs at all?  I mean, because you could look at all the

6   briefing that was done in the courts below as well as the

7   arguments of those courts as well as the petitions for cert and

8   whatnot that were filed at the Supreme Court.  Could the court

9   look at that and -- you know, because if *Baker v. Nelson*

10  controlled, when all of those cases came up to the Supreme

11  Court, couldn't the court have just simply slammed the door on

12  them and said, *See Baker v. Nelson.  All of y'all are wrong.*

13  *Case closed.  It's over.  We said it in 1971 or '72 that it's*

14  *over and done with, period*?  Couldn't they have done that?

15         MR. MATHENY:  They could, your Honor.  And I think

16  that that too is a good point.  It also folds back into the

17  point that I was making earlier.  Cert denials -- unlike

18  dismissals for want of a substantial federal question as it was

19  back before 1988, cert denials are not an endorsement of what

20  the courts have done below.  In fact, the court has said, *When*

21  *we deny cert, that means we deny cert and you're not supposed*

22  *to guess why.*

23         Now, given the facts and circumstances here, we

24  know -- and I've read, you know, that Justice Ginsburg has

25  spoken to students in Minnesota about, well -- saying why the

1  court denied cert, and that was because there was no circuit

2  split, so there was no need for us to accept cert.  There's

3  that rationale.  There's tons of other rationale that could be

4  assigned to the denial of cert.  But one thing that the orderly

5  process of how courts work tells us is that it's not because

6  it's an endorsement of what the lower courts did below.

7        THE COURT:  What about *Windsor*'s citation and wrapping

8  its arms around *Loving* in *Windsor*?  Equal protection and due

9  process, which is contrary to -- isn't that contrary to *Baker*

10 *v. Nelson*?  Doesn't *Baker* -- *Baker v. Nelson* says, *There's*

11 *nothing justiciable here*; and *Windsor* says, *Well, there is.*

12 *See Loving.  Loving*, as we know, talks about equal protection

13 and due process and all of that.  So isn't that a repudiation

14 of *Baker v. Nelson*?

15       MR. MATHENY:  That's something that's interesting,

16 again, about this orderly process, your Honor.  In -- the

17 *Loving* case was decided in I think it was 1967 or '68.  *Baker*

18 *v. Nelson* came after that.  And it's a point that comes up

19 later on when we're talking about the fundamental rights

20 analysis and the heightened scrutiny issue.  But while not

21 every court has accepted it that has looked at it since, I

22 think that there are many different ways to read *Windsor*.

23       I can remember back many months ago now in the context

24 of the other case that's pending at the Mississippi Supreme

25 Court, the Texas Supreme Court was having an oral argument

about *Windsor* and what it means and trying to grapple with what

it means.  And the justice that was questioning the counsel

made the point, you know, *Windsor* has a little bit of

everything in it for everybody.  Is it decided on federalism?

Is it decided on equal protection?  Does it deal with

fundamental rights?

The State's position with respect to *Windsor*,

obviously, lies in the federalism aspects of it and thinks that

that's what it stands for, that when it comes to the federal

government -- when New York decided that it was going to

recognize same-sex marriage and authorize that as a matter of

state law, that the federal government could not ignore that

choice and deny the federal benefits to New York couples.

But in doing that, what it was saying to the state

was, *You have a -- you have a choice.  You get to decide how*

*you are going to define marriage in your state,* which is

undoubtedly one of the most -- it's certainly not I think the

most, but it's right up there with one of the biggest important

aspects of the state's police power and we've had authority to

regulate it for a very -- since the beginning of the United

States.

So that -- what *Windsor* speaks to and what it means,

it's important when it comes to the *Baker v. Nelson*; but I

think specifically on the *Baker v. Nelson* point, it's like you

pointed out, they didn't explicitly overrule it.  And there

1   are -- there's the State's viewpoint.  I think many ways you

2   can read it as not having implicitly overruled *Baker v. Nelson*

3   either.

4           THE COURT:  So what doctrinal developments -- what

5   doctrinal developments could exist in the State's world that

6   would say that the case has been implicitly or otherwise sort

7   of overruled?  I mean, we have a lot of evidence here.  What

8   additional things could it say other than the fact that they --

9   they take up a case and say, *See Baker v. Nelson, period*?  What

10  else would we need?

11          I mean, the Supreme Court, for example, has done

12  per curiam summary reversals of the Fifth Circuit recently,

13  yesterday -- Monday -- Monday on a case saying, *You all got it*

14  *wrong.  You've been looking at the notice pleading doctrine*

15  *wrong.*  So they took up the case, PC reversed.  *Tolan v.*

16  *Cotton,* misapplication of how you deal with qualified immunity.

17  They took it up and they PC reversed, said, *You got it wrong.*

18          So what else would the State suggest short of that I

19  guess that could show that the doctrinal developments no longer

20  exist because *Baker v. Nelson* was decided before *Frontiero* I

21  believe and the *Virginia v.* -- the *VMI* case and all those where

22  they -- where they not expanded the rights of women, but where

23  they acknowledged the gender discrimination, same-sex

24  discrimination and elaborated on that, you know, talked about

25  women not -- well, working in the workforce and not necessarily

1    being tied to their home?  What other things would the State

2    suggest that the court needs to say that the doctrinal

3    development no longer underpins *Baker v. Nelson*?

4             MR. MATHENY:  Well, first, I would say with respect to

5    the gender discrimination, I think you have to cabin that.  And

6    as counsel said, they -- they mentioned that in the footnote in

7    their brief, but that's not what they're arguing here today,

8    that they're relying on gender discrimination as the basis to

9    raise the scrutiny applied here.

10            But I think the answer, your Honor, has to go back

11   to -- my point is that a change in a controlling precedent

12   should come from the court that laid the precedent.  And I

13   would offer you this example, because, like I said before, this

14   notion of how the Supreme Court used to handle the docket and

15   how this following-precedent stuff works, it confused me and it

16   was something that I had to look into when I first started

17   grappling with this.

18            And so one case that I felt -- and I'm not saying that

19   this case is a same-sex marriage precedent that has to be

20   followed.  I'm not breaking any new ground.  I'm not the first

21   attorney that's ever been able to find this case and argue

22   something brand-new, but I think that this tells you a lot

23   about the orderly process that's at play here.

24            In 1988 the Fifth Circuit decided a case that involved

25   the Texas Constitution.  It was Article 5, Section 1-a.  And

what that Texas constitutional provision provides is -- or at
least at that time it provided an absolute rule that when
judges reach age 75 they have to vacate their office.  This is
elected judges in Texas.

So the Fifth Circuit -- the district court had upheld
the challenges against the constitutional provision, which were
equal protection challenges and a fundamental right challenge
based upon First Amendment associational freedoms, because
elected judges implicate the right to vote for those elected
judges.  But, in any event, you have an equal protection claim
and a fundamental right and the judge sues and loses in the
district court.  So he goes to the Fifth Circuit.

Judge Goldberg, who was 82 when he had to write the
opinion and he certainly pointed out that there's a long
tradition of fine judges in the history of our country that
have served past age 75, Judge Goldberg looked at the -- at the
case.  There was a dismissal for want of substantial federal
question that the Supreme Court had applied -- had ruled in a
previous case that had come out of New York, because
New York -- they elected their judges at that time and their
upper age was 70.  The New York Supreme Court had said that was
fine.  The U.S. Supreme Court affirmed by dismissing for want
of substantial federal question.

Judge Goldberg had to recognize that that bound his
decision in -- it's Judge Hatten's case in the Fifth Circuit.

1    It was binding.  But he gave us some insight because Judge

2    Goldberg, nevertheless, went through and explained all the

3    reasons, the analysis applicable to the equal protection, age

4    discrimination claim and the fundamental association right, and

5    he had to find that he had to follow the summary disposition by

6    the U.S. Supreme Court even though he totally disagreed with

7    it.

8            And, quote, he had said, Perhaps unfolding years will

9    open eyes that are now closed.  Until then we are bound by

10   precedent to affirm.  The case is cited at 854 F.2d 687.  It's

11   *Hatten v. Rains*.  Judge Jolly concurred in the opinion.

12           And one note -- and this is just purely a note -- but

13   since that time, Texas has amended that statutory -- that

14   constitutional provision -- I'm sorry -- four different times.

15   They haven't decided that -- that they should change the age

16   specifically about the age 75 being mandatory retirement, but

17   they have tweaked it a little bit to allow for sitting judges

18   to serve a little bit longer.  And the point being is it's not

19   like they couldn't change the constitutional provision to

20   address issues like that that had come up.

21           In any event, I think that that illustrates the

22   orderly process that we're dealing here with *Baker v. Nelson*.

23   When you're looking at issues like doctrinal developments, when

24   you're looking at issues, like the court has said, *You've got*

25   *to leave it to us to overrule our own precedents*, when you're

1  trying to read between the lines, if you will, when the Supreme

2  Court doesn't explicitly say, *We're abandoning something that*

3  *we've decided earlier,* I think that that's important.

4  It's important to how courts work and it's important

5  to how -- it's important to how democracy runs, because people

6  need to be able to believe in the court system; and if you

7  don't follow the order, then it certainly doesn't mean that

8  there will be riots that break out in front of the courthouse

9  today, but over time it is something that erodes the public's

10 confidence in the system that's in place for orderly

11 resolutions of disputes.

12 THE COURT:  When a lower court tells a higher court

13 that your earlier decision has no resonance today, no

14 application to this case, and that case -- and that court takes

15 that decision up and rules on that decision, isn't there an

16 obligation to that court to at least put in a footnote or

17 something to say, as an aside, *It does have resonance, but*

18 *we're saying that this is the* -- I mean, that's what I'm still

19 grappling with, because the Second Circuit told the world that

20 *Baker* had no resonance in the *Windsor* case.

21 *Windsor* went up to the Supreme Court and not one

22 judge, not one judge on the Supreme Court, said, *Aha, but Baker*

23 *does have resonance, and I concur, I dissent, I disagree*, I

24 whatever.  Doesn't that speak volumes as well?  I mean, silence

25 sometimes is golden.

1    MR. MATHENY:  It brings up two points, your Honor.

2  And I guess the first is -- and I want to be careful whenever

3  I'm talking about what judges are obligated to do.  I would

4  never purport to tell you that you must do this or that.

5    THE COURT:  Okay.

6    MR. MATHENY:  But I would say this, not mentioning it

7  in the Supreme Court opinion in *Windsor*, what it tells me is

8  that it was not relevant.  They didn't have to address it.  And

9  the reason that they didn't have to address it is because what

10 they were doing was telling the federal government that you

11 cannot disturb New York's choice that it made through a

12 deliberative process, through a democratic process that some

13 people have faith in and some people don't, but New York

14 decided something and the federal government could not disturb

15 that.

16    That's a totally different issue than what was raised

17 in *Baker*, and that -- because what was raised in *Baker* is what

18 we have here which is as a matter of the Fourteenth Amendment

19 do the states have the right to define marriage within their

20 borders in terms of between a man and a woman.  That's my

21 answer to that.

22    I would also point out that at the same time -- and I

23 think I pointed it out in my brief, your Honor.  At the same

24 time that the New York -- that the -- I'm sorry -- that the

25 Second Circuit was looking at this, the First Circuit looked at

1    it as well and said, *We've got to adhere to the Baker v.*

2    *Nelson.*  So you have two -- two circuits.  And I don't -- I'm

3    not saying they think alike because they're right next to each

4    other or anything like that, but the point being is people were

5    still viewing it differently at that point.  People are still

6    viewing it differently now.

7                 THE COURT:  Not many.  Right?  I mean, most of the

8    courts that have ruled on this issue, they're nearly unanimous.

9    I understand the Sixth Circuit and maybe Puerto Rico maybe.

10               MR. MATHENY:  Well, your Honor, I don't think you can

11   play a numbers game with it because I don't know how you would

12   calculate these district judges found this, these district

13   judges over here is a small number and they found this, and

14   then you subtract Sixth Circuit overruled all these district

15   judges.  It's not a game of math.

16               I think what it is is it's a choice between two

17   different lines of reasoning.  And the State's position is that

18   the courts, specifically Judge Sutton in the Sixth Circuit and

19   the judge from Puerto Rico, that they have the better view of

20   *Baker v. Nelson.*  And that's what we're asking the State to

21   accept and apply here, adhering to the orderly process of how

22   courts are supposed to work.

23               If your Honor doesn't have any other questions about

24   *Baker v. Nelson*, I'll move on to the next line of decisions in

25   the decision tree.

```
 1            THE COURT:  Okay.

 2            MR. MATHENY:  I see the issue as the issue of what

 3   kind of scrutiny are you supposed to apply to these laws that

 4   are at issue.  We know we have heightened scrutiny and that

 5   there's ways that the Supreme Court has defined that.  We have

 6   intermediate scrutiny that applies in some other instance, and

 7   we have rational basis scrutiny.

 8            What I heard counsel talking about was something that

 9   I've read in having to look and research these issues more

10   extensively recently, but this idea that some sort of different

11   kind of scrutiny applies because it's -- it's heightened

12   scrutiny, but it's rational basis because it's rational basis

13   with a careful considerations -- or with careful considerations

14   in mind.  I want to address that as I go through it, but I

15   think the most orderly way is to start with the suspect class

16   issue because -- and it's a point that had come up.

17            It's true there are those four factors and the four

18   factors about how you identify a class that should be granted

19   or be identified as a suspect class.  Those four factors -- and

20   I can't say that they -- that none of those four factors are

21   met here, that none of those four factors are important factors

22   and that some of those factors and good reasons for those

23   factors apply to gay people and to same-sex couples.  It's

24   certainly -- there's some points in there that are -- that are

25   inarguable.
```

1          There are a few that are important that I think your

2     Honor was digging into with the questions with counsel.  One

3     thing that got pointed out when you were talking about

4     political powerlessness, the standard is not political

5     powerness in terms of a political power where you can get

6     anything that you want.  The standard means less than that.

7     And that there -- there are other reasons, again, most recently

8     pointed out with the Sixth Circuit case about the merits of

9     applying the four-factor test, why there's difficulty --

10    difficulty in being able to do that here.

11          For me and the way I have to rationalize it and to

12    represent my client, I look at it in terms of the orderly

13    process that I've been talking about.  There was some debate

14    here about, well, the Supreme Court hasn't decided it.  It

15    hasn't said affirmatively or -- but what we do know is the

16    Supreme Court's never applied anything more than the rational

17    basis test when it's dealing with issues of a suspect

18    classification in terms of sexual orientation discrimination.

19          And it was pointed out, the *Baker v. Wade* issue -- I

20    know I addressed it in my brief, your Honor.  *Baker v. Wade* did

21    deal with issues that were related to the *Bowers v. Hardwick*

22    and then the *Lawrence* case.  And, yeah, there would be a --

23    there is an argument, a good argument that *Baker v. Wade* has

24    been displaced by those Supreme Court decisions.

25          When the Fifth Circuit has looked at it -- and, again,

1    I don't think that it matters that it's a -- in the pro se

2    context, because I certainly know in your Honor's court and

3    certainly at the Fifth Circuit it's not as if the hardworking

4    clerks and judges down there take pro se arguments lightly.

5            But when the -- when the Fifth Circuit has looked at

6    the issue and -- most recently and said, *Are we talking about a*

7    *suspect class when it comes to sexual orientation?* and it said

8    no.  And what it relied on in doing that was not *Baker v. Wade*.

9    It wasn't citing *Baker v. Wade* in the *Johnson* case that we

10   cited in our brief.  What they're looking at is *Romer*, which at

11   that time I'm not sure of the sequence of cases, but that was

12   the last case that the court had decided on the issue.

13           So the State's position is that the Fifth Circuit's

14   precedent, precedent from several of the other circuits that

15   are out there -- in fact, I think it's only the Second Circuit

16   with the opinion we were talking about earlier with *Windsor* and

17   then the recent Ninth Circuit opinion that went ahead and said,

18   *There is a suspect class here and that's why we're going to*

19   *apply heightened scrutiny.*

20           THE COURT:  Is it converted to a suspect class when

21   that class of individuals is targeted?  Does that -- can that

22   be -- can you convert that to a suspect class if that class of

23   individuals is targeted with respect to action like DOMA?  DOMA

24   specifically says that people of the same sex, we won't

25   recognize their benefits or something like that.  With DOMA

1    coming after the State of New York has decided that it would

2    recognize same-sex marriage, DOMA and the mini DOMA's, like

3    Mississippi, that came forth and specifically targeted this

4    group of people, does that make it a suspect class?

5              MR. MATHENY:  I don't think that the notion that the

6    laws targeted that class transforms it into a suspect class in

7    terms of how you're talking about defining suspect classes for

8    purposes of heightened scrutiny in applying Supreme Court

9    precedent.

10             Judge Sutton had pointed out, I mean, that the United

11   States Supreme Court hasn't recognized a new suspect class in

12   more than 30 years and has had plenty of opportunities to make

13   that decision with respect to sexual orientation

14   discrimination.

15             I think your Honor's question also folds into the

16   point of if you're looking for evidence and you -- you had

17   specifically distinguished between the evidence generally that

18   there has been unfortunate incidents and maltreatment in the

19   past versus -- as a whole versus in Mississippi -- and one of

20   the first things that counsel pointed to and said, *Well, look

21   at the law that we're here about today.*  I don't know and I

22   certainly can't agree on behalf of my client that that's

23   evidence.

24             But if -- when it comes to something as weighty as

25   recognizing a suspect class for purposes of heightened

1    scrutiny, I certainly think you have to have more evidence than

2    that; and here's why.  Your Honor pointed it out when you went

3    down the line of talking about how recognizing the suspect

4    class can affect other -- broader issues than just marriage

5    such as the -- the *GlaxoSmithKline* case in the Ninth Circuit

6    where that went off on jury service and -- so the point being

7    is that once the Supreme Court establishes -- or once the lower

8    federal court controlling -- whose precedent is controlling on

9    the court, once it's determined that sexual orientation is a

10   suspect class, that might open the door.

11          But the point is I think -- that makes it important

12   when you're talking about how much evidence and how weighty the

13   issue is, I'm not parading the horribles, but I'm saying that

14   saying -- saying that homosexuals -- or that gay people are a

15   suspect class has much broader implications in the -- in the

16   law than simply what the issue is that we're here about today,

17   which is where -- the specific issue of same-sex marriage in

18   Mississippi.

19          THE COURT:  What about the idea of the state banning a

20   homosexual couple from adopting a child, a couple recognized by

21   another state?  They can come here.  Obviously, the State would

22   not deem them a couple.  So, therefore, they would not be

23   eligible to adopt a child who they love and who the child --

24   and in return the child loves them.  But the State stands in

25   between them.  Is that sort of creating a barrier?

1          MR. MATHENY:  Well, that may be something that I think

2     that you could take into account when you are going through the

3     rational basis analysis and looking at is there -- when you're

4     looking at the effect of a law, in other words, what impact do

5     our laws have on all the other laws in terms of the universe of

6     benefits and other things like the plaintiffs have pointed out,

7     when you're looking at something like that and the effect, that

8     may have some sway in -- in the rational basis analysis.  But I

9     think that that's where that fits in.  I don't think it's in

10    terms of *Do you -- Does that mean suspect class?  Yes or no.*

11          I think the bottom-line point and the State's position

12    on it is is that the orderly process of the way the controlling

13    precedent has to be applied controls the issue about whether or

14    not -- the specific issue about whether or not you apply

15    heightened scrutiny on account of sexual discrimination --

16    sexual orientation discrimination as a suspect class.

17          With respect to the fundamental right, which is an

18    entirely different analysis not only because they've raised it

19    as a fundamental right in terms of a substantive due process

20    type claim, but it also means something different than

21    recognizing a suspect class in order to get to heightened

22    scrutiny.  And that's one of the things -- and I guess maybe as

23    the lead-in to talking about the fundamental rights analysis,

24    that's one of the things that's interesting.  Kind of relates

25    back to your point about all these different courts have looked

1   at these things, *Baker v. Nelson* and all these other issues,

2   and come out with different decisions on those.

3   　　　　At the end of the day, as I read them -- and I've had

4   to read them feverishly over the past few weeks to get ready

5   for this since so many of them are brand-new, but one thing

6   that comes out of it is it's -- they all agree on the result

7   that they reached, but they're not all in agreement about the

8   reasons about how to get there.  They all didn't follow the

9   same decisional tree and they didn't come up with the same

10   rationale.

11   　　　　And so when you're -- in the matter of -- well, like a

12   decision tree, when you're -- when you're looking at it and

13   you're talking about the differences between a suspect class

14   issue and the fundamental substantive due process right issue,

15   that really more falls in line with what the Tenth Circuit has

16   said that decided the issue of the -- of the fundamental right.

17   You have the Tenth Circuit deciding the fundamental right, and

18   then you have the Ninth Circuit that was the suspect

19   classification, and then you have the Seventh Circuit that --

20   whether you want to call it careful consideration or animus --

21   　　　　THE COURT:  Rational basis plus?

22   　　　　MR. MATHENY:  Rational basis plus.

23   　　　　THE COURT:  Basis with punch or something?

24   　　　　MR. MATHENY:  Those things are hard to keep up with.

25   But with respect to the fundamental right, I think counsel said

1    it best is there's an issue about -- and I think the threshold

2    issue is does this *Glucksberg* test apply or not.  The

3    *Glucksberg* test is, as we know, how the Supreme Court back in I

4    think it was 1997 said that when somebody wants to have

5    recognized a new fundamental right, this is the test that we

6    apply to be able to determine whether or not it is.  And, as we

7    know, it means -- the test is when you carefully describe the

8    right, is that a right that's deeply rooted in the nation's

9    history and tradition.

10          We know all of these judges that have looked at it

11   have wrestled with the *Glucksberg* test and what it means and

12   whether or not to apply it.  But that's the real issue is do

13   you apply that, because I think there's a pretty good

14   consensus -- I won't put words in counsel's mouth, but I think

15   that courts seem to agree that if you apply the *Glucksberg*

16   test, then the right to same-sex marriage is not something that

17   qualifies under the *Glucksberg* test as a fundamental right.  So

18   the real issue becomes, well, if you don't apply the *Glucksberg*

19   test, then how does it get there.

20          THE COURT:  And it's not because it's not rooted in

21   tradition and all of that?  Is that why you should not apply

22   the -- or that's why the *Glucksberg* test does not apply?

23          MR. MATHENY:  And I --

24          THE COURT:  Or if you applied it, it wouldn't be --

25          MR. MATHENY:  Yeah.  And I hate to oversimplify it,

1    your Honor, but when you're looking at how marriage has been

2    traditionally defined since the beginning -- since back before

3    the beginning of the country, I think that the -- I think what

4    you see is that when you carefully describe and you ask the

5    question in terms of throughout our nation's history and

6    traditions has a right to same-sex marriage been recognized as

7    a fundamental right, I think the answer is no, because, as we

8    all know, as a matter of tradition up until -- well, really, up

9    until certainly just before the turn of the century and with

10   things like the Massachusetts ruling in 2003, that people

11   didn't think of marriage in terms of including more than

12   opposite-sex unions.

13          But that point gets into the -- if you buy the

14   argument -- and I don't think you should, but if you buy the

15   argument that *Glucksberg* is not the way to approach it and you

16   say that you're going to go analyze the fundamental right in

17   terms of a broad freedom to marry or I think some courts have

18   called it a right to marry one -- a partner of one's choosing,

19   however you formulate it, I think what it boils down to is to

20   go down that line of reasoning, you have to be able to find

21   that all these cases that support that theory that they had in

22   mind when they were talking about marriage, that they were

23   looking at it as some broad, all-encompassing fundamental right

24   that everybody has to be able to choose whoever one wants to

25   get married to.

1          And the reason why that doesn't work, whether you're

2     talking about the *Loving* case or the *Turner* case or some others

3     that they didn't cite in their brief but that are out there,

4     like the *Zablocki* case or other cases that are -- relate to

5     marriage issues, in none of those was the court speaking in

6     terms or even thinking about the notion that it was talking

7     about marriage in terms of inclusive of anything more than

8     opposite sex.

9          THE COURT:  But up until *Loving*, though, everything

10     prior to *Loving* -- because *Loving* overturned about 100 years of

11     cases, it didn't recognize that -- they didn't think that

12     people of opposite races would even dare want to marry each

13     other or choose to marry each other or -- I mean, because,

14     again, they looked at it for 100 years and the segregation laws

15     were in full force by many states and federal courts.  And

16     even, you know, the *Loving* couple was I guess married in

17     either -- either married in D.C. and came over to Virginia,

18     were prosecuted.

19          In 2014 your children couldn't even think that that

20     was going on in 1967 or so when *Loving* was decided.  So the

21     definition -- so how they defined in the expansive way that

22     they looked at marriage in the 1800s and the early 1900s,

23     they're not even conceptualized in the opposite-race context.

24     And many of those cases dealt with blacks and whites marrying.

25          So what does the State say about that?  And how can

1   you say *Loving* is different and we need to -- how can we

2   distinguish *Loving* and the broad application of *Loving* to the

3   principles here today?

4         MR. MATHENY:  One thing I would say, your Honor, is

5   certainly I'm sensitive to all of the issues that were going on

6   back then with *Loving* and the circumstances.  And I appreciate

7   counsel when she had mentioned that we're not trying to --

8   we're not trying to say that *Loving* and the situation in *Loving*

9   is exactly the same kind of situation we have here, but it does

10  have import.

11        And I think that the State's response to your

12  question, your Honor, is, one, it -- there is a point that goes

13  back to the -- to the *Baker v. Nelson* point in that *Loving* was

14  decided and then *Baker v. Nelson* came after that.  And the

15  orderly process of the way courts work, I mean, you have to

16  assume that the court knew when it decided the case after

17  that -- that that shed some light on what it was talking about

18  in *Loving*.  So I think that that's an important point.

19        I think another point -- and I can't claim to have

20  come up with this because that's one of the things about being

21  the last state to get sued to get to go to federal court and

22  having all this material out there, but I think I've also seen

23  it made the point that in *Loving* that they were talking --

24  clearly talking about opposite-sex marriage because --

25        THE COURT:  Yeah, because the people were actually

```
1    opposite sex.
2            MR. MATHENY:  They were actually opposite sex.  Thank
3    you, your Honor.  I didn't mean to miss the obvious.  But they
4    were also talking in terms of procreation as being one of the
5    reasons with the procreation that those -- that in the Loving
6    case that was at issue is the reason that it was -- it was
7    reached in its decision.  And we know that while today there's
8    certainly -- you can't say that 100 percent across the board
9    that men and women are the only -- that the only way that
10   people can procreate because of modern science, but that's
11   certainly the mindset that the judges had to be writing from in
12   Loving.
13           And it continues on with the other cases that are
14   examples of when they're dealing with marriage.  And I think --
15   I certainly can't purport to be able to put out the same kind
16   of rhetoric that comes off of Judge Sutton's opinion, but I
17   think his point is that it's pretty safe to say that --
18   for example, in the Loving case, if it had been two opposite
19   sex -- or two same-sex-but-different-race partners that had
20   come in and that were the plaintiffs in that case, then the
21   court probably would have looked at it and said, Well, you
22   can't do it because it's -- because you're of the same sex,
23   not -- and divorce that from the race aspect of it.  But, like
24   I said, Judge Sutton makes that point much more eloquently than
25   I can standing here.
```

```
 1              I think the point that what it all gets to, your
 2   Honor, that it's neither because of breaking new ground and
 3   recognizing sexual orientation as a suspect class or a
 4   fundamental right, which is something separate and distinct and
 5   a different line of rationale, but neither of those avenues, if
 6   you will, are available to increase the scrutiny that are
 7   applied to Mississippi's laws.
 8              I think that that -- what that leaves you with is,
 9   like your Honor put it, are you talking about rational basis
10   plus, or I think someone mentioned earlier -- I can't remember
11   if it was your Honor or counsel talked about vanilla rational
12   basis versus something different.
13              But I think the point is that if you are looking at
14   rational basis plus, you have to get into this issue of the
15   animus supposedly driving the law, and, you know, I get the
16   point about we can look at newspaper articles and maybe that is
17   what -- or some indication of what a legislator was thinking.
18   I don't think that that's proof and I certainly don't think
19   that that's sufficient proof and I certainly don't think that
20   you can look into the minds of the electorate in the case of
21   the constitutional amendment.
22              THE COURT:  Can you look at the chronology of events
23   with respect to Hawaii making its decision, Massachusetts in
24   making theirs, DOMA in between, the mini DOMAs coming, the
25   constitutional amendment?  Let's extrapolate this to another
```

1   point that's currently under way.

2          It was I think last year there was an attack on the

3   Second Amendment here in the state of Mississippi.  There was a

4   lawsuit filed against the State about the Second Amendment and

5   the right to -- you know, what does this right to bear arms

6   mean?  Can we wear it in a public place or whatever it was?

7          What the state has now done in reaction to that was --

8   or somebody -- put it on the constitutional amendment.  And I

9   think the governor said, you know, *We just want to make sure*

10  *that everybody understands that you have a constitutional right*

11  *to bear arms despite the fact that the Second Amendment says*

12  *so*, and some other article of the state constitution.  But I

13  assume this new constitution provision that was just voted on

14  last week, 88 to 12 percent --

15          MR. MATHENY:  The hunting?

16          THE COURT:  The hunting.  It was to solidify that *We*

17  *have the right to hunt,* which I presume means we have the right

18  to bear arms.  *I don't care how you try to file suit against us*

19  *on anything else.*

20          So if you look at what was going on, you cannot look

21  at any law or anything else.  You must look at the context in

22  which it was voted on, the context in which it was submitted to

23  the legislature or the context in which you go gather votes to

24  put it on a referendum and then do it that way.

25          The context of all of these most recent enactments of

1   the mini DOMAs came after Hawaii recognized the right and

2   Massachusetts solidified the right and in between there you had

3   DOMA.  And as I asked the lawyer for the State -- excuse me.

4   I'm sorry -- the lawyer for the plaintiffs, as of now I've not

5   heard any elected official or there's not evidence of anybody

6   backing away from the position as the presidents did in DOMA,

7   as the Congress did in DOMA and everybody else.

8          MR. MATHENY:  Your Honor, I think that this is an

9   important point, and I'm going to answer your question as best

10  I can.  But I think one important point is there's -- well,

11  like many other things or many other issues that are in play

12  here, you have to be careful about blurring things together.

13          And the important point here when you're talking about

14  the context, which certainly there are ways to look at the

15  historical context and the proceeding of what happened and draw

16  some conclusions from that, but the point is you're

17  distinguishing between talking about evidence in terms of the

18  kind of evidence that would come from the witness box over here

19  and looking at it from a standpoint that way and then

20  approaching it in terms of a can you use this model of -- can

21  we rule out everything else but animus and leave that as

22  obviously the sole reason?

23          THE COURT:  Why didn't they think -- why didn't the

24  legislature think to do this in 1980 or '85 or '89 or '90 or

25  '95?  Because they saw no need for it.

1          MR. MATHENY:  That's right.

2          THE COURT:  They only saw a need for it after the

3     other states had done it, and they patterned this mini DOMA in

4     the legislature.  We'll take the legislature separate from the

5     constitutional thing.  Is this legislation modeled after DOMA?

6          MR. MATHENY:  Well, I think that certainly it would

7     be -- I don't want to say -- it would be pretty difficult for

8     me to say not because, obviously, the historical context leads

9     to the point.  And then *Windsor* itself, it says one of the

10    reasons that Congress when they were looking at the federal

11    government context specifically that they passed it to put

12    their finger on the scale I think is the term that was used.

13         But the point is this, your Honor.  The historical

14    context and, you know, was it a response because this was

15    happening in Hawaii or this judge decided it in Massachusetts

16    or when it was -- remember back then an issue of how elected

17    judges are interpreting state constitutions, not the federal

18    constitution, but state constitutions, I think that you still

19    have this issue of can you rule out anything but animus.

20         And counsel had mentioned something, and I'm glad she

21    did because it reminded me of something that I had read

22    somewhere.  She was talking about President Clinton's op-ed

23    please.  And I know that this doesn't necessarily square with

24    the factual findings that they're asking you to take from

25    *Windsor* despite all the differences and the issues and

1   everything and transpose it on Mississippians, but I had also

2   read about Judge Clinton -- I'm sorry, "Judge Clinton" --

3   President Clinton's thoughts about the law.

4           And one of the explanations that I had heard him

5   say -- I can't remember if it was in his memoirs or an op-ed

6   piece or something, but at that point in time in the historical

7   context that the country was headed toward the potential for a

8   federal constitutional amendment that would address this issue

9   and that he had felt like that this was one way to head it off

10  as compromise as part of the process to prevent that from

11  happening.

12          Certainly, there's other suggestions out there about

13  President Clinton specifically and others about how they

14  changed their viewpoints on things over time and that people

15  see things differently and that things are changing.

16          THE COURT:  But if the legislation mimics DOMA, we

17  could assume that the State was at least concerned because --

18  was concerned about all the things that they raised in

19  passing -- passage of DOMA.  Can the court make -- can the

20  court make that leap?  Prior to DOMA, *Lawrence* v. Texas was

21  passed.  *Lawrence v. Texas*, the court ruled on that in 2003.

22  Right?  And how should the court look at that?

23          MR. MATHENY:  Well, I think that the best I can say is

24  that when you're faithfully applying the test of anything but

25  animus, that you can identify some things that look like animus

1    and you also have to be careful I should say -- when you're

2    talking about animus, you have to be careful about what it is

3    you're actually talking about, because animus has different

4    meanings in different contexts, of course.

5            But when you're talking about the reasons that the law

6    was passed, there's certainly that historical context.  But the

7    State's position is you can't rule that -- rule out everything

8    but an animus reason, whether you're defining animus as malice

9    in terms of like legal malice or you're talking about nefarious

10   motive or the motive behind the law and specifically around --

11   in the minds of the electorate which I think, like Judge Sutton

12   had gone into, there's lots of different reasons why people

13   vote for or against something.  And I would even say with your

14   Honor's example with the hunting, I didn't vote for it.  I

15   shouldn't say it.  I didn't vote for it.

16           But you know why I didn't?  I didn't vote for it

17   because I don't like how -- I don't like how the -- the way

18   that it was worded on the ballot.  I couldn't understand it

19   when I'm looking at it there on the poll.  And so I voted

20   against it, even though I have nothing against hunting and have

21   been hunting before.  But I'm certainly entitled to have that

22   opinion about it.  And I can have that opinion even though I

23   think that -- you know, the basic opinion that it should -- we

24   didn't have to constitutionalize it, as I saw it.  But back

25   in --

1    THE COURT:  Reconstitutionlize it.  Constitutionalize

2  it with a punch.

3    MR. MATHENY:  Fair enough, your Honor.  I think the

4  bottom line is -- the way to look at it is if you're talking

5  about animus in terms of evidence -- and certainly -- gosh,

6  I've been forgetting to mention it, but when you're looking at

7  something in terms of the preliminary injunctive context and

8  you're talking about evidence, looking at evidence to try to

9  find animus and you're talking about newspaper stories and

10  those sort of things, that's very problematic.

11    But I also -- the State's position is that this

12  anything-but-animus approach doesn't work.  And I would -- I

13  would be remiss if I didn't point out that there are a lot of

14  judges, even a lot of judges that have agreed with the result

15  in a lot of these recent cases, but as we cited in our brief,

16  there's plenty of judges at all different levels, Judge Holmes

17  in the Tenth Circuit and others, that have rejected this idea

18  of state definitions and constitutional provisions or statutes

19  can be pinned down to anything but animus in terms of

20  triggering something more than just ordinary rational basis.

21    With respect to the rational basis review, we know

22  what the test is and we know when you're talking in terms of

23  ordinary rational basis review like the State believes should

24  be applied here, we know that you're looking for a legitimate

25  interest.  And then the judges look for is there some rational

1  basis or rational relationship between the law and that

2  legitimate state interest.

3         And it's -- as all the opinions have mentioned,

4  rational basis talk about -- it's the most deferential.  It's

5  not one where the states have to come in and put on evidence.

6  I think your Honor had pointed out earlier again to counsel

7  about there being a lack of legislative history.  Ms. Kaplan

8  may have been surprised by that, but I certainly was when I

9  started working for the State that we really don't have

10 legislative history at all other than what you can find in

11 house journals about who voted for what or if you can get the

12 inside scoop on a committee or something like that.  But --

13        THE COURT:  The cynics would say there's probably a

14 reason why they choose not to.

15        MR. MATHENY:  Well, the main point, your Honor, is

16 when it comes to rational basis review, though, it doesn't

17 matter, because the question is -- and it's not what motivated

18 it at the time or anything of that sort.  It's can the court

19 conceive of any rational basis that a -- that a -- a rationale

20 related to legitimate state interest.  And I don't how to best

21 formulate it.  I have to be honest.  I didn't come up with it.

22 Like I said --

23        THE COURT:  So what is the State's rational basis for

24 saying that same-sex couples cannot marry, that we will not

25 recognize same-sex couples who are married from other states,

1  and we will further burden same-sex couples and prohibit them

2  from adopting children, children they can provide for, children

3  who they love?

4          All the -- well, all a child wants is to be loved.

5  They don't care by whom or what.  All they want is to be

6  nurtured and loved.  So what's the State's rationale for say,

7  *We're going to pull out of the pool of eligibles those same-sex*

8  *couples and deny you the right to be able to adopt children*?

9          MR. MATHENY:  Well, and as I would say, I think

10  whatever label you put on it, we're talking about the

11  responsible procreation theory or the irresponsible procreation

12  theory as it's referred to sometimes.  But when you're talking

13  about the legitimate state interest being stable families and

14  children --

15          THE COURT:  Let's take procreation.  You allow persons

16  who are imprisoned to be married, and I think the State no

17  longer allows conjugal visits.  So if somebody is in prison for

18  a while, they're married, can't procreate.  Old people can

19  decide to get married at 75 and 80.  Probably very few Abrahams

20  and Sarahs around, or -- you know.  So we'll put that to rest,

21  old people.

22          What about the married couple who choose -- chooses

23  not to have children but choose to adopt children?  They don't

24  want to have children because they don't want to bring their

25  own child into this world.  They say that *There are other*

*children out here who need us.*  Procreation, where does that

take us with procreation?   How legitimate then is procreation?

           MR. MATHENY:  Well, your Honor -- and I think what all

those examples are getting at, you're getting into the issue

about the overinclusiveness or underinclusiveness issues about

the law, because, obviously, like you said, to -- a man and a

woman could get married and choose not to have a child or

numerous other kind of examples.

           When you're getting into those issues when you're

talking about irresponsible procreation, you're really getting

into changing the scrutiny that you're applying to it because

underinclusive and overinclusive in an ordinary-rational-basis

sense, the deference that you're giving to the legislature or

the legislature and then the Constitution, the line drawing

that's there, the rational basis test accounts for imperfect

line drawing in that you're going to get some right or --

you're going to miss some here, you're going to miss some here,

but it all comes down to --

           THE COURT:  Couldn't you ban -- if procreation is

really the reason, couldn't you say that persons who are

infertile or otherwise cannot produce can get married,

opposite-sex people?

           MR. MATHENY:  If you had to more narrowly tailor the

law, then I think that that might be an issue.  But I think

that that results -- that relates to the same -- to the same

point.  And I would point out -- and I made this point in the

brief because it relates to it, but I can't stand here and deny

that other federal judges around the country have looked at

responsible procreation and said, *Well, that's no good and,*

*specifically, that's no good post Windsor*, even though that --

and not getting into a debate about what -- getting back into

the debate about what *Windsor* means, but every time that

they're doing that or nearly every time -- and I have to put

that caveat on it because I don't know that I've read every

word in every opinion that's come out about this.

THE COURT:  There's been a lot of opinions.

MR. MATHENY:  But I can say this, that the

overwhelming majority, if not all of them, when they're coming

out and rejecting this responsible procreation theory, it's

because of using a different lens to view the law and faulting

it for the overinclusive and underinclusive examples like your

Honor had pointed out.

So whether it's the Ninth Circuit adjusting the

scrutiny up because of that suspect class or the Tenth Circuit

and the fundamental right or the Seventh Circuit and the

careful consideration or rational basis plus or however you

want to call that, in most all those instances you're talking

about ratcheting up the level of scrutiny.  So you have to

start getting into the issues of how good does the law fit the

particular objective.

1          It's the State's position that that's not the way that

2     its law should be viewed and that rational basis should be

3     applied.  And it's what Judge Sutton said just last week and

4     Judge Feldman and the federal judges that have seen it post

5     *Windsor*.  But it's also important -- I don't think that it's --

6     because this is something else that has boggled me a little bit

7     about these cases, and it's how you know that you have to

8     change the level of scrutiny to be able to strike down these

9     laws.

10         You know because the cases before *Windsor* that are

11    looking at it, that are applying the rational basis test,

12    they're saying, *Well, it's a rational basis.*  They had no

13    reason before *Windsor* to apply a higher level of scrutiny.  Now

14    an argument has developed when you're talking about time lines

15    of things -- and the legal time line of things and arguments

16    have developed and everybody doesn't agree as to which ones

17    apply or if any apply at all, but these methods of ratcheting

18    up the scrutiny is really what has undone the responsible

19    procreation in the eyes of some of the courts that have decided

20    this issue.

21         I think you also -- in addition to -- and, again, I've

22    labeled it responsible procreation and it's spelled out in our

23    briefs, but you also have to take on these other issues and

24    they have labels as well.  But you're talking about tradition,

25    caution, whether you're calling it wait and see, I think it's

1    related -- I don't know how distinct it is, but I think it's

2    also related to the rationale of this is something that should

3    be decided through a democratic process regardless of how

4    successful you might ever think that would be, that it is

5    devoted --

6              THE COURT:  I'll pose the wait-and-see question to you

7    about the all deliberate speed.  So if we do that -- it was

8    1954 that *Brown* was enacted and in Mississippi it was 1970

9    before my first-grade class was integrated.  And it was a

10   first-grade class in my hometown because of the speed at which

11   the State of Mississippi wanted to travel in making sure that

12   *Brown* was effected.

13             So why -- doesn't the court have some responsibility

14   to maybe not wait and see and to -- to not wait and see?

15   Because we may be here in 2031.  We may be here in 2131.  No,

16   no.  I mean, the -- I think it was Judge Posner and some others

17   who said things have happened in light years everywhere else

18   around the country in all this litigation, but what guarantee

19   is there that the political process would work its way through

20   in what I might consider or what the courts might consider to

21   be a timely fashion?

22             MR. MATHENY:  There's two things about it.  Don't let

23   me forget to get to the second part.

24             THE COURT:  Okay.

25             MR. MATHENY:  But the first thing that I would say

1  there, your Honor, is one problem with the logic of that attack

2  on the -- if you want to label it "wait and see," it assumes

3  that at the end of the road the wait and see has inevitably got

4  to lead to the recognition of allowing same-sex couples to be

5  married.

6          I think that the point of the wait-and-see

7  rationale -- the point is that it folds into the you're going

8  to let things play out in other courts in other jurisdictions

9  and other electorates and see -- and you're not just looking at

10  do people's minds change about it, but you're also looking at

11  are there reasons that emerge that are reasons to revisit the

12  policy.  But it's really hard if you're going to approach it

13  from the mindset of it's got to change, why should they have to

14  wait for that when it's definitely going to change.

15          THE COURT:  Well, didn't the antimiscegenation laws

16  change?  I'm not sure if Mississippi had it in its

17  constitution, but it had it on its books, I presume.  And did

18  they ever -- when did they take it off the books?  Certainly,

19  they didn't take it off in 1967.  Did they '68 or was it '80 or

20  was it '90 or was it 2000?  Same with the anti -- the sodomy

21  laws.  Are they still on the book?

22          MR. MATHENY:  Your Honor, I'm not sure.  But the point

23  is well made.  Whether they've technically come off the books

24  or not, unfortunately, it certainly -- the way that you're

25  talking about being on the books or off the books are, in

1  reality, you can't help but -- it's undeniable that it took too

2  long when you're talking about all deliberate speed in the

3  context of *Brown v. Board of Education* and the like, which,

4  again, that's a context that you're talking about heightened

5  scrutiny for -- across the board for many reasons, because a

6  lot of things you're talking about in terms of rights, public

7  education and other things that -- you've got fundamental

8  rights that play there and then you've also got, you know,

9  equal protection and Fourteenth Amendment --

10      THE COURT:  And plaintiff contends that you have a

11  fundamental right here, fundamental right to marry, Fourteenth

12  Amendment, see *Loving*.  So the plaintiffs contend that these

13  are fundamental rights as well.

14      MR. MATHENY:  Your Honor, that's only if you accept

15  the analysis that we're -- like I was talking about earlier

16  about -- and in the brief about the *Glucksberg* test and whether

17  you follow that and that line of reasoning.  Certainly, when

18  you're talking about things whether or not something is certain

19  to happen or not, if you ratchet up the level of scrutiny

20  through a fundamental right or some other basis, it's going to

21  produce a different result at the end.

22      THE COURT:  But if we keep it at rational basis, the

23  State has a rational basis for saying that same-sex couples

24  cannot get the same benefits, that is -- and I'm looking at

25  this narrowly right now through the sense of providing love and

 1  nourishment to a child who loves them.  They cannot adopt that

 2  child.

 3          MR. MATHENY:  If -- if it's a question of can the law

 4  be faulted because it's overinclusive or underinclusive and

 5  that it has effects like that, then that's a problem for the

 6  law.  But under the rational basis, the lowest level of

 7  scrutiny, the deferential level, it -- it doesn't have a

 8  problem there.  And, like I said, courts looking at it in terms

 9  of pure rational basis and pure deference have upheld them.

10          My second point, your Honor -- I didn't want to forget

11  that -- let me see where I had it.

12          THE COURT:  No problem.

13          MR. MATHENY:  The good questions got me so far off of

14  thinking about that.  When I find it, I will point it out.

15          THE COURT:  No problem.

16          MR. MATHENY:  And I just found it.

17          THE COURT:  Okay.

18          MR. MATHENY:  The other point is, we can't confuse

19  this wait-and-see idea, the wait-and-see bases for the laws.

20  You have to divorce that from the lens that we're looking at

21  this litigation with in the preliminary injunction context that

22  we have here, because it's one question if you're talking about

23  wait and see in terms of the laboratories of democracy,

24  intentions, how things play out elsewhere.  It's another thing

25  when you're talking about in a preliminary injunction context

wait and see in terms of, *Hey, we've got two cases up at the*
*Fifth Circuit that are fully briefed and they're going to*
*argument in a week and a half.*

So the wait-and-see aspect on a much smaller scale
when we're talking about preliminary injunction, that's
something that is important in the context of this case that
bears on the equitable factors that have to be considered when
you're talking about preliminarily enjoining a state law.
Broadly preliminarily enjoining is what they've asked for.  I
read their requested relief as asking for an injunction meaning
that the laws are struck down, meaning that all over the state
they have no application going forward.

I think that that wait-and-see issue in terms of we
do -- in terms of the equitable factors of the injunction, that
we need to wait and see how the precedent is going to play out.
Is the Supreme Court going to take up the issue now that we
have a circuit split?  What is the Fifth Circuit going to do
about it?  And when you factor in that stuff --

THE COURT:  What if the Supreme Court decides not to
take it up, the Sixth Circuit?  Because they can choose not to
take up a case whether there's a split in the circuits or not.
They took a case last week that there was no split in the
circuits on how to read the Affordable Care Act thing I
believe.  So they took that.  I mean, so what if they decide
not -- what if they deny cert in the Sixth Circuit case?

1          MR. MATHENY:  Well, given what we have here, we do

2     know this, we do know that whether the Supreme Court takes up

3     the Sixth Circuit or not, we know that the Fifth Circuit has

4     two cases in front of it, like I said, fully briefed and ready

5     for oral argument, as we all know, in January, and we know that

6     the Fifth Circuit's not going to deny cert on those.

7          It's going to have to decide the issues.  And whatever

8     it decides, I have not been able to find any reason that

9     those -- that the Louisiana laws at issue and the Texas laws at

10    issue would be in any way distinguishable from our case here.

11         THE COURT:  Should the Fifth Circuit wait until the

12    Mississippi Supreme Court rules on the other case?  Because

13    what if the Mississippi Supreme Court -- and I don't know all

14    the facts or issues in that case, but what if they -- I don't

15    know if the parties there raised it in violation of a state

16    constitutional issue, for example.  What if the -- should the

17    Fifth Circuit wait until the state supreme court rules?

18         MR. MATHENY:  It's a good question, and I think it

19    relates back to the orderly process concept or theme that I've

20    been talking about is we know -- and I know this because it's

21    come up with the Mississippi Supreme Court case.  Whatever the

22    Mississippi Supreme Court says on -- on an issue of federal law

23    has no precedential effect on what you would decide, your

24    Honor, or what the Fifth Circuit would decide and certainly not

25    what the United States Supreme Court would decide on an issue.

1          And that's a two-way street in the sense that the

2    Mississippi Supreme Court can look at -- because of how the

3    system works, they can look at the law and come to a

4    conclusion.  And not only is that not binding on you, but --

5    and, again, you have to be -- when you're talking about the

6    process, of course, your injunction would take precedence when

7    we're talking about supremacy clause type issues; but in terms

8    of an opinion from any federal court other than the Supreme

9    Court, the Mississippi Supreme Court's not bound by that in

10   terms of they have to follow that precedent.

11          It raises another -- and because of the context here

12   that -- like I said, that's something I've had to look into

13   myself when you're talking about -- when you're talking about

14   dealing with that separate case that's going on.  And I would

15   note, I think that counsel opposite e-mailed you our briefs in

16   that case.  And I don't know if you've looked at them and I

17   don't know -- I don't know how much you would want to or at

18   all, but it is a slightly different issue, as your Honor had

19   pointed out.  But it really relates to an issue that I wanted

20   to make because you had raised it earlier.

21          The issue in the other case is not whether or not the

22   couple could get married, but it's a divorce case.  So it is

23   more in line with the issue about recognizing marriage as

24   solemnized in other states.  And it was because this couple had

25   gone -- lived in Mississippi and gone to California and gotten

1  married over a weekend and come back and now they wanted to get

2  a divorce.  So it tracks more along the lines of -- and, in

3  fact, they did make the argument that -- that the plaintiffs

4  are not making here about the full faith and credit issues that

5  come up and of the sort.

6          But I think that the attorney that's involved in that

7  case and the equal protection and due process challenge to the

8  laws is teed up, because like many of these other cases that

9  we've seen, there was a point that the case got to where they

10  said, *Well, if you want this kind of relief, you have to strike*

11  *down the law to be able to get there.  You have to have the*

12  *Mississippi chancery court recognize this marriage, which the*

13  *law says it can't do, in order to be able to undo the divorce*

14  *(sic) by divorce.*

15          Your Honor, I -- the last points that I wanted to make

16  when I was thinking about the decision tree, and, again, it

17  relates to -- it relates to orderly process, and it's important

18  because of the preliminary injunction.  Mr. Barnes is going to

19  argue -- and I know we -- the State had filed a motion for

20  stay, and the point of that being is that having the benefit of

21  seeing what has gone on in other cases, we know that if -- if

22  your Honor sees it and rules for the State, then -- because of

23  the way the appeal statutes work, then the plaintiffs would be

24  entitled to appeal.  If your Honor rules against the State,

25  then the State would have the right of appeal and there would

1   be an issue about staying the injunctive -- the preliminary

2   injunctive relief.

3          It's a little bit different test when you're talking

4   about looking at it in terms of a stay versus when you're

5   looking at it through the lens of *Should I grant a preliminary*

6   *injunction* and looking at the equity -- equity factors there.

7   So I wanted to make sure to point out that difference and point

8   out that Mr. Barnes is going to discuss those issues with you.

9          But I did want to point out, as we said in our brief,

10  we disagree about the three equitable factors and whether or

11  not that there's been a sufficient showing when -- in terms

12  of -- you're talking about a preliminary injunction, you're

13  talking about gigantic relief.  It's essentially class relief

14  on a three-week string that they've asked for.  It's not

15  limited to just the plaintiffs that are here, what they've

16  asked for.

17         It's not limited to some discrete issue like some of

18  the other cases where preliminary injunctive relief has been --

19  has come out.  It's not -- there's not issues about do we have

20  someone listed on a death certificate or a birth certificate or

21  something that -- where there's more immediacy from the State's

22  point of view.  It's an important legal point that I have to

23  make.

24         There are, obviously, a lot of other cases out there.

25  There's very few that have gone off on preliminary injunction.

1    Most involved individual circumstances, like I was saying.

2    Others limited their relief, like, for example, in Tennessee

3    where the judge said *I'm going to -- I'm going -- I find the*

4    *equitable factors weigh in the plaintiffs' favor and I'm going*

5    *to order relief to these plaintiffs and these plaintiffs only.*

6    But then, of course -- I mean, with Tennessee, that involved

7    injunctive relief and it ended up getting reversed.

8           THE COURT:  What about the slew of cases that went to

9    the Supreme Court, Idaho I believe, Alaska, I think there's

10   something in Kansas today?  I don't know what Justice Sotomayor

11   has said about it.  But what about all these other cases that

12   have gone and asked the Supreme Court for a stay after -- and

13   maybe that's something we'll talk about in Mr. Barnes'

14   argument, but they -- they sort of -- I think Justice Kennedy a

15   couple of times granted a stay for a day, a weekend or a week,

16   but lifted the stay in Utah I believe and some other states?

17          MR. MATHENY:  It's an important point and I know it --

18   it gets right back into the orderly process issue and about how

19   courts work and everything.  Those examples that you're talking

20   about there, I'll go in reserve order, like the Kansas case.

21   The issue is there, well, the Tenth Circuit had already decided

22   the issues.  Now, there was some -- I think that the -- the

23   issue with the Kansas deal -- I mean with Justice Sotomayor

24   recently, Kansas had some defenses that they were raising that

25   were more procedural or, you know, legal defenses separate and

 1    apart from the merits of the cause.  I think specifically there

 2    was an abstention issue and maybe some standing or others in

 3    Kansas.

 4            The Ninth Circuit, obviously, that's different from

 5    where -- not just because it's California and such, but what

 6    I'm saying is the Ninth Circuit going to the Supreme Court is

 7    different from district court going to the Fifth Circuit and --

 8            THE COURT:  Okay.

 9            MR. MATHENY:  -- and having unsettled law.  So I

10    apologize for a muddled recount of how the court -- how the

11    appeals process works and everything.  But one last point I'd

12    make on it, your Honor, and I was glad that counsel opposite

13    had sent you a copy of the West Virginia order that had come

14    out.  I'm not positive about the timing, but I think it was

15    after the Sixth Circuit.  No, I'm positive it was after the

16    Sixth Circuit because they're talking about it.

17            THE COURT:  Right.

18            MR. MATHENY:  But I'm glad counsel sent you that order

19    because there was some important points that I wanted to

20    highlight in it.  Number one is that case was a lot like this

21    case in several respects, number one being that it was a

22    West Virginia district court and the case had been filed while

23    the -- specifically, the Virginia cases were much further along

24    up at the Fourth Circuit; and the West Virginia court stayed

25    the case entirely, not just not going to grant any kind of

1    injunction, but stayed the case entirely to see what would

2    happen with the *Bostic* case.

3            So while they -- there was some rejection of the Sixth

4    Circuit line of reasoning for similar reasons because after it

5    stayed the case and the Fourth Circuit decided *Bostic*, there

6    was nothing left for the West Virginia court to do essentially

7    other than address the outstanding motions.  And it said, *The*

8    *holding in Bostic controls this case.*  So in the context of

9    that kind of case, there was no emergency, no immediacy to run

10   out and proceed there when there were other proceedings that

11   were going to be binding on --

12           THE COURT:  Is there any emergency that the State

13   would recognize?  Suppose that the plaintiffs were a couple,

14   one of whom was on his deathbed.  Would the State say that

15   we -- you are to be -- you are to move forward, if you think

16   that they will be irreparably harmed because one of the spouses

17   will die before this is decided by the Fifth Circuit and they

18   want to be married now in Mississippi?

19           MR. MATHENY:  That might be a circumstance, but I

20   think what your example -- the important point about it is

21   is -- and particularly when you're talking about preliminary

22   injunctive relief, in these other cases where that has come up,

23   they went through the process that applies and there was proof

24   about those things.

25           In this case when we're talking about broad relief, I

1   don't think that you can do it.  I don't think you can ignore

2   that there's not any evidence before the court that there's

3   some sort of situation out there like those described that are

4   the basis for wanting an injunction, a statewide applicable

5   injunction to the state laws.

6          One other point about the West Virginia case that's

7   buried in there, but it's significant I think, is even when --

8   even -- even in spite of the Fourth Circuit's decision, the

9   judge in West Virginia sua sponte stayed the case until all the

10  appeals were exhausted to be absolutely sure that they got the

11  decision right.

12         And unless your Honor has some other questions, that

13  would bring me to my closing point which is in talking about

14  the orderly process and the importance of that and then the

15  lens of looking at this in terms of preliminary injunctive

16  relief, you want to let the process play out and you want to

17  follow the process specifically, because one thing that we can

18  all agree on, everybody in this room, whatever the legal result

19  is we want to get it exactly right and we want it to be exactly

20  right.  We don't want to -- for the law to be on and then off

21  and then on and then off again.

22         That's how you sum up the way I believe the State

23  looks at the equity factors and the importance of those in

24  terms of their relation to the motion for preliminary

25  injunction.  And as I had said before, I'll let Mr. Barnes

1    address the discrete issue of -- or the similar but different

2    issue about what to do -- if there is an injunction, what to do

3    about preserving the appellate rights to seek a stay.

4         THE COURT:  Okay.  Thank you, Mr. Matheny.  Could

5    counsel approach, please.

6       (BENCH CONFERENCE)

7         THE COURT:  The intentions were to go back to

8    Ms. Kaplan and then move into the stay, but I think my court

9    reporter will need a break for lunch and probably y'all too.

10   Are we prepared to go --

11        MS. KAPLAN:  I'm prepared to go on on reply, if that's

12   easier for your Honor, whatever you choose.

13        THE COURT:  Yeah.  And then that will create a good

14   amount of segue or separation between, but I do think we're

15   going to take about an hour lunch break after Ms. Kaplan

16   finishes her -- if it's better to do it -- to break now, I can

17   do that as well.

18        MS. KAPLAN:  I'm happy to do the reply now.  And, as

19   your Honor knows, I'm fast.  So I'll go quickly.

20        THE COURT:  And then we'll -- I'll announce on the

21   record what time we'll come back and all.

22      (BENCH CONFERENCE CONCLUDED)

23        MS. KAPLAN:  Your Honor, I'm going to respond briefly

24   to the points made by my friend for the State.  I'm going to

25   take, if it's okay with your Honor, the arguments in reverse

1  order the way they were made.  So let me start with the

2  argument about -- the last argument about preliminary

3  injunction and orderly -- orderly process.

4       I think the fundamental thing to think about here is

5  that the parties have agreed with respect to this motion that

6  there is no need for evidentiary presentations, no need for

7  proof and that the issues can be decided on the law.  As a

8  practical matter then, the only distinction between a

9  preliminary injunction and a ruling later, since there's -- no

10 one's talking about putting on any evidence, is the timing of

11 the briefing, because they will both be briefing -- we're

12 talking about briefing on legal issues.

13      Here while I certainly concede that the briefing

14 schedule was expedited, the State did an extremely good job in

15 filing a lengthy brief on the merits within the page limits, of

16 course, another brief for the Governor on the merits and a

17 brief on a stay.  So as a practical matter, I don't really see

18 a distinction between the procedure that we're following here

19 on a preliminary injunction -- a preliminary injunction and the

20 procedure that one would follow if an injunction -- preliminary

21 injunction had not been sought other than the fact that the

22 briefing on the legal issues happened a little bit more quickly

23 than ordinarily.

24      With respect to the wait-and-see approach, it's my

25 understanding that that approach is one that has to do with the

 1    democratic process.  In other words, the argument is that

 2    courts shouldn't rule because they should let the legislatures

 3    and legislators decide.  I'd never heard the argument prior to

 4    today articulated that the wait-and-see approach extends to

 5    courts so that the court should wait and see while another

 6    court decides something.

 7            And the truth of the matter is, your Honor, I can't

 8    think of any principled way for that form of wait and see to be

 9    applied.  Who's to decide which court gets to decide?  A court

10    in Mississippi?  A court in Louisiana?  A court in Texas?  So I

11    don't think that argument makes a lot of sense when we're

12    speaking about courts.

13            THE COURT:  How about the Fifth Circuit ruling on --

14    and let's assume, for example, that Texas law is the same as it

15    is here and the Louisiana law is the same as it is here and

16    they're represented by capable counsel and the argument's due

17    to be argued on January the 5th.  Should we wait until the

18    Fifth Circuit -- and that may be something we'll get into in

19    the next prong of the argument, but should -- is that something

20    the court should wait on?

21            MS. KAPLAN:  I think -- obviously, the Fifth Circuit

22    will have the opportunity to make the ultimate decision within

23    the circuit.  But I think there's only an advantage to the

24    Sixth Circuit (sic) having the benefit of your Honor's opinion

25    before it when it makes that decision.  That way it has the

1   advantage --

2           THE COURT:  The Fifth Circuit.

3           MS. KAPLAN:  Excuse me.  The Fifth Circuit has the

4   benefit of decisions from judges in all three states that are

5   affected.  I think that's appropriate here.  And I will point

6   out that that's exactly what happened in the Sixth Circuit.

7   The Sixth Circuit, unlike what my counsel mentioned, heard

8   appeals from Michigan, Ohio, Kentucky and Tennessee.  So some

9   courts have stayed, but most courts have actually decided in

10  all the states and those decisions have gone up.

11          And, again, your Honor, I'm a New Yorker.  So I don't

12  want to presume to say anything, but I assume Mississippi has

13  its own interests, its own values and certainly is a different

14  state, though they're close by, than Louisiana or Texas.

15          And your Honor brought up an issue with respect to

16  this wait-and-see issue in terms of all deliberate speed in the

17  wake of *Brown v. Board* and you asked counsel a very good

18  question, which is, *Look, who's to know when things will*

19  *happen?  How do we know when the legislature will act?  And how*

20  *can I have any confidence that that will happen?*  And you

21  actually raised the question of the sodomy statute.

22          Ironically, the very case -- I think I mentioned this

23  before -- that the State offers here, which is Exhibit 2 to

24  Governor and Attorney General's response in Opposition to

25  Plaintiffs' Motion for Preliminary Injunction -- and that's the

1    *Walker v. Mississippi* case, the magistrate's decision and the

2    district court's decision.  As I mentioned, that prisoner had

3    originally moved to strike Mississippi's sodomy statute and

4    that -- it says in the decision that that court dismissed that

5    motion.

6              Now, what's truly interesting about that is that was

7    in 2006, three years after *Lawrence*.  So the court should have

8    known at that point that the statute was no longer good law.

9    Mississippi legislators should have done something.  It was

10   still on the books.  And even the court dismissed an argument

11   that it should be struck as unconstitutional.

12             There was a lot discussion about overinclusive and

13   underinclusive and whether a court applying rational basis can

14   ask itself the question whether a statute is so radically

15   either overinclusive -- here the statutes are both -- and

16   underinclusive that it doesn't satisfy rational basis.  And the

17   argument was made that that necessarily is an analysis that can

18   only be done under heightened scrutiny.  That's not the case.

19             In two cases not involving gay people, *Cleburne* and

20   *Moreno*, Supreme Court cases, the Supreme Court did precisely

21   that kind of analysis and said it was applying rational basis

22   and held the statutes to be unconstitutional.  In *Romer* in

23   1996, again, the Supreme Court did precisely that analysis,

24   said it was doing rational basis review and said that the

25   Colorado amendment at issue in *Romer* was broadly both

1    overinclusive and underinclusive and, therefore, it was

2    unconstitutional under rational basis.  Moreover, I don't even

3    think that really matters because you still, as counsel

4    conceded, have to have a rational connection, either a good

5    reason and a rational connection between the legitimate reason

6    and the law.

7            Let me talk about some of the rational basis cases

8    that people on the other side like to rely on here.  *Beach*

9    *Communications* is a case about FCC regs.  It's an opinion by

10   Justice Thomas.  And in that case Justice Thomas goes on to

11   cite a whole bunch of good reasons, a lot more than are cited

12   here, none of which are really arguable good reasons, for why

13   FCC regs about cable companies and how they operate was totally

14   rational.

15           In *Johnson*, the case was about the government giving

16   certain kinds of benefits to veterans who had actually served

17   in the military as opposed to conscientious objectors.  And,

18   there again, the Supreme Court said it makes sense to give

19   educational benefits to someone who actually took the risk of

20   serving and risk their life for the country as opposed to

21   someone who's a conscientious objector.  Again, a very strong

22   reason, a very rational reason that's connected to the

23   objective, the kind of reason that's completely lacking here.

24           So the counsel on the other side also asked what has

25   changed.  And he's right about that.  The fact of the matter is

```
 1    I've been doing this litigation for a long time.  The same

 2    arguments that were made in the early 2000's are being made

 3    today, and the decisions are coming out the other way.  I think

 4    the answer to that question is not the law, frankly, your

 5    Honor.

 6         I think the answer to that question is that -- as

 7    Justice Kennedy said in Lawrence, is that times can blind us to

 8    certain truths and that people had not -- did not have the

 9    understanding that they have today that gay people are no

10    different than anyone else.  And if there was any question

11    about that, I think what's really moved both courts and the

12    country on that is the Supreme Court's decision in Windsor that

13    basically made it clear time and time again that gay people

14    have the same dignity as everyone else and that that dignity

15    needs to be respected equally under the law.

16         Let me talk a little bit about animus.  I think your

17    Honor is getting at it from exactly the right place, which is

18    the fundamental point about animus in this context is that the

19    Supreme Court of the United States found there to be animus in

20    the Windsor case.  There's no question about that.  And I think

21    that fatally undercuts counsel's arguments that in order to

22    find animus you have to conclude that it was -- there was no

23    other objective, no other motivation.  I think counsel said

24    anything but animus.

25         That's not what Justice Kennedy did in Windsor.  He
```

1  did not make a conclusion that every single legislator who

2  voted for DOMA had impermissible animus in his heart or mind.

3  As I said before, he just looked at the text of the statute, as

4  your Honor has pointed out, and the context and the statement

5  in the House report.

6          Here in the context of Mississippi I think the

7  constitutional amendment of this argument is particularly

8  strong because, after all, Mississippi had a statute on its

9  books already from 1997 prohibiting marriage between gay

10  people.  And again with all respect, I think it's realistic to

11  assume that there was really no way on God's green earth in

12  2004 that the State of Mississippi was going to somehow decide

13  legislatively to decide to allow gay people to marry.

14          So, therefore, the only reason for putting a

15  constitutional amendment in addition to the decision that came

16  out of Massachusetts in *Goodridge* is some sense that we've got

17  to make it really, really, really, really sure that gay people

18  are going to be treated differently.  And that's the kind of

19  animus that Justice Kennedy was talking about in *Windsor*.

20          Let me talk briefly, very briefly, about Justice

21  Sutton's opinion in the Sixth Circuit, only on one point.  I,

22  frankly, do not know how one can reconcile Justice Sutton's

23  approval, apparently, of the *Loving v. Virginia* case with his

24  view that one needs to do an original interpretation of the

25  Fourteenth Amendment, because if your Honor -- as your Honor

1  had pointed out, when the people were ratifying the Fourteenth

2  Amendment, it was absolutely clear that black people couldn't

3  marry white people.  And so if that view of the Fourteenth

4  Amendment is correct, then *Loving* was no longer good -- was

5  not -- was incorrectly decided.  And that, again, shows why

6  that interpretation I think is incorrect.

7          In terms of the fundamental right analysis, and I

8  think -- and there was a lot of talk about *Washington v.*

9  *Glucksberg*.  I think what's clear from the court's decisions is

10  that the fundamental right to be recognized has to be based on

11  tradition.  So here there's obviously a tradition --

12  fundamental tradition of people having -- getting married in

13  our society.  That's always been the case, or at least for a

14  very long time in Western society.

15          But I think what the Supreme Court has been very clear

16  about is that once that fundamental right based on tradition is

17  recognized, what's not based on tradition is who gets to

18  exercise it.  So again going to *Loving*, in *Loving* there was a

19  longstanding tradition that black people, or African-American

20  people, could not marry white people.  The races couldn't mix.

21  But the Supreme Court recognized there's a fundamental right to

22  marry and said that you can't limit that fundamental right to

23  groups who want to exercise it.  And the same thing applies to

24  gay people, of course.

25          On the heightened scrutiny issue and what your Honor

1   can or cannot do in that respect, I heard the State to concede

2   that *Baker v. Wade* is no longer good law.  I need to correct

3   myself on that.  The statute at issue in *Baker v. Wade* was

4   actually a Texas statute.  It was the same statute that was

5   overruled in *Lawrence*.

6           I don't think that the fact that the Supreme Court has

7   not decided whether or not gay people get heightened scrutiny

8   binds this court.  After all, the Sixth Circuit actually didn't

9   reach this issue.  Judge Sutton made no ruling on whether gay

10  people get heightened scrutiny.  He said he was bound by a

11  post-*Lawrence* Sixth Circuit decision, which is different than

12  the court here.  But he made no analysis of the factors.

13          And if the Supreme Court's nondecision, essentially,

14  not to decide the question of whether gay people get heightened

15  scrutiny was binding, then the President never would have

16  changed his opinion on DOMA.  What changed the Department of

17  Justice's view on DOMA is the fact that they concluded that gay

18  people get heightened scrutiny and that that was an open issue

19  both in the Second Circuit and in the Supreme Court.

20          And counsel's correct that the -- that post *Baker v.*

21  *Wade* cases in the Fifth Circuit basically just say the Supreme

22  Court hasn't decided this.  But, again, that's not a reason not

23  to decide it.  It is not a binding determination, your Honor.

24  It just means it's an open question.

25          Let me talk a little bit about -- there's a lot of

1   *Baker*s here -- *Baker v. Nelson*.  This is what Judge Jacobs

2   wrote in the *Windsor* case about *Baker v. Nelson*.  "In the 40

3   years after *Baker* there have been manifold changes to the

4   Supreme Court's equal protection jurisprudence."  And he cites

5   *Frontiero*, *Boren, U.S. v. Virginia, Romer* and *Lawrence*.  As

6   your Honor pointed out, that decision was a decision that was

7   affirmed by the Supreme Court.  And not only was that not

8   mentioned -- that argument not mentioned by the majority, it

9   wasn't even mentioned by any of the dissenters.

10          While I agree with your Honor that a court has to be

11  very careful about relying on cert denials, the fact of the

12  matter is is that four justices of the Supreme Court thought

13  that *Baker v. Nelson* was binding.  One -- and it was clear and

14  obvious that there was no issue to be litigated anymore.  One

15  would presume that four justices would have voted to take cert

16  and clarify that correction in October of this year.

17          With respect to the *Hatten v. Rains* case cited by my

18  adversary, that was that New York case that was dismissed

19  summarily by SCOTUS the same year as the Texas case was before

20  the Fifth Circuit.  As you pointed out, it was a claim of age

21  discrimination with respect to judges.  But in that case there

22  was no question of subsequent doctrinal developments.  There

23  couldn't have been and there were none with respect to the

24  issues that were presented within that, you know, very short

25  period.  I'm not even sure there have been any since.

 1          And, indeed, talking about another important issue in

 2     the case, age does not get heightened scrutiny for a very good

 3     reason, or at least a reason that now I think is very good --

 4     maybe when I get older, I'll disagree -- and that's because

 5     under the second factor of heightened scrutiny, people assume

 6     that as you get older it actually does have some ability (sic)

 7     to your ability to contribute to society.  And I think we heard

 8     from the State that they concede that being gay does not.

 9          Finally, my adversary talked about -- I think his

10     expression was that Windsor has everything in it for everyone.

11     In one respect I agree with him.  People can find something --

12     a lot of people can find something that they like in *Windsor*.

13     That's actually what lawyers do.  We get trained and paid to

14     find things that we like in Supreme Court decisions.  So that

15     is certainly true that lawyers have been able to find something

16     for everyone in *Windsor*.  But the difference is judges.

17          With respect to the judges post *Windsor* who are not

18     paid and are not -- don't have clients and are supposed to be

19     deciding things based on justice and the law, the vast majority

20     of judges have agreed that *Windsor* is not a decision that says

21     that states can do whatever they want with respect to who can

22     marry and that what *Windsor* stands for is the proposition that

23     gay people have the same dignity and the same equality as

24     everyone else.

25          And, as I said before, once the court recognizes that,

1   as we've heard today, it's very, very hard, if not impossible,

2   to come up with any decent reason for why there should be

3   discrimination in marriage.  Thank you, your Honor.

4           THE COURT:  Let me ask you this.  Since this *Windsor*

5   can be seen by different people for different reasons and ways,

6   *Windsor* speaks in enhancing the dignity of a person and not

7   demeaning and sort of -- New York had attempted to do that.

8   And *Windsor* spoke positively about expanding the rights.

9           If I want to see that from the viewpoint of the court

10  suggesting to the states maybe you ought not to diminish these

11  rights in the way that the Congress attempted to do in DOMA,

12  could -- since anybody can see any case in any way, is that an

13  arguable way to sort of read *Windsor*?

14          MS. KAPLAN:  Yeah.  I mean, I think what Justice King

15  is talking about and is certainly true is that in New York in

16  *Windsor* -- you're right.  The New York Legislature enacted

17  equality in marriage for gay people.  And states always have

18  the right to expand the rights of minorities.  There's no

19  question about that.  What states don't have the right to do is

20  have a law that violates in some respect the Constitution.  And

21  that's what we're talking about here.  I completely agree with

22  that, your Honor.

23          THE COURT:  All right.  Thank you.  This is an

24  extremely important case to everyone.  We're at the point where

25  the court is going to take a lunch break.  We don't expect this

1    to go all day, but we do -- we'll start back up at 1:45.  And

2    is that sufficient time for counsel?  It's 12:32 now.  Is that

3    sufficient time for counsel?

4              MR. MATHENY:  Yes, your Honor.

5              THE COURT:  Okay.  And we'll start back up then.

6    Thank you so much.

7         (NOON RECESS)

8              THE COURT:  You may be seated.  I hope everyone

9    enjoyed their lunch, or at least their break.  I think now it's

10   appropriate to turn to the State for the second half of the

11   argument.  Are you ready to proceed?

12             MR. BARNES:  Yes, your Honor.  Paul Barnes with the

13   State.  May it please the court.  The factors that apply that

14   the court should consider in determining whether or not to

15   apply a stay are well known:  Strong showing that the applicant

16   is likely to succeed on the merits; where the applicant will be

17   harmed in the absence of a stay; where the issuance of a stay

18   will substantially injure other parties interested in the

19   proceeding; and where the public interest lies.

20             There's no reason to belabor the merits issues here

21   today, obviously, although we would like to point out that it's

22   a slightly different standard that applies when the court is

23   considering the injunction itself on the merits and when the

24   court is deciding whether to issue a stay.

25             When the equities heavily weigh in favor of the

1   applicant, the applicant need not make a strong showing or show

2   a probability of success on the merits, but need only show a

3   substantial showing that -- and a serious legal question.  We

4   think that the State prevails on the stay issue here under

5   either standard.

6           They took us to task a little bit in their response to

7   the motion saying that we were admitting defeat by asking for a

8   stay before an injunction had been granted.  That's not the

9   case.  We feel strongly in the strength of our arguments on the

10  merits.  However, in light of events that have occurred in

11  other states, it would have been foolhardy not to take into

12  account the possibility that the State might not be successful.

13          So we filed this motion specifically to avoid a

14  sequence of events like that which occurred in Utah.  Utah is

15  the best example.  And it was complete chaos.  In Utah the

16  district court entered a preliminary injunction striking down

17  the State's traditional marriage laws, but the State had not

18  requested a stay at that time in the event the court entered

19  the injunction.

20          The court -- the State then moved for a stay.  Three

21  days later the district court denied the stay.  Immediately

22  same-sex couples began going to the appropriate clerk's

23  office -- offices.  Apparently, over 1100 licenses were issued;

24  over 1,000 marriages took place.  Meanwhile, I believe the

25  application for a stay in the Tenth Circuit was denied; but,

1    ultimately, the State applied for a stay to the Supreme Court

2    which granted a stay several weeks later.

3              At that point is when the real mess began.  The State

4    took the position that the marriages which had occurred in the

5    interim were on hold and could not be recognized or should not

6    be recognized until the merits were resolved by the appellate

7    courts.  In Utah you had different public officials both on the

8    state and local levels taking different positions, both

9    privately and publicly, about the meaning and impact of the

10   injunction, the impact of the stay and the validity of the

11   marriages.

12             Ultimately, there was -- for example, you even had a

13   state court recognizing the validity of marriages in an

14   adoption case, and the Utah state courts issued a show cause

15   order against officials of the state agency who would not

16   recognize validity of the marriage.  And the state Supreme

17   Court then had to step in and stay the result of that order.

18   So it was a real mess.  And, again, those kinds of things would

19   be likely to occur if the court should enter an injunction here

20   and not order a stay, and we'd like to avoid it.

21             Ultimately, the same-sex -- some of the same-sex

22   couples who had been married while the preliminary injunction

23   was in effect but before the stay went into effect had to file

24   a separate lawsuit in federal district court to get an

25   injunction to require the State of Utah to recognize their

1   marriages as valid.

2          The court ruled in their favor through what I consider

3   some fairly sophisticated legal legerdemain, but -- regarding

4   that activity.  But the end result was that the state then

5   appealed that to the Tenth Circuit.  That was still pending

6   when the Supreme Court denied cert in *Kitchen*.  So at that

7   point you had a Tenth Circuit precedent saying that state laws

8   barring same-sex marriage were unconstitutional, cert had been

9   denied on the Tenth Circuit ruling, and at that point the state

10  stops trying to defend the laws -- stopped trying to the

11  challenge the validity of the marriages which had occurred in

12  the interim and withdrew its appeal.

13         We have every reason to believe that if the court

14  enters an injunction, as soon as possible same-sex couples

15  would begin going to state courthouses and circuit clerk's

16  offices to seek marriage licenses.  We -- I don't think it's a

17  surprise to anyone that we will appeal if the State is

18  unsuccessful here, and we would ask for stay relief from the

19  Fifth Circuit.  I think if we were successful here on the

20  merits, I doubt that the plaintiffs wouldn't also appeal.

21         So the issue is should this court go ahead and grant a

22  stay to hold the status quo to prevent irreparable injury to

23  the State, to the litigants and injury to the public

24  interest --

25         THE COURT:  How will the State be irreparably injured,

1   though?

2          MR. BARNES:  Well, a number of ways, your Honor.

3   First you've got the practical difficulties with dealing with

4   an immediate and sudden change in law.  On the one hand, the

5   plaintiffs say denying same-sex couples the benefits of

6   marriage is a wide-ranging scheme of discrimination that

7   involves numerous different areas of law such as taxation,

8   probate, health, education, et cetera.  On the other hand, they

9   make the assertion in their complaint that the State of

10  Mississippi will incur little to no burden in allowing gay

11  couples to marry and recognizing valid marriages of gay couples

12  from other states.

13         Well, that has not been my personal experience in

14  state government in that changing some of those administrative

15  schemes does take at least some minimum amount of time.

16  Moreover --

17         THE COURT:  How much?  Two weeks?  Ten days?  A month?

18         MR. BARNES:  You know, your Honor, honestly, I'm not

19  going to tell you I'm an expert on every area of administrative

20  law, but I would think that at a minimum a couple of weeks

21  would give the clerks and the other personnel time to be

22  prepared to begin dealing with the issues that would result.

23         THE COURT:  I've got some questions for the clerk's

24  office as far as what it takes for them.  It seems to me

25  that -- I hadn't gone through that process in about 25 years,

1  but I think it's just a matter of filling out an application.

2          MR. BARNES:  It's simpler now.  And if we were just

3  talking about the marriage licenses, that would be one issue.

4  But, again, as soon as the marriage license is issued, as

5  they -- they've only brought in the Hinds County Circuit Clerk

6  as a party; but as they've argued, you know, a marriage license

7  issued by any county in Mississippi is valid throughout the

8  state.  So that means that every one of the circuit clerks in

9  every one of 82 counties would have to be prepared to issue

10 same-sex marriage licenses.

11         THE COURT:  And how much -- that question is going to

12 be asked of the circuit clerk's attorney.

13         MR. BARNES:  Yes, sir.

14         THE COURT:  But what's the difference between -- if

15 1200 opposite-sex couples merge onto the Hinds County Clerk's

16 Office -- we won't use Hinds County because he's going to be

17 prepared to answer that question -- Oktibbeha County --

18         MR. BARNES:  Well, your Honor --

19         THE COURT:  -- what happens?

20         MR. BARNES:  Well, I think, obviously, in some

21 counties, perhaps in smaller counties, it might take longer to

22 get one application processed than it would to get 100 handled

23 in a larger county.  So I think there would be a range of time.

24 I think you'd really have to ask -- as far as the licenses are

25 concerned, you'd have to ask the clerks in each county.

1          I do agree that the process is easier than it was when

2     I got married.  You no longer have to have a blood test.

3     There's no longer a three-day waiting period, et cetera.  It's

4     my understanding that both parties go and apply.  However,

5     they're also asking the State -- this court to enter an

6     injunction immediately requiring the State to recognize the

7     validity of same-sex marriages, not only same-sex marriages

8     performed in the state, but same-sex marriages which have been

9     performed in other states.

10          Now, the cogs that turn -- that have to turn to adjust

11     things like taxation schemes and adoption and education, which

12     are complex administrative regulatory schemes, that would take

13     more time.  Obviously --

14          THE COURT:  But the adoption process is a legal

15     process anyway where somebody has to formally go into court and

16     file a petition and that petition is answered.  There is a

17     hearing before a chancellor.  And if the chancellor knows that

18     it's a same-sex couple trying to adopt a child, then --

19          MR. BARNES:  That's true, your Honor, and perhaps

20     adoption may not be the best example.  But taxation is a good

21     one where we all know that that is a -- that's a very intricate

22     system.  And also in their complaint the plaintiffs didn't

23     exactly go into detail as to exactly how same-sex couples are

24     disadvantaged --

25          THE COURT:  Well, let's talk about taxation.

1  Generally, people file taxes once a year.

2          MR. BARNES:  That's right.

3          THE COURT:  I mean, generally.  I mean, they wait

4  until April 15th, thereabouts, when they file.  So -- and they

5  file either jointly or separately or however they file.  And it

6  is processed through the tax commission's office in that

7  manner, right, once they make the affirmative showing of how

8  they are filing?  Right?

9          MR. BARNES:  Yes, your Honor.  Again, but it's my

10  understanding that -- again, I -- I'm not going to state this

11  for a fact, but I believe that proprietary software is involved

12  and it's not just as simple as flipping a switch.  They do have

13  to go in to modify the way the system was going to handle those

14  tax returns.  And it is also true that you can amend an

15  individual's tax return in Mississippi for up to three years.

16          So particularly with regards to irreparable and

17  immediate harm which might occur to plaintiffs on the taxation

18  issue, as you mentioned, they wouldn't have to file tax returns

19  for this year until the spring.  And then also if their rights

20  were vindicated, I mean, this court or on appeal or ultimately

21  the U.S. Supreme Court, they could amend their tax returns.

22          THE COURT:  But people can always amend their tax

23  return.

24          MR. BARNES:  That's right, your Honor, which is why

25  it's not immediate and irreparable injury to the plaintiffs for

1   this court to deny (sic) a stay.

2          THE COURT:  Well, why should the State be given the

3   benefit of a stay just because they have to go through some

4   regulatory rigmarole with respect to taxes, with respect to

5   adoptions, with --

6          MR. BARNES:  I'm glad you asked, your Honor, because

7   it's not just that.  First of all, the Fifth Circuit has

8   accepted the premise on several occasions and very strongly

9   accepted the premise that when a state is prevented from

10  enforcing its laws, the State necessarily suffers irreparable

11  harm.

12         Plaintiffs have argued and I'm sure will argue again

13  that a moment's delay in the exercise of a civil right is

14  automatically irreparable harm.  We are not going to suggest

15  that it would be no harm to litigants.  I think that would

16  be -- we couldn't justify that statement.

17         However, when you're talking about the cases that deal

18  with that type of irreparable harm generally are dealing with

19  well-established and fundamental rights that have been long

20  recognized.  That is not the case here where even though

21  they're asking the court to find a fundamental right,

22  nonetheless, none of us would I think disagree that they are

23  asking the court to change the status quo.  So we don't think

24  those cases are as appropriate as they might be in another

25  context.

1              Second and because the situation in Utah is relevant

2      to all three of the remaining factors, the public interest in

3      the one sense, in the sense of enforcement of the State's laws,

4      the Fifth Circuit has said that the public interest merges with

5      that of the State.  Also the public interest -- the State --

6      the public has a strong public interest in the stability of

7      marriage laws.

8              And I think we can all agree that whether we're

9      talking about marriage laws in general or same-sex marriage,

10     the State and the public interests would be best served by

11     stability of marriage laws.  The public interest would not be

12     served by an on-again, off-again situation like happened in

13     Utah.  Now, in their response the --

14             THE COURT:  If the court rules against the State, the

15     State can decide not to appeal like some of the other states

16     did.

17             MR. BARNES:  Well, your Honor, all I can say is that

18     is a decision that will be made well above my pay grade, and

19     I'm happy to let that be the case.

20             THE COURT:  Okay.

21             MR. BARNES:  That wouldn't be my call.  But -- you

22     threw me off a little bit, your Honor.

23             THE COURT:  I'm sorry.

24             MR. BARNES:  But the --

25         (REPORTER READ BACK REQUESTED PORTION)

1          MR. BARNES:  I was going to say that the plaintiffs

2    accused the State of chutzpah in its response for asserting

3    that a stay might provide protection for the plaintiffs.  That

4    may be so.  But if so, that reasoning was -- has been accepted

5    by more than one district court in determining to issue at

6    least a temporary stay.

7          That was true of the court in Wyoming last month after

8    the Supreme Court had denied cert in *Kitchen* when the *Long*

9    court essentially said, *I know I have a Tenth Circuit precedent*

10   *against me, I know cert has been denied, but the court is faced*

11   *with the reality that the stability in marriage* -- that *if*

12   *same-sex couples are going to have the right to marry, if*

13   *they're entitled to that, they need to get it once and for all*

14   *time and we don't need to give with the one hand while we take*

15   *away with the other.*  And that is a concern that has motivated

16   other courts.  And, your Honor --

17         THE COURT:  Isn't that what might happen on the

18   national level, assuming the Supreme Court takes the Sixth

19   Circuit case and assuming the Supreme Court says, *You know*

20   *what, Sixth Circuit?  You were right and everybody else in the*

21   *world was wrong*?  What happens to all the marriages of people

22   who have been married since cert denied, since other stays were

23   lifted, since -- since DOMA?  What happens?  Since *Windsor*.

24   Since *Windsor*.

25         MR. BARNES:  I think that it would -- my best answer

1   would be it would probably end up being a result of state law.

2   It would be a separate question in each state.  I do know that

3   in the -- in the *Evans* case in Utah the federal court looked to

4   Utah state law to determine the retroactivity of statutes.  And

5   as I understand the holding in that case, it was that the

6   same-sex marriage ban had been in place.  The preliminary

7   injunction lifted it.  Marriages occurred during the interim

8   when there was no stay.

9        When the Supreme Court entered the stay, the law

10  became effective again.  The district court there said there's

11  no indication that Utah intended its same-sex marriage

12  prohibition to be retroactive.  So, therefore, these marriages

13  were valid when they occurred and they're valid now.  But I

14  think the essential point from that situation is that it

15  required a separate lawsuit, you know, to vindicate those

16  rights.  And it was still only ultimately resolved when the

17  Supreme Court denied cert in the *Kitchen* case.

18       And there, again, you had -- you had, you know, the

19  Tenth Circuit, and here we don't have anything from the Fifth

20  Circuit yet.  And so it does place us in a slightly different

21  situation.  As I understand it, just today a district court in

22  South Carolina entered a temporary stay.  I don't know all the

23  details, but I was just trying to catch up at lunch to see if

24  Judge Sotomayor or the court had done anything in the Kansas

25  case.

 1          But the South Carolina court had entered a temporary

 2   stay to allow the State to seek relief from the Fourth Circuit.

 3   And that was true even though there was already a Fourth

 4   Circuit precedent striking down bans on same-sex marriages.

 5   Again, the State's in a different position here because there

 6   is no Fifth Circuit precedent controlling.

 7          THE COURT:  I guess ultimately, though, the question

 8   becomes how long does the State seek the stay assuming the

 9   court rules against the State.  I mean, we know that there's an

10   argument scheduled in the what I'll call the companion case as

11   I know it -- trust me, this one here is not tied to those two

12   at all -- but January the 5th.  So that's almost six -- a

13   little bit less than 60 days.  And, of course, the court will

14   have to rule after that point.

15          MR. BARNES:  That's true, your Honor.  We would ask --

16   the State asks that the court, if it was to rule against the

17   State, would enter a general stay pending the result of the

18   appeal and the result of the Fifth Circuit's resolution of the

19   issue.

20          Whether this case would then go -- I'm assuming it

21   would go up quickly.  Whether or not expedited, you know,

22   handling might be granted, who knows.  That would be the Fifth

23   Circuit's decision.  But we do know that the Fifth Circuit has

24   in place a plan to resolve this issue in Louisiana and Texas

25   cases.

1          We know that they have a timetable set.  The cases are

2    set before the same merits panel.  Of course, we have no idea

3    who that is yet.  But we know they're assigned to the same

4    merits panel.  And as the court mentioned, that oral argument

5    is set for the 5th of January.  Presumably, hopefully, the

6    court then would rule within two to three months after that,

7    maybe less, maybe more.

8          Considering the fact that it's one merits panel and

9    they've got all the arguments before them and they have the

10   benefit of all the other decisions and the reasoning and

11   rationales that the courts have applied on both sides,

12   hopefully, you know, the court will have plenty of things to

13   work with.

14         And so we would ask for a general stay.  And at a

15   minimum, we would ask the court to enter a stay of at least two

16   weeks merely to allow the -- one, the clerks to prepare, and to

17   allow the State to seek a longer stay from the Fifth Circuit.

18   We believe, though, that when the court is making the decision

19   that will change the social fabric of the state, which this

20   will, we would urge caution at least -- you know, as far as the

21   stay is concerned -- and that -- as the other district courts,

22   the court in Wyoming and the court in South Carolina, the

23   courts in Florida have.

24         THE COURT:  Have there been any -- have there been any

25   courts that did not grant stays and that later, I mean, there

1  was no problem with them not granting stays?

2  MR. BARNES:  I'm not aware of any, your Honor, but I

3  am not going to profess to be an expert on every same-sex

4  marriage case that's ever come down because, as you know, there

5  are many.

6  I am not aware of any recently other than the cases in

7  the Ninth Circuit, Tenth Circuit, Fourth, Second Circuit,

8  et cetera, where they dissolved the stays that had previously

9  existed, where the Supreme Court dissolved the stays.  And I

10  know that the parties in those cases then moved for a final

11  relief, final judgment since the stay had been lifted and that

12  that has been granted.  I'm not aware of a situation exactly

13  like the court described.

14  But, again, because the Fifth Circuit does have -- is

15  poised -- really is poised -- this issue is squarely teed up by

16  the Louisiana and Texas cases.  And to this point no same-sex

17  marriages have been permitted to occur in either Louisiana

18  since the court upheld the validity of the law or in Texas

19  since the court stayed the effect of the law.

20  We do think that the Fifth Circuit is likely to take

21  into account that Mississippi would then be the only state

22  within the circuit where same-sex -- that same-sex marriages

23  were being performed and recognized at a time when the court is

24  on the verge of taking up the issue through oral argument.

25  THE COURT:  With respect to the Texas court, do we

 1    know -- did that court articulate his reasons why he was giving

 2    the stay?  I mean, Texas is how many times bigger than

 3    Mississippi?  A lot.

 4            MR. BARNES:  I'm sorry?

 5            THE COURT:  Texas is how many times bigger than

 6    Mississippi?

 7            MR. BARNES:  It is, your Honor.

 8            THE COURT:  And I assume populationwise, if you do

 9    have -- you know, 3, 4, 5 percent of that population decides to

10    make a run on the clerk's office, that's probably half of the

11    population of the state of Mississippi.

12            MR. BARNES:  Of course, you'd also presume that they

13    have a lot more clerks' offices and the ability to handle it.

14    But I actually looked at the transcript from the stay, the

15    injunction hearing, the stay hearing in the Texas case.  And,

16    of course, that did occur before, you know, the Supreme Court's

17    decision to deny cert in several circuits.  Happened back in

18    either January of this year or February.

19            And, essentially, the court didn't -- didn't really

20    explain this reasoning, but there the plaintiffs did not oppose

21    the stay.  And there was really no -- it was -- seemed to be

22    accepted as a matter of common sense that, you know, that some

23    sort of stay at a minimum would be necessary to implement such

24    a change.  But that stay has never been revisited and it hasn't

25    been lifted and it's still in place today.

1          And one thing that we can say that the Supreme Court

2  has shown in regards to same-sex marriage is that the Court,

3  one, is not going to take up the issue unless it absolutely has

4  to.  Two, the Sixth Circuit creating a split probably means

5  that they will have to, but no one's going to dictate to the

6  U.S. Supreme Court, as you well know.  And the Sixth Circuit

7  opinion also, though, pointed out the fact that there's not

8  just a split in ultimate result; you know, there's a split in

9  reasoning, as Mr. Matheny talked about, on the merits.  And

10  there's no real clear consensus there.

11          THE COURT:  And since there is this split on what type

12  of review and all that, couldn't the court have found that as a

13  reason in which to have granted cert to sort of decide whether

14  it would be heightened scrutiny or rational basis or rational

15  basis with a punch or whatever and --

16          MR. BARNES:  Certainly, that's within the court's

17  power, you know.  But, again, the court doesn't ask any of us

18  what we think it should do, and they're going to make up their

19  own mind.  Obviously, we all know Justice Ginsburg, Thomas,

20  that in light of the Sixth Circuit decision, that there's more

21  urgency for the court -- there now is urgency for the court to

22  take up the issue.

23          We also know that the court often likes to let all the

24  circuits have a say.  The court very well might wait to hear

25  what the Fifth Circuit has to say on the issue, what the

1   Eleventh Circuit has to say on the issue.  You know, they like

2   to let the issues percolate before they -- before they take

3   them up.

4        But we do know without any doubt that the Fifth

5   Circuit has got to take up this issue.  And we know that the

6   Supreme Court has shown that they are going to let the

7   individual circuits settle things for themselves so far.  Since

8   they denied cert in the cases in early October, you know, the

9   court has -- seems to be taking a hands-off approach.

10       Again, we'll be watching with interest what happens in

11  the Kansas case.  We don't think -- obviously, if the Supreme

12  Court granted a stay in the Kansas case, we think that would

13  favor our position here.  On the other hand, you've already got

14  a Tenth Circuit, you know, precedent in place and you've got

15  the murky state law issues involved in that case.  So I'm not

16  sure if they deny a stay that it would -- that it would affect

17  our -- the relief we're asking for that much.

18       But, again, essentially, we're asking the court -- the

19  State is taking a cautious approach.  Let me start over.  The

20  State is taking a cautious approach.  We took a cautious

21  approach in filing this contingent motion in the event that the

22  court ruled against us.

23       THE COURT:  You just filed it early, I mean, because

24  if I rule against you, this would have been coming next.

25  Right?

1            MR. BARNES:  Yes, your Honor.

2            THE COURT:  Yes.

3            MR. BARNES:  Yes, it would have been.  And, honestly,

4    we felt it prudent not to allow a gap to occur if that -- if

5    that happens.

6            THE COURT:  Absolutely.

7            MR. BARNES:  But, you know, to grant a stay is a

8    decision that's within the sound discretion of the court.  And

9    we are asking the court, even should it decide to grant relief

10   to the plaintiffs, that the court exercise its discretion and

11   also, you know, exercise some caution in the immediate -- and

12   recognizing the immediate effects that would result from a

13   preliminary injunction if a stay were not entered.

14           I don't want to belabor the point.  If the court has

15   other questions, I'll be happy, you know, to answer them.  I

16   know you seem to have some questions of Mr. Teeuwissen, and

17   I'll be happy to let him address those.  If there's anything

18   else specifically I can help the court with.

19           THE COURT:  I would be interested in knowing -- we've

20   talked about -- and when Mr. Teeuwissen comes up, you can

21   probably think of other reasons.  You talked about taxes,

22   for example.  You mentioned taxes.  You mentioned adoptions,

23   birth certificates, I guess.

24           MR. BARNES:  Basically, all the things that -- I'm

25   sorry, your Honor.

```
1            THE COURT:  No, no.

2            MR. BARNES:  All the things that the plaintiffs were

3    asserting would be affected in their complaint, that they're

4    being -- each and every one of those regulatory schemes would

5    take some time for adjustment.  Some of them would probably be

6    quick and easy.  Some of them would be more complex.

7            THE COURT:  You know, because right now all I see is

8    changing a form or identifying a different person for

9    retirement benefits for PERS.  I think you can only put your --

10   I don't know.  I think if you're not married -- it's assumed

11   that the person who will get your benefits is your spouse, I

12   think.  But if you choose a -- if you designate a beneficiary,

13   you write that person's name in and that's a matter of a form.

14           MR. BARNES:  Right.  But, your Honor, again, it is my

15   understanding, though, that the computer systems which have to

16   process forms, et cetera, it's not quite that easy.  It might

17   be that easy in sending in a form saying, *I'm changing my*

18   *beneficiary*, but for them to process it is something different.

19           But you brought up an interesting point, because some

20   of the harms that they described in the complaint are -- there

21   doesn't seem to be any chance that these particular plaintiffs

22   would suffer those harms.

23           For instance, the court asked questions about the

24   institutional or representational standing of the Campaign.  In

25   the complaint the Campaign really says, *We have some*
```

1    *Mississippi members,* none are identified.  As for the

2    individual plaintiffs, none of them have been identified as

3    public employees.  None of them have been identified as

4    municipal employees.  None of them have been identified as

5    having involvement in the state retirement or having state

6    health insurance.  So there's no showing that any one of these

7    plaintiffs or any one that we know about specifically would be

8    affected immediately and irreparably.

9            THE COURT:  They couldn't get married.

10            MR. BARNES:  That's true, your Honor, but the point is

11    they're saying that there's immediate and irreparable harm that

12    needs to be remedied because of the state's conference of

13    benefits on, for instance, spouses of police officers killed in

14    the line of duty.  Well, as far as we know, there's no police

15    officers involved in the case.

16            You discussed the parade of horribles, you know,

17    earlier on the merits.  And they've sort of put a parade of

18    horribles out there too as regards to all the possible and

19    potential harms which could occur to any same-sex couple under

20    the appropriate circumstances.  We would ask the court to look

21    more closely at the harms that might be suffered here.  And

22    again, essentially, we think that the stability of marriage --

23    if same-sex marriages are ultimately upheld by the appellate

24    courts, you know, so be it, and, of course --

25            THE COURT:  I guess my problem is, you know, you

1    talked about, *Okay.  We don't do it by form.  We do it by*
2    *computer.*  The gender of a person, how is that relevant to
3    their name?

4         MR. BARNES:  Well, I think -- again, your Honor, I
5    can't really speak to the specifics, but I know that in many of
6    the state's computer systems it has to be coded a certain way
7    or it has to be programmed a certain way, because it will
8    only -- it won't accept inputs that would violate the law, for
9    instance.  So it's not just a matter of someone saying on the
10   form, well, yes, you can -- both spouses can be the same sex.
11   At least, that is my understanding.  But, again, I am not the
12   best person to talk to you about the intricacies.

13        But I will say I think this is the first -- this is
14   the first place where -- or the first state or case where the
15   fact that there would be at least some -- some regulatory
16   issues which would have to be dealt with requiring some minimum
17   amount of time to get up and running, they've never seriously
18   been questioned.  And, again, I wish I could give you -- the
19   court more specifics, but I'm not able to do so as I stand here
20   today.

21        But, again, we would just ask the court to consider
22   the impact that a preliminary injunction would have on
23   everyone, not just the litigants, but the public interest, and
24   view it in light of the fact that the Fifth Circuit is, in
25   fact, poised to resolve the issues.  And we thank the court for

1   your consideration.

2           THE COURT:  Thank you.  Mr. Teeuwissen.

3           MR. TEEUWISSEN:  May it please the court.

4           THE COURT:  You may proceed.

5           MR. TEEUWISSEN:  Your Honor, many have said that it

6   would be -- before a court in Mississippi seriously considered

7   same-sex marriage, it would be a cold day.  It's a cold day.

8           THE COURT:  It's supposed to be even colder tomorrow.

9           MR. TEEUWISSEN:  It is -- it's truly humbling and an

10  honor to participate in a case such as this and participate in

11  this legal argument.  And make no mistake, that's what we're

12  here about.  This isn't some social commentary, religious

13  debate, moral debate.  It's a legal argument.  And as I

14  understand it, it's a narrow legal argument between the State

15  and the plaintiffs.

16          And as I've said in the pleadings filed on behalf of

17  Ms. Dunn, Hinds County takes no position whatsoever in their

18  argument.  In fact, we take an even narrower position.  And if

19  you'll give me a chance, I have two points to make with that

20  narrow position.  And I think I'll be considerably shorter than

21  either side.

22          The first point, your Honor, is that Ms. Dunn's

23  duties -- and Ms. Dunn was sued in her official capacity, and

24  that's the same as suing Hinds County, as your Honor is aware.

25  I may use those interchangeably, but that's what I mean.

1    Ms. Dunn's duties are ministerial in nature.  There's a

2    statutory scheme that says what she must do as a circuit clerk

3    when someone comes to apply for a marriage license.

4           Importantly, there's been some case law from around

5    the country with other clerks that reinforces that point.

6    Judge Crabtree on pages 14 and 15 of the *Marie v. Moser* opinion

7    said that the clerk's duties are ministerial.  Likewise, the

8    Tenth Circuit in *Bishop v. Smith*, 760 F.3d 1070, 1092, said

9    that the clerk's duties are ministerial.

10          The reason I want to make this point, your Honor, is

11   that in paragraph 4 of the prayer for relief there is a request

12   for attorneys' fees for bringing this action.  If your Honor is

13   to get to that point down the road, I want to make clear those

14   attorneys' fees should not come from Dunn or Hinds County.  She

15   is merely following the law that is established in the State of

16   Mississippi.

17          And with all due respect to the plaintiffs, it's not

18   yet a clearly established right for a same-sex marriage in the

19   Fifth Circuit.  And I say that again solely that if you get to

20   the issue of attorneys' fees at some later date, the

21   ministerial nature of Ms. Dunn's duties and the lack of a

22   clearly established right should mean that no attorneys' fees

23   should come from Hinds County.

24          That takes me to the second point, the stay.  That's

25   really the only issue that Hinds County has.  Interestingly

1    enough, Hinds County, Barbara Dunn is the only circuit clerk

2    sued in this matter.  That raises a question of whether your

3    Honor can enter relief with respect to 81 other circuit clerks.

4              You can certainly invalidate the state's

5    constitutional provision and the state's statute that prohibit

6    same-sex marriage.  Can you order circuit clerks who are not

7    before you then to allow -- or to register there?  That's an

8    open question.  I certainly would -- on behalf of Ms. Dunn

9    don't want to see her placed in a position where she's treated

10   differently than 81 other circuit clerks.  And I would ask the

11   court to consider that.

12             Beyond that, if the court does not enter a stay, folks

13   come to Hinds County, request the marriage license, issued,

14   filed, and then at a later date the Fifth Circuit -- and Lord

15   knows I'm never going to try and predict the Fifth Circuit.

16   Been down there enough -- but let's say they reverse your Honor

17   and say that the provisions of Mississippi state law for

18   whatever reason are valid, has Ms. Dunn then by issuing

19   licenses violated the law in the interim?

20             If she has, she's subject to fine because under the

21   statutory scheme for issuing marriage licenses, if she doesn't

22   comply with the law, she can be fined between 50 and $500.

23   But, more importantly, if she violates the law, she's subject

24   to removal from office.  That is an irreparable harm.

25             And I don't profess to speak to what the State speaks

1      to, but I don't want to see Ms. Dunn, my client, placed in a

2      situation where arguably at a later date if something was to

3      happen in some unseen way find herself being accused of having

4      violated the law for trying to comply with this court's order.

5              THE COURT:  Complying with the federal court order

6      would get her removed from office or get her sanctioned by the

7      State?

8              MR. TEEUWISSEN:  Your Honor, you've asked the State

9      whether they would not appeal.  I think we know who the

10     governor is.  I think we know who's being sued.  I don't want

11     to take a chance that somebody at the state level wouldn't come

12     back against my circuit clerk and say, *Yeah, you complied with*

13     *that interim federal order, but that got overturned, and you*

14     *shouldn't have done it.*  You can't ask Ms. Dunn to be in that

15     position.

16             Now, I want to answer a question you asked previously

17     of the State.  You said how long should the stay be in place if

18     you were to grant one.  I think the answer's pretty simple.

19     That stay is in effect until the Fifth Circuit rules, whether

20     that's on the January decisions that are before it or this

21     case, period.  I don't think you have a stay until the Supreme

22     Court resolves this.  I think you have a stay until the Fifth

23     Circuit sets precedent.

24             If you look at what has occurred in the other circuits

25     and the other district courts, you kind of have court's

1    entering stays; and then once circuit precedent is established,

2    those stays are dissolved.  That's it.  I would ask that you

3    consider the same approach here.

4         If you are to invalidate the state's constitutional

5    provision and the state statute banning same-sex marriage,

6    enter a stay until the Fifth Circuit establishes circuit

7    precedent.  At that time take the same approach that was taken

8    in West Virginia, was taken in other states and dissolve the

9    stay.  I think that short --

10        THE COURT:  When is Fifth Circuit precedent

11   established?  After a three-judge panel rules or after --

12   assuming somebody asks for en banc consideration?  When does

13   it -- when is precedent established?

14        MR. TEEUWISSEN:  Your Honor, I think you're in a

15   better position to answer that than I am.  You would have to be

16   comfortable with when you considered Fifth Circuit precedent

17   established.  I certainly would follow by the court's guidance.

18   If we're looking at the Sixth Circuit, seems to be that a split

19   three-judge panel there has established precedent.

20        I think we could have precedent in the Fifth Circuit

21   as soon as February.  If you have an argument in January, I

22   think you could see an opinion as soon as February and you

23   could establish precedent.  In the meantime, what harm is to

24   the two couples that are before this court?  One couple is

25   already legally married in Maine.

 1          THE COURT:  But can't adopt child that they either are

 2    with or want.  Right?

 3          MR. TEEUWISSEN:  Can't adopt it, but that has nothing

 4    to do with Barbara Dunn.  Barbara Dunn doesn't have anything to

 5    do with adoptions.  So that stay from that standpoint --

 6          THE COURT:  She won't give them the order to get

 7    married, though.

 8          MR. TEEUWISSEN:  Excuse me?

 9          THE COURT:  She can't give them the order to get --

10    she can't -- she can't ministerially process their marriage

11    application.

12          MR. TEEUWISSEN:  I agree, but I think the issue is

13    does it affect their marriage.  And the answer is it does not

14    affect their marriage.  The other couple is not married at all.

15    So there's no change in the status quo.

16          THE COURT:  They want to get married.

17          MR. TEEUWISSEN:  I understand they want to get

18    married.

19          THE COURT:  They want to get married now.

20          MR. TEEUWISSEN:  I understand that.  And, quite

21    frankly, for somebody that's been married 21, 22 years, if they

22    want to have all the joy, not joy of being married, I think

23    you're welcome to it.

24          THE COURT:  Yeah.  I mean, with the benefits of

25    marriages comes all the sacrifices, the pains, the gains.

1          MR. TEEUWISSEN:  And I certainly personally welcome

2    that.  Having said that, whether they get those joys and

3    sacrifices and pains now or at some time period down the road

4    where Fifth Circuit precedent is established, again, they don't

5    have a clearly established right to be married until the Fifth

6    Circuit says they do.

7          And I think that's an important point.  We're

8    presuming they have that right, but that right has not yet been

9    established in the Fifth Circuit.  And the other circuits'

10   precedent isn't binding.  And, of course, the Supreme Court

11   hasn't said you have a clearly established right.  They kind of

12   sidestepped all around this.

13         Having said that, I go back to the concerns about

14   Barbara Dunn.  I represent the circuit clerk -- I want to say

15   this carefully -- has some challenges in meeting her statutory

16   duties and has found herself called before our state's highest

17   court on several occasions in recent years in meeting her

18   challenges.

19         Should this be placed before her, she may find herself

20   again afoul of the law, not intentionally.  But I think to

21   avoid that and avoid her finding herself either afoul of the

22   law in a criminal sense or because of management capacity, a

23   stay would prevent that sort of harm.  And I think your Honor

24   understands what I'm saying without me articulating further.

25         Your Honor asked about forms.  I think that's an

1    important question.  That one, with all due respect to my

2    colleagues, goes to the State.  The statutory scheme says that

3    Barbara Dunn enters the information that is required by the

4    State of Mississippi, Department of Health or Department of

5    Vital Statistics.  So they would have to -- they being the

6    State would have to change the form.  She and any other clerk

7    would presumably file the form that was then sent out by the

8    State.  And I can't speak to those.

9            THE COURT:  I mean, I assume the form only asks for

10   the name of the two people.  And if somebody's name is Joe,

11   J-O-E, or J-O, what difference does it make?

12           MR. TEEUWISSEN:  Again, I think you're asking the

13   wrong party, your Honor, because like you, I haven't had to

14   apply for one of those in 20-plus years.  In fact, somebody was

15   talking about blood tests and all --

16           THE COURT:  I thought they still required blood tests.

17           MR. TEEUWISSEN:  Yeah.  Well, I had those issues,

18   obviously.  I don't know, but I'm saying that's a -- the

19   inquiry is more proper for the State.  I think the -- that's

20   not a problem for the clerk.  Let me be honest.  The clerk is

21   going to do whatever the State says with respect to the form.

22           And I agree with your Honor, whether the name is Joe

23   with an E or J-O for Jo, I don't think that affects the clerk.

24   It doesn't place an additional burden or obligation on the

25   clerk.  The clerk -- and I would presumably say this not just

1    for Ms. Dunn, but all 82 circuit clerks -- is simply going to

2    complete whatever form the State of Mississippi says complete,

3    period.  That once a month under the statute she has to turn

4    those forms into the State, period.

5            THE COURT:  And let me ask you this.  Well, I could

6    defer this question to the State, but it could not be a run on

7    the Hinds County from people who did not reside in Hinds

8    County.

9            MR. TEEUWISSEN:  Yes, it could.

10           THE COURT:  Isn't that correct?  Oh, it could.

11           MR. TEEUWISSEN:  Yes.  Interesting -- your Honor used

12   to serve as a special master in chancery court, correct, as I

13   recall?  To get divorced in Mississippi, you must live in the

14   county where you're seeking a divorce for six months next

15   preceding the divorce.  To get a marriage license, you can show

16   up at any circuit clerk's office anywhere as long as you reside

17   in the state of Mississippi.

18           So there could be a run on Hinds County.  And,

19   arguably, if some other circuit clerk -- and I don't presume to

20   know what 81 other circuit clerks would do, would say, *I'm not

21   subject to this case.  I'm not made a party* or something like

22   that, you could see people then from Madison, Rankin or

23   wherever say, *Okay.  We'll go to Hinds County because that

24   clerk was a party to that.*  So I do think there could be some

25   sort of run.

1   And, again, I would remind the court of the challenges

2 that the clerk's office has had in maintaining records, court

3 files, transcripts and all those sorts of things.  And it would

4 be an unfair burden to place on the clerk some sort of run like

5 that.

6   Again, this is a very narrow argument, your Honor.

7 We're staying far away from the merits of this case.  And we

8 just ask that the court consider a stay with respect to the

9 unique situation that Ms. Dunn may find herself in as opposed

10 to 81 other circuit clerks and certainly as opposed to -- if

11 there's a change in the law and she issues something pursuant

12 to your Honor's order, presumably, but the law changes, that

13 she may find herself then at the mercy of other state officials

14 who may have agendas that are different than those parties who

15 are here before you.

16   THE COURT:  So should the -- so should the plaintiffs

17 have sued the other 81 circuit clerks?

18   MR. TEEUWISSEN:  Your Honor, I don't -- I don't want

19 to tell the plaintiffs how to do their case.  They're very good

20 lawyers.  They made a choice, obviously, as to how they wanted

21 to proceed and that was their choice.

22   THE COURT:  Okay.

23   MR. TEEUWISSEN:  And it may be that, quite frankly,

24 everybody wants to come to Hinds County, get married.  And

25 considering the county's finances, that may end up being good.

1    We do get to collect a small fee.

2         THE COURT:  How much time does it take do you know for

3    the clerk to issue the marriage license?

4         MR. TEEUWISSEN:  I think --

5         THE COURT:  And I guess I asked that sort of a

6    compound sort of question.  Individually, how many --

7    approximately how many is the clerk doing on a -- they have

8    a -- do they keep up with the number on a weekly or monthly

9    basis or quarterly basis?

10        MR. TEEUWISSEN:  Obviously, they keep up with the

11   number, as does the State.  I did not ask that question.  I

12   would presume that Hinds County as the largest county does

13   considerably more than any others.  One thing that our

14   neighboring counties tend to forget is how much larger we are.

15   You put Madison and Rankin together, you get the population of

16   Hinds.  That just gives you an example.

17        And, certainly, if there was a question as to whether

18   other clerks could issue licenses, then I think you'd not only

19   get the Hinds population, but folks from other parts of the

20   state coming to Hinds County.

21        One thing that I found interesting that's not alleged

22   in the pleadings, I was somewhat curious -- it's more than just

23   curiosity -- I don't know whether these plaintiffs reside in

24   Hinds County.  They don't have to by statute.  They can come

25   here.  But it is interesting, are they Hinds County residents

1   or have they chosen to come here for the very purpose of trying

2   to register to marry?

3        Now, there is a short waiting period, as I understand

4   it.  There is a three-day challenge period.  It's at least

5   three days between when you can -- when you file your -- for a

6   marriage license and when you get it.  There is some sort of

7   archaic three-day challenge period where you, I, these good

8   folks, anybody who wants to go and file a marriage license, any

9   other member of the public can supposedly go and challenge

10  their marriage license and file something with the circuit

11  court.  So there is that three-day waiting period.

12       THE COURT:  Do you know from Ms. Dunn or otherwise how

13  long does it take to process the couple who comes in on a

14  particular day?

15       MR. TEEUWISSEN:  It's my understanding it's very

16  short.  It's probably a 15- or 20-minute process to process

17  them.  And, again, then once a month Hinds County has some

18  amount of time that it takes because it compiles these and

19  submits these to the State and it only has to do that once a

20  month.  So about 15 or 20 minutes.  It's a fairly short

21  process.

22       THE COURT:  Okay.

23       MR. TEEUWISSEN:  Yes, sir.

24       THE COURT:  All right.

25       MR. TEEUWISSEN:  Any other questions, your Honor?

1          THE COURT:  No, sir.  Thank you, Mr. Teeuwissen.

2          MR. TEEUWISSEN:  Hopefully, to paraphrase Matthew, I

3   stuffed a camel through the eye of a needle.  Thank you.

4          MS. KAPLAN:  Thank you, your Honor.  Your Honor, let

5   me begin by saying I want to thank everyone for the incredible

6   welcome we've had here in Mississippi.  Mississippi --

7          THE COURT:  It's the hospitality state.

8          MS. KAPLAN:  The hospitality has been so wonderful

9   that they've even brought our cold weather here down south to

10  make us feel more at home.

11          I have to say I'm somewhat perplexed by the State's

12  argument with respect to injury to the State and as I also can

13  hear in some of your Honor's questions.  When someone gets

14  married, they're married.  And for purposes of taxation,

15  benefits, other sets of laws, the crucial question is whether

16  they're married or not.  And if they're married, the State

17  should process the married couple the same way it would process

18  any couple.  And so there seems to be something about the

19  State's understanding here that somehow the marriages of gay

20  couples would somehow be different.

21          The facts are that they would not.  The experience in

22  other states is that they are not.  The State of New York,

23  for example, didn't pass -- didn't make one change to one other

24  law other than the law that allowed gay couples to marry.  And

25  there had to be no changes in regs.  I think the only change

1    I'm aware of are changes on forms where they changed the gender

2    from "husband" and "wife" to "spouse."  That's the change that

3    needed to be made.

4           So I'm not sure I understand what the State is talking

5    about here.  And, frankly, since this is their motion, I don't

6    really think they've made the necessary showing.  They haven't

7    really made any showing.

8           Computers, as your Honor pointed out, don't seem to

9    know the difference between someone's gender, as far as I'm

10   aware.  Maybe someone's invented a computer that does that,

11   but, certainly, the state's computers probably don't do that.

12   And with respect to taxes, frankly, there arguably would be

13   less of a burden to the state because if couples start getting

14   married, they're going to file joint returns.  So there's less

15   returns for the state to process.

16          And tax deduction goes to the issue of irreparable

17   injury because if a couple can't be married, then they're going

18   to have to pay -- they don't get deductions, so they have to

19   pay higher taxes now, where if they can get married now, they

20   will able to get those deductions.  So, again, I'm not sure I

21   understand that argument at all.

22          Now, let me turn -- I'm going to take some of these

23   arguments a bit out of order, your Honor.  Let me turn to Utah.

24   I respectfully could not disagree more strongly that what

25   happened in Utah was chaos.  What happened in Utah is how

1  constitutional litigation in this great country of ours

2  happens.  And, frankly, all those people who were married in

3  Utah are married today.

4       And in Utah today gay couples are getting married

5  every single day, and it hasn't burdened the budget of the

6  State of Utah.  It hasn't thrown things out of whack in the

7  State of Utah.  I'm not aware that any clerks in the state of

8  Utah have been subject to any kind of personal liability.

9       And so what happens in the state of Utah is what

10  happens in our great constitutional system when rights get

11  recognized and when litigation happens.  Moreover if by -- I

12  don't think it will happen, obviously, given who I am.  But if

13  the Supreme Court were somehow to accept the appeals in the

14  Sixth Circuit and then affirm the Sixth Circuit's decision,

15  those people in Utah would still be married.  It's res judicata

16  in those cases.

17       Those appeals were denied cert by the Supreme Court.

18  And if the State of Utah wants to unmarry those people, it's

19  going to have to pass a new law that -- in order to again

20  prevent gay couples from marrying.  And I don't know what will

21  happen in Utah, but I would venture to say that if that

22  happens, a lot of states actually won't pass that new law.

23       Now, while counsel talked about the standard that

24  applies -- the Fifth Circuit standard that they talked about,

25  it's on page five of their brief, the problem with those

1   cases -- they're not talking about this issue in the context of

2   a preliminary injunction.  And for the reasons that we have

3   discussed and we set forth in our brief, in a situation where a

4   party is seeking a stay from the issuance of a preliminary

5   injunction is a unique situation because the district court has

6   already held that there's a probability -- likelihood of

7   success on the merits.  And courts have held it's actually

8   inconsistent then for the same court having held that and that

9   the preliminary injunction is warranted to then stay that

10  decision.

11          Now, your Honor asked about whether there were states

12  where no stays were issued, and there were.  According to my

13  list, it includes Arizona, Alaska, North Carolina, Michigan,

14  Pennsylvania and Oregon.  Short stays were issued to allow the

15  parties to seek a stay from the appellate court:  In Kansas,

16  seven days; Wyoming, six days; and South Carolina, which just

17  came out today, which was a seven-day temporary stay.

18          THE COURT:  Do you think any sort of stay would be

19  appropriate in this case?

20          MS. KAPLAN:  We do not.

21          THE COURT:  Four days?  Seven days?

22          MS. KAPLAN:  If your Honor --

23          THE COURT:  14 days?

24          MS. KAPLAN:  -- were to issue a stay, I mean, I

25  would -- only a short stay to allow them to go -- again, to go

1    to the Fifth Circuit, a very short amount of time, something

2    like four or five, six days.

3            With respect to the irreparable harm to the State, as

4    I said, the showing is very, very weak.  And, again, *Loving*

5    keeps coming to mind today and I think a consideration of

6    *Loving* is appropriate here too.  It's not my understanding that

7    when *Loving* was decided that the State of Virginia had to go

8    through some huge administrative expense to allow white people

9    to marry black people.  And, again, the same thing would happen

10   here.  I just don't understand what the State is talking about.

11           However, in terms of the equitable issues that are

12   before the court on a stay, comparing the harms, as your Honor

13   I think has acknowledged, the harms to the plaintiffs and to

14   gay couples in Mississippi are serious.

15           THE COURT:  Let's separate the two.

16           MS. KAPLAN:  Sure.

17           THE COURT:  Let's talk about the plaintiffs in this

18   case.

19           MS. KAPLAN:  Sure.

20           THE COURT:  What is so unique about the plaintiffs

21   that are before here --

22           MS. KAPLAN:  That's --

23           THE COURT:  -- the individual plaintiffs, not the

24   Campaign, but --

25           MS. KAPLAN:  Sure.  There's one thing -- let me start

out with the thing that's not unique.  And the thing that's not

unique -- and I'm going to use an expression.  I hope it

doesn't offend anyone -- but the truth is, your Honor, marriage

matters the most when -- I'm not going to use the word -- when

bad stuff happens.  That's when marriage matters the most.

That's the truth about life.

         So when is marriage most important?  It's most

important when someone gets critically ill, because then you

have the rights you have.  It's most important when someone

dies.  That's when it's most important.  And, frankly, it's

very important when you split up because then the kids have the

rights of the court proceedings for joint custody, support,

et cetera.

         No one knows -- the one thing I know for sure about

life is that no one knows when that's going to happen to them.

It could happen to any one of these individual plaintiffs, God

forbid, tomorrow.  And the reason that irreparable harm on our

part is such a strong showing here is that's -- I don't think

that's a disputable fact by the side, by the government, by

anyone else.

         And so they have to live with day to day knowing that,

God forbid, if one of them gets hit by a car or if something

happens at the school and they have to go pick up their kid

from school, the one who's not the parent has to go pick up

their kid from school, they don't have the assurance that every

other married couple in the state has, that they have

protections of the laws and assurance of knowing that they will

be able to protect their families.

Now, that's not all.  There was a talk -- let me --

it's not just those practical benefits.  In our complaint, if

you look, we attach affidavits in our original pleadings.  And

there's an affidavit from our clients Carla and Joce.  And they

talk about the fact that there's -- in that affidavit at

paragraph 7 about how their six-year-old daughter urges -- has

urged them to get married.  If your Honor will indulge me, I

want to tell the true story about that.

The true story is their six-year-old daughter came

home from school one day and said to their parents -- to their

two mothers, I don't understand how it is possible that you

could have children before you got married.  And they had to

answer their daughter's question.  Every day that goes by that

they can't give an adequate answer to that daughter's question

not only harms them in terms of their dignity, but harms the

dignity of their daughter.

So we're not only talking about contingency, about the

God-knows-what-will-happen-in-life things that we all deal with

every day, we're talking about the dignity of people knowing

that their families are their families, that their parents are

married, and that the State considers them like everyone else.

Now, with respect to other people in the state -- and

1   I concede that we don't have a class here and we don't have

2   other plaintiffs other than the named plaintiffs.  Let me give

3   you an example.  So I have actually reached out and spoken to

4   counsel for plaintiffs in the Texas case.  And as my adversary

5   pointed out, the stay in that case was unopposed.  But he is

6   not -- to use a proverbial expression, he is not a happy camper

7   right now.

8          And the reason he's not a happy camper right now, I

9   think he's quite upset that he agreed to a stay, is because the

10  Fifth Circuit, frankly, has dragged it out.  It's a -- it's

11  supposedly expedited, but it's not expedited the way things

12  would be expedited in New York City.  The case has been pending

13  for a long time.  He's got a client who's about to give birth,

14  and she really, really, really wants to be the mother of the

15  child and have her spouse or her partner be the other mother of

16  the child when that child is born.  So that's the kind of issue

17  that faces gay couples in Mississippi.

18         In addition, there are gay -- I know for a fact that

19  there are gay couples in Mississippi, some of whom were public

20  employees, who face life-threatening injuries or

21  life-threatening illnesses.  And if they die in the next few

22  days, God for -- again, God forbid, they won't have the

23  benefits that they would get under state law for -- you know,

24  for -- not Social Security, but for pension benefits,

25  et cetera.

1          So this isn't some theoretical thing.  I don't have to

2     show you it's real.  You're a human being, your Honor.

3          THE COURT:  Because those pension benefits only pass

4     to --

5          MS. KAPLAN:  Exactly.

6          THE COURT:  -- the spouse.  Is that the reason?

7          MS. KAPLAN:  Yeah, exactly right.  Exactly right.

8     You're a human being, your Honor.  We're all human beings.  We

9     all know what life is like.  We all know what it brings.  And

10    these are the kind of harms that these people face every day.

11         Now, in terms -- in addition, in terms of the Fifth

12    Circuit, you know, I heard my adversary saying that he wanted

13    your Honor to issue a stay, not even a temporary stay, but a

14    stay that lasted until the decision of the Fifth Circuit.

15         But I think it's very crucial and perhaps much more

16    telling about what he did not say, and that is I did not hear

17    him say that the governor of the state of Mississippi is

18    willing right now to stand up and say that if the Fifth Circuit

19    rules in favor of the rights of gay couples to marry, he will

20    engage in no further litigation in the state of Mississippi and

21    will allow gay couples to marry.  Unless and until he makes

22    that representation, in my view the balance of the equities is

23    he has no right to ask for that kind of a stay.

24    (COUNSEL CONFERRED)

25         MS. KAPLAN:  I'm told it is -- I'm told that there is

1  no longer a three-day waiting period for marriage.  There was

2  Senate Bill 2851, effective July 1, 2012.

3       THE COURT:  I would tell you I pulled that up on my

4  computer, but I didn't.

5       MS. KAPLAN:  I'm just telling you what the note says,

6  your Honor.

7       THE COURT:  Things happen in this case so fast.  I

8  appreciate whoever that is.

9       MS. KAPLAN:  Finally, with respect to some of the

10  discussion that we heard about Wyoming and other states like

11  that, I, frankly, your Honor -- and I'm trying to be as

12  diplomatic as I can -- I think what those efforts to seek the

13  stays and then the grant of the stay show is more about the

14  continuing misunderstanding of gay people and their

15  relationships than anything else.

16       After all, my adversary was talking about stays that

17  were sought in circuits where there was binding precedent.  And

18  even when there was binding precedent, there were parties in

19  the political system who were willing to still go to court and

20  seek a stay.  What that I think -- what that shows, your Honor,

21  I believe, is animus against gay people and nothing more.

22       With that, unless your Honor has questions, I will

23  close.

24       THE COURT:  What other circuits are we waiting to hear

25  from?  11th.  D.C.?  Is D.C. one of them?

1          MS. KAPLAN:  No.  So, basically -- I'll go through

2   each circuit and let you know.  So the Fifth is the -- we'll

3   start.  The Sixth we know.  I assume cert petitions will be

4   filed.  The Fifth Circuit there is argument.  It's actually the

5   week of January 5th.  It could be that day; it could be some

6   other day that week.

7          The Eighth is way behind, and the Eleventh is way

8   behind.  There are cases pending in the Eighth and the

9   Eleventh, but they are nowhere near being resolved.  And then

10  the First Circuit is the only other circuit that now comes into

11  play because although all the other states in the First Circuit

12  already allow gay couples to marry, you have that case out of

13  Puerto Rico.  And that will get appealed.  That's in the First

14  Circuit.

15         Is that the current status?  I'm looking at y'all.

16  Did I get that right?

17         That's the current status, as far as I know.

18         THE COURT:  With respect to the individual plaintiffs

19  here -- I know we don't have a class yet -- are they public

20  employees?  Is that --

21         MS. KAPLAN:  No.

22         THE COURT:  -- a worry?  They are not?

23         MS. KAPLAN:  No.  None of them are public employees,

24  your Honor.

25         THE COURT:  Okay.  Could they -- with respect to the

1    awful contingency of death, could they prepare a will or is

2    that -- or would that be a burden?  I mean, because, obviously,

3    you can get by without doing a will and die intestate and you

4    know how things will be parceled up.

5          MS. KAPLAN:  Yeah, but we -- they could -- obviously,

6    the parties can prepare a will.  Actually, one couple is -- one

7    of the women is out of a job.  So for her right now probably

8    paying the legal fees -- I could speak for myself.  Before I

9    was able to get married, I spent an awful lot of money in

10   New York trying to have agreements and wills and trusts and

11   things to protect my family.

12         And, presumably, people can do that, but it's quite

13   expensive.  And I know that at least probably both, but

14   certainly one of the couples -- injured couples would not be

15   able to afford this at this point in time.  They have testified

16   in their affidavit that they don't even have the funds to go to

17   another state to get married.

18         Two more things I forgot, and I apologize for

19   forgetting.  With respect to Ms. Dunn, what I've seen in other

20   states on this is that once a decision by a federal court is

21   issued, the clerks of the counties generally follow the federal

22   court order.  We have the supremacy principle in the United

23   States.  And there haven't -- there have been a couple of

24   outliers that haven't been clerks protesting, massively

25   refusing to follow a decision of a federal court.

1          With respect to attorneys' fees, I'm going to be quite

2     clear now.  Paul Weiss and Mr. McDuff's firm are doing this

3     entirely pro bono, and we waive completely any application for

4     attorneys' fees.  So that would not be an issue.  Anything

5     else, your Honor?

6          THE COURT:  No.  Thank you.

7          MS. KAPLAN:  Thank you.

8          MR. BARNES:  Very briefly, your Honor.  I also had

9     pulled up the statute and had a copy of it and was going to

10    also inform the court the three-day waiting period, in fact,

11    had been removed two years ago.  However, I do notice the

12    statute still makes a difference between males who can only get

13    married when they're 17 and females who can get married when

14    they're 15.  So I don't know, you know, where we might be with

15    that situation in the future if marriage is an unrestricted --

16          THE COURT:  Then males would have to be 17 and the

17    females would have to be 13 (sic).

18          MR. BARNES:  That might be, your Honor.  In the event

19    there was some unforeseen personal emergency, personal

20    circumstance, under Rule 62 this court would always retain

21    jurisdiction to modify an injunction while a case is on appeal.

22    Even though the normal rule is that the district court and the

23    Court of Appeals cannot have jurisdiction at the same time,

24    that is an exception under Rule 62.

25          What happened in Utah is not speculation.  It's not

1    guesswork.  It is fact.  And, in fact, in Utah clerks in

2    different counties were confused and didn't know what to do.

3    Some clerks began issuing licenses; others didn't.  Then they

4    received conflicting instructions from various state officials.

5              The court specifically talked about adoption, and

6    adoption is an issue here with one of the couples.  In Utah

7    what happened was one of the same-sex couples got married and

8    tried to adopt their son.  Same situation we have here.  The

9    partner was forbidden by state law to adopt the child until the

10   ban was struck down.

11             State adoption proceedings began in court.  The court

12   entered an order for -- and the couple took the -- took the

13   order to the department of health or vital statistics -- and in

14   Mississippi, vital statistics is under the umbrella of the

15   state department of health.  They went to get a new birth

16   certificate based on the adoption order.

17             The vital statistics department there declined to

18   issue it because there was confusion.  That is what led to the

19   state judge issuing a show cause order against the department

20   of health as to why they were not issuing a birth certificate.

21   And that court then -- the State had to appeal, and the state

22   supreme court had to tell the adopt -- the court in the

23   adoption court to stay the effect.

24             So it's not just a matter of we've got a judge who

25   would oversee a process.  It's the fact that there are various

```
 1    steps that have to take place in that process.  And at any time
 2    if there's no stay, if a stay then comes down later, where are
 3    you in that process?  What happens to the relationships, family
 4    relationships, marital status, marital relationships which
 5    occur in the interim?  How does the court unwind those
 6    relationships if -- if necessary?  And it's not as easy an
 7    issue as opposing counsel would like to say.
 8         THE COURT:  But what about the issue with respect to
 9    the harm to the plaintiff who can't visit their spouse in the
10    hospital or the -- I don't know what the regs are at UMMC,
11    for example.  You know, you're in serious injury, you're in
12    intensive care and only your immediate family --
13         MR. BARNES:  Well, your Honor, as you pointed out --
14    you asked the question before -- problems of estate planning
15    can be addressed by a will.  Problems with the ownership of
16    property can be --
17         THE COURT:  But that costs money.
18         MR. BARNES:  Well, it does, your Honor, but it costs
19    money to everyone.  But advanced healthcare directives are
20    another way.  There's a simple form in which one can fill out
21    advanced healthcare directive that you can give another person
22    the right to make decisions if that person is incapacitated, if
23    someone has -- under state law, if someone has the power to
24    make healthcare decisions, then they are --
25         THE COURT:  What is so unique about marriage to the
```

```
 1   State then if anybody can do --
 2            MR. BARNES:  It's presumed -- it is presumed that --
 3   that a spouse has that right.  There are situations where,
 4   actually, it is -- the same-sex -- I mean opposite-sex couples,
 5   traditional marriages where the spouse doesn't trust their
 6   other spouse and they go out and get an advanced healthcare
 7   directive and give it to one of their children.  So that has
 8   happened to me in private practice where I've had to deal with
 9   that.  But, again, the issue of property, ownership of the
10   home, you can just -- a deed, advance healthcare directives,
11   contracts.  And so --
12            THE COURT:  But those are steps that an opposite-sex
13   couple would not have to do.  Right?
14            MR. BARNES:  That is true, your Honor.  But at this
15   point the harm that would result from a stay would be no
16   greater than has occurred heretofore.  Now -- and, again, I'm
17   not saying there is no harm, because we're not taking that
18   position, but it's -- certainly, a stay would not increase the
19   harm in any way other than a length of time.  And with the
20   Fifth Circuit prepared to act, we think that it is reasonable
21   to believe that that would be a relatively short time.
22            THE COURT:  But I can't tell the Fifth Circuit when to
23   rule.
24            MR. BARNES:  No, your Honor, you can't, and --
25            THE COURT:  I can only try to expedite my ruling,
```

1   and -- whatever it is, and that ruling would be subject to it

2   being reviewed by a higher court.  Right?

3            MR. BARNES:  That is true, your Honor.  And we

4   certainly respect the authority of this court to issue the

5   ruling it sees fit.  But, again, we'd ask the court in its

6   discretion to enter a stay should the court find that

7   injunctive relief is appropriate.

8            THE COURT:  The plaintiff mentioned that the -- so far

9   the State has not placed on the table the issue of finality at

10  the -- because we are talking about the Fifth Circuit, the

11  precedent of the Fifth Circuit, the precedent of the Fifth

12  Circuit.  Is the State in a position to say that once the Fifth

13  Circuit rules, that would -- that the State would honor the

14  ruling of the Fifth Circuit precedent?

15           MR. BARNES:  No, your Honor.  I can't say that today.

16  Obviously, I'm not the governor of Mississippi.  I'm merely

17  representing him today.  No.  I could not make that

18  representation.  And that decision would have to be made by the

19  governor and the attorney general, you know, in the

20  circumstances at that time.

21           So, no, we're not in a position to do that.  But I

22  don't think that there -- there are often counsel in these

23  cases who have been in that position, and there have actually

24  been very few courts -- I mean, very few states where the

25  public officials have stopped trying to defend their laws, at

1  least to the point of seeking a stay at the U.S. Supreme Court.

2          THE COURT:  I think that -- I think the attorney

3  general of Virginia --

4          MR. BARNES:  Sir?

5          THE COURT:  I think the attorney general of Virginia

6  decided not to defend the case at the Fourth Circuit level, I

7  think.

8          MR. BARNES:  And there have been some, your Honor.

9  But, no, we are not in a position to say that the State would

10  do that.  And I would say my best answer now is I believe the

11  State will fully defend the validity of its laws and

12  constitution.  And that's the best answer I can give to you

13  here today.

14          THE COURT:  The plaintiffs contend that might show

15  some signs of animus.

16          MR. BARNES:  Your Honor, we are bound by statute,

17  especially here in the Attorney General's Office, to defend --

18  and by statute, to appear and defend the laws of the state; and

19  that is exactly what we're doing.  So to suggest that it is

20  animus that we're doing our job, our statutory duty to defend

21  the laws to the best of our ability is inappropriate; and we

22  don't think it's true.

23          And I can't speak to elected officials who are, you

24  know, my superiors; but I don't think it's evidence of animus.

25  I think it's evidence that the public officials recognize their

1    duty to the citizens of Mississippi to defend the will that

2    86 percent of the citizens voted on.

3            THE COURT:  That gets you to a whole other can of

4    worms about that 87 -- just because 86 percent of the people

5    vote to do what could be a harmful thing to a suspect class,

6    i.e., take away the vote against another group of individuals.

7    Hopefully, the attorney general would not seek to defend that.

8            MR. BARNES:  Your Honor, you're now -- you're putting

9    me in a situation where -- no, we're not -- that -- now it's a

10   parade of horribles.  What I would suggest was just that that

11   was ten years ago.  And the same-sex marriage and gay rights

12   movement has gained a lot of steam in the last ten years.  So

13   it is speculation to say what might result if that issue came

14   up before.  So, no, your Honor.

15           But the law -- the state law is the law of this state,

16   and we are required to appear and defend it.  And the -- all

17   public officials in this state take an oath to support and

18   defend the laws and Constitution of the United States, the

19   State of Mississippi.  So we have those obligations and we must

20   fulfill them.  That's what we're trying to do.

21           THE COURT:  And this court has the obligation to

22   defend the United States Constitution.

23           MR. BARNES:  Absolutely, your Honor.  And we certainly

24   are not asking the court not to.

25           THE COURT:  Thank you, Mr. Barnes.

1           MS. KAPLAN:  Your Honor.

2           THE COURT:  Ms. Kaplan.

3           MS. KAPLAN:  Very briefly.  I just want to be clear,

4    we're not arguing that the State of Mississippi is showing any

5    animus.  What we're arguing is that for the State of

6    Mississippi on the one hand to ask that this court should go so

7    far as to issue a stay pending a decision by the Fifth Circuit

8    on the one hand and on the other hand to say, *But we're not*

9    *telling you at that point that we'll let you get married.*

10   *We're saying that we could still do all kinds of stuff to try*

11   *to stop you from getting married,* that, to me, shows the

12   weakness of their arguments for the stay.

13          THE COURT:  And the court misspoke.  You connected the

14   animus to what the actions were in the other circuits where

15   there had been precedent and people were -- state officials

16   were still pushing it despite what their circuit court had

17   already found and determined.

18          MS. KAPLAN:  Exactly, your Honor.  Thank you.

19          THE COURT:  All right.  Thank you.  I wanted to make

20   sure everybody understood that I was listening.  Just misspoke.

21   Is there anything further from the parties?

22          MR. BARNES:  Not from the State, your Honor.

23          MS. KAPLAN:  Not from plaintiffs, your Honor.

24          MR. TEEUWISSEN:  Not from Hinds County, your Honor.

25          THE COURT:  Okay.  Ladies and gentlemen, thank you for

1   your spirited arguments today.  The court will take this matter

2   under advisement.  I realize we expedited and got this matter

3   on the docket on an expedited fashion, and the court intends to

4   rule as soon as possible.  I don't know all 122 cases that have

5   just come down in the last three months, but I'm trying to

6   learn all 122 of them.  Thank you all so much.

7            MS. KAPLAN:  Thank you, your Honor.

8      (PROCEEDINGS CONCLUDED)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF REPORTER

2

3          I, MARY VIRGINIA "Gina" MORRIS, Official Court

4   Reporter, United States District Court, Southern District of

5   Mississippi, do hereby certify that the above and foregoing

6   pages contain a full, true and correct transcript of the

7   proceedings had in the aforenamed case at the time and

8   place indicated, which proceedings were recorded by me to

9   the best of my skill and ability.

10          I certify that the transcript fees and format

11   comply with those prescribed by the Court and Judicial

12   Conference of the United States.

13          This the 17th day of November, 2014.

14

15                    s/ Gina Morris
                      _____
16                    U.S. DISTRICT COURT REPORTER

17

18

19

20

21

22

23

24

25