## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**CAMPAIGN FOR SOUTHERN**                            **PLAINTIFFS**
**EQUALITY; REBECCA BICKETT;**
**ANDREA SANDERS; JOCELYN**
**PRITCHETT;** *and* **CARLA WEBB**

**V.**                                          **CAUSE NO. 3:14-CV-818-CWR-LRA**

**PHIL BRYANT,** *in his official capacity as*                 **DEFENDANTS**
*Governor of the State of Mississippi*; **JIM**
**HOOD,** *in his official capacity as Mississippi*
*Attorney General*; *and* **BARBARA DUNN,** *in*
*her official capacity as Hinds County Circuit*
*Clerk*

## <u>MEMORANDUM OPINION AND ORDER</u>

Two same-sex couples brought this lawsuit challenging Mississippi's laws prohibiting same-sex marriage. One couple wishes to marry in Mississippi; the other was married out-of-state and wants Mississippi to recognize the marriage. A group advocating for gay and lesbian equality has joined their effort to seek relief on behalf of its members.

The plaintiffs claim that Mississippi's constitutional and statutory provisions limiting same-sex marriage (the "same-sex marriage ban") discriminate against them and other same-sex couples, depriving them of rights guaranteed under the Fourteenth Amendment to the United States Constitution. They have moved for a preliminary injunction to stop the State from enforcing the ban, as well as a declaration that it is unconstitutional.

The State of Mississippi defends its laws. It argues that same-sex marriage should be defined by tradition and left up to the legislature and the voters. In the event it loses, it asks the court to stay the preliminary injunction so that the State may appeal without disrupting the status quo.

The court has considered the parties' briefs and asked questions of their attorneys at a hearing held November 12, 2014. There are no disputed facts. The only evidence consists of uncontested affidavits from the plaintiffs. The principal questions are matters of law. That law is relatively straightforward.

This case is one of many in which gay and lesbian couples ask the judiciary to finally resolve whether same-sex marriage bans violate the United States Constitution. In the wake of *United States v. Windsor*, 133 S. Ct. 2675 (2013), nearly every court presented with the issue has found such bans unconstitutional.[1]

The majority of Mississippians disapprove of same-sex marriage. They have made that abundantly clear through every channel in which popular opinion can be voiced. This court does not believe that the 86% of Mississippians who voted against same-sex marriage in 2004 did so with malice, bigotry, or hatred in their hearts. Many were simply trying to preserve their view of

[1] *See Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014); *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014); *Latta v. Otter*, --- F.3d ---, 2014 WL 5151633 (9th Cir. Oct. 15, 2014); *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014); *Guzzo v. Mead*, No. 14-CV-200, 2014 WL 5317797 (D. Wyo. Oct. 17, 2014); *Hamby v. Parnell*, --- F. Supp. 3d. ---, 2014 WL 5089399 (D. Alaska Oct. 12, 2014); *General Synod of the United Church of Christ v. Resinger*, 12 F. Supp. 3d 790 (W.D.N.C. 2014); *DeBoer v. Snyder*, 973 F. Supp. 2d 757 (E.D. Mich. 2014); *Bassett v. Snyder*, 951 F. Supp. 2d 939 (E.D. Mich. 2013); *Brenner v. Scott*, 999 F. Supp. 2d 1278 (N.D. Fla. 2014); *Burns v. Hickenlooper*, No. 14-CV-1817, 2014 WL 3634834 (D. Colo. July 23, 2014); *Bourke v. Beshear*, 996 F. Supp. 2d 542 (W.D. Ky. 2014); *Love v. Beshear*, 989 F. Supp. 2d 536 (W.D. Ky. 2014); *Baskin v. Bogan*, 12 F. Supp. 3d 1137 (S.D. Ind. 2014); *Baskin v. Bogan*, 12 F. Supp. 3d 1144 (S.D. Ind. 2014); *Wolf v. Walker*, 986 F. Supp. 2d 982 (W.D. Wis. 2014); *Whitewood v. Wolf*, 992 F. Supp. 2d 410 (M.D. Pa. 2014); *Geiger v. Kitzhaber*, 994 F. Supp. 2d 1128 (D. Or. 2014); *Latta v. Otter*, --- F. Supp. 2d ---, 2014 WL 1909999 (D. Idaho May 13, 2014); *Henry v. Himes*, 14 F. Supp. 3d 1036 (S.D. Ohio 2014); *Obergefell v. Wymyslo*, 962 F. Supp. 2d 968 (S.D. Ohio 2013); *Tanco v. Haslam*, 7 F. Supp. 3d 759 (M.D. Tenn. 2014); *Bostic v. Rainey*, 970 F. Supp. 2d 456 (E.D. Va. 2014); *De Leon v. Perry*, 975 F. Supp. 2d 632 (W.D. Tex. 2014); *Bishop v. United States ex rel. Holder*, 962 F. Supp. 2d 1252 (N.D. Okla. 2014); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181 (D. Utah 2013); *Gray v. Orr*, 4 F. Supp. 3d 984 (N.D. Ill. 2013); *Lee v. Orr*, No. 13-CV-8719, 2013 WL 6490577 (N.D. Ill. Dec. 10, 2013); *Condon v. Haley*, --- F. Supp. 3d ---, 2014 WL 5897175 (D.S.C. Nov. 12, 2014); *Bradacs v. Haley*, No. 3:13-CV-2351, 2014 WL 6473727 (D.S.C. Nov. 18, 2014); *McGee v. Cole*, No. 3:13-24068, 2014 WL 5802665 (S.D. W. Va. Nov. 7, 2014); *Lawson v. Kelly*, --- F. Supp. 3d ---, 2014 WL 5810215 (W.D. Mo. Nov. 7, 2014); *Rolando v. Fox*, --- F. Supp. 3d ---, 2014 WL 6476196 (D. Mont. Nov. 19, 2014); *Majors v. Jeanes*, --- F. Supp. 3d ---, 2014 WL 4541173 (D. Ariz. Sept. 12, 2014); *Marie v. Moser*, No. 14-CV-2518, 2014 WL 5598128 (D. Kan. Nov. 4, 2014); *Griego v. Oliver*, 316 P.3d 865 (N.M. 2013); *Garden State Equality v. Dow*, 82 A.3d 336 (N.J. Super. Ct. 2013); *Costanza v. Caldwell*, No. 13-52 D2 (La. Dist. Ct. Sept. 22, 2014); *Wright v. State of Arkansas*, No. 60-CV-13-2662 (Ark. Cir. Ct. May 9, 2014); *Barrier v. Vasterling*, No. 1416-CV-3892 (Mo. Cir. Ct. Oct. 3, 2014). *But see DeBoer v. Snyder*, --- F.3d ---, 2014 WL 5748990 (6th Cir. Nov. 6, 2014) (upholding four states' same-sex marriage bans); *Robicheaux v. Caldwell*, 2 F. Supp. 3d 910 (E.D. La. 2014) (upholding Louisiana's same-sex marriage ban); *Conde-Vidal v. Garcia-Padilla*, --- F. Supp. 3d ---, 2014 WL 5361987 (D.P.R. Oct. 21, 2014) (upholding Puerto Rico's same-sex marriage ban).

what a marriage *should* be, whether by religion or tradition. They deserve an explanation as to why same-sex marriage is now sweeping the country.

It has become clear to the court that people marry for a number of reasons: marriage is a profound source of emotional support; marriage is a private and public expression of commitment; some marry in exercise of their religious beliefs; some do so because it opens the door to economic and government benefits; there are those who marry to present a certain status or image; and others do it for the noble purpose of legitimizing their children. In reviewing the arguments of the parties and conducting its own research, the court determined that an objective person must answer affirmatively to the following questions:

Can gay and lesbian citizens love?

Can gay and lesbian citizens have long-lasting and committed relationships?

Can gay and lesbian citizens love and care for children?

Can gay and lesbian citizens provide what is best for their children?

Can gay and lesbian citizens help make their children good and productive citizens?

Without the right to marry, are gay and lesbian citizens subjected to humiliation and indignity?

Without the right to marry, are gay and lesbian citizens subjected to state-sanctioned prejudice?

Answering "Yes" to each of these questions leads the court to the inescapable conclusion that same-sex couples should be allowed to share in the benefits, and burdens, for better or for worse, of marriage.

The court concludes that Mississippi's same-sex marriage ban deprives same-sex couples and their children of equal dignity under the law. Gay and lesbian citizens cannot be subjected to

such second-class citizenship. Mississippi's same-sex marriage ban violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

## I.   Background

### A.   The Parties

#### 1.   Campaign for Southern Equality

The Campaign for Southern Equality (CSE) is a non-profit advocacy group based in Asheville, North Carolina, that works across the South to promote "the full humanity and equality of lesbian, gay, bisexual, and transgender people in American life." Docket No. 1, at 3. CSE brought this suit on behalf of its members who currently live in Mississippi and claim harm from Mississippi's same-sex marriage ban. *Id*.

#### 2.   Rebecca "Becky" Bickett and Andrea Sanders

Becky Bickett and Andrea Sanders are partners who have shared a committed relationship with each other for 10 years. Together they raise twin 16-month-old boys, whom Becky legally adopted. Andrea has no parental rights.

Becky and Andrea were introduced to each other by their sisters. Shortly thereafter, they began dating. After Hurricane Katrina destroyed their homes in 2005, they started living together. Becky and Andrea have lived together as a couple ever since. At their Harrison County home, they regularly host holiday events and cook-outs with their families, with whom they are close. They enjoy going to the beach, car shows, parades, and street fairs with their boys.

Becky and Andrea both graduated from the University of Southern Mississippi. Becky previously worked for Northrop Grumman – a job she sought out because it was one of the few local employers that offered domestic partnership benefits to Andrea – but her office closed. She

is currently seeking employment in geographic information systems mapping, a field in which she has experience. Andrea stays at home to care for their boys.

In 2010, Becky and Andrea had a commitment ceremony. In March 2014, they sought to make their commitment legal by applying for a marriage license in the Hinds County Circuit Clerk's office. They were denied a marriage license because they are both women.

### 3. Joce Pritchett and Carla Webb

Joce Pritchett and Carla Webb have been a couple for 11 years. They currently live in Hinds County, where they raise two children, ages six and two. Joce carried the children and is their lawful parent. Carla has no parental rights.

Joce graduated from Mississippi State University with a degree in civil engineering. Carla graduated from Millsaps College and the University of Mississippi School of Dentistry. Both own small businesses: Joce works as a civil engineer and Carla is an endodontist.

Joce and Carla's six-year-old daughter told them that she wanted them to marry, and Joce and Carla agreed. They traveled to Maine in September 2013 and got married. Upon returning to Mississippi, Joce and Carla held a ceremony at their home to celebrate their marriage, which was witnessed by approximately 100 friends and family members.

Joce and Carla say that their family functions as any other: they take trips to Florida, play with their kids at the park, and work to keep their house in order. Due to Mississippi's refusal to recognize same-sex marriage, Joce and Carla claim that their family is burdened by Carla's lack of parental rights, significant financial and estate planning obstacles, and the regular need to explain to others why their children have two mothers.

### 4.    The Defendants

Governor Phil Bryant is sued in his official capacity, as is customary in constitutional challenges like this. He is the State's "supreme executive officer" and is statutorily required to "see that the laws are faithfully executed." Miss. Code Ann. 7-1-5(a), (c); *see Barbour v. State ex rel. Hood*, 974 So. 2d 232, 240 (Miss. 2008) ("Execution is at the core of executive power.").

Attorney General Jim Hood is sued in his official capacity. He is required to "intervene and argue the constitutionality of any statute when notified of a challenge thereto." Miss. Code Ann. § 7-5-1; *see Kennington-Saenger Theatres v. State ex rel. Dist. Att'y*, 18 So. 2d 483, 486 (Miss. 1944) ("As to all litigation, the subject-matter of which is of state-wide interest, the Attorney General alone has the right to represent the state.").

Hinds County Circuit Clerk Barbara Dunn is charged with issuing marriage licenses and keeping records relating to marriage licenses in Hinds County. *See* Miss. Code Ann. §§ 41-57-48, 93-1-5, 93-1-11, & 93-1-23. She too has been sued in her official capacity.

### B.    Mississippi Law

The plaintiffs seek to preliminarily enjoin the defendants from enforcing Mississippi Code Section 93-1-1(2) and Section 263A of the Mississippi Constitution.

### 1.    Mississippi Code Section 93-1-1(2)

On May 5, 1993, the Supreme Court of Hawaii became the first in the nation to recognize the possibility that same-sex couples had a right to marry. *Baehr v. Lewin*, 74 Haw. 530, 571-80 (1993) (ruling that the denial of marriage to same-sex couples may violate the equal protection clause of the Hawaii constitution). The Hawaii proceedings were later preempted by a state constitutional amendment, but the seed of same-sex marriage as a legal right had been planted. In response, Congress passed the Defense of Marriage Act (DOMA) in 1996. Pub. L. No. 104-199,

110 Stat. 2419 (1996), *invalidated in part by Windsor*, 133 S. Ct. at 2675. DOMA excluded same-sex partners from the federal definitions of "marriage" and "spouse." *Id.*

It is not clear whether Mississippi's laws expressly forbade same-sex marriage at that time. But in the wake of Hawaii's ruling and with the introduction of DOMA, some Mississippi officials thought it imperative to outlaw same-sex marriage to protect Mississippi's interests. In 1996, Governor Kirk Fordice, an ardent opponent of same-sex marriage,[2] signed an executive order banning same-sex marriage in Mississippi. Ronald Smothers, *Mississippi Governor Bans Same-Sex Marriage*, N.Y. Times, Aug. 24, 1996. Mississippi was the first State to attempt to do so by executive order. *Id.*

The following year, in February 1997, the Mississippi Legislature passed a bill prohibiting same-sex marriage. Governor Fordice signed the bill into law. The law states:

> Any marriage between persons of the same gender is prohibited and null and void from the beginning. Any marriage between persons of the same gender that is valid in another jurisdiction does not constitute a legal or valid marriage in Mississippi.

Miss. Code Ann. § 93-1-1(2). This provision amended Mississippi's domestic relations laws, officially preventing same-sex marriages from being conducted or recognized in Mississippi.

### 2.   Section 263A of the Mississippi Constitution

The amendment to the Mississippi constitution that bans same-sex marriage arose from similar concerns. By 2003, two cases were perceived to have substantially advanced same-sex marriage. The United States Supreme Court found that state laws criminalizing private, consensual sodomy violated the Fourteenth Amendment's Due Process Clause. *Lawrence v.*

---

[2] In a news conference announcing efforts to stifle same-sex marriage, Governor Fordice declared that "same-sex marriage makes a mockery out of the institution of marriage, which is already embattled." Ronald Smothers, *Mississippi Governor Bans Same-Sex Marriage*, N.Y. Times, Aug. 24, 1996. Political enthusiasts will note a certain amount of irony in that statement. *See* Jere Nash & Andy Taggart, Mississippi Politics: The Struggle for Power, 1967-2006 272-73 (2006); Ryan Lizza, *Mr. Quayle's Wild Ride*, Indianapolis Monthly, Oct. 1999, at 218.

*Texas*, 539 U.S. 558, 578 (2003). The Massachusetts Supreme Judicial Court (that state's highest court) then found that its ban on same-sex marriage was unconstitutional under its state constitution. *Goodridge v. Dep't of Pub. Health,* 440 Mass. 309 (2003).

In Mississippi, these decisions fermented a debate on whether Mississippi should amend its constitution to curtail any impact that these rulings might have on State marriage laws. The goal was to stop any recognition within Mississippi of marriages legally performed outside the State. *See* Jean Gordon, *'Issue Not Going Away,'* The Clarion-Ledger, Oct. 29, 2004 (reporting that according to Rep. Jim Barnett, the principal author of the marriage amendment, the Massachusetts ruling "prompted" Mississippi's constitutional amendment). Mississippi lawmakers swiftly passed legislation allowing the voters to amend the State constitution and enshrine their views on same-sex marriage in a more permanent form.

In November 2004, an overwhelming majority of Mississippi's voters approved the constitutional amendment. It states:

> Marriage may take place and may be valid under the laws of this State only between a man and a woman. A marriage in another State or foreign jurisdiction between persons of the same gender, regardless of when the marriage took place, may not be recognized in this State and is void and unenforceable under the laws of this State.

Miss. Const. art. XIV, § 263A.

## II.      Threshold Questions

### A.      Standing

Article III of the United States Constitution limits federal courts to deciding actual cases or controversies. U.S. Const. art III, § 2. Standing is a vital component of the case-or-controversy requirement. *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 386 (5th Cir. 2003). Although not raised by the parties, the court is obliged to consider whether the plaintiffs have standing to bring forth their complaint in this forum. *FW/PBS, Inc. v. City of Dall.*, 493 U.S. 215,

231 (1990) ("The federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of [the jurisdictional] doctrines.").

As the party invoking federal jurisdiction, the plaintiffs bear the burden of establishing the three essential elements of Article III standing: (1) injury in fact, (2) causation, and (3) redressability. *Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Mgmt. Council*, 364 F.3d 269, 272 (5th Cir. 2004).

"To show injury in fact, a plaintiff must demonstrate an injury that is concrete, distinct and palpable, and actual or imminent." *Id*. (citation and quotation marks omitted). "[I]njury in fact is the invasion of a legally protected interest." *Pederson v. La. State Univ.*, 213 F.3d 858, 870-71 (5th Cir. 2000) (citation and quotation marks omitted). The second requirement is satisfied when there is a sufficient causal connection between the plaintiff's injury and the defendant's conduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing's redressability requirement is satisfied when it is "likely" that the injury will be "redressed by a favorable decision." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976).

When considering whether a plaintiff has standing, a court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). A case with multiple plaintiffs survives as long as at least one plaintiff has standing. *Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 (1977).

Taking as true the allegations in the complaint, it is evident that Becky Bickett, Andrea Sanders, Joce Pritchett, and Carla Webb have standing. These couples are all residents of Mississippi, where they are subject to laws which deny Becky and Andrea the right to marry and

deny recognition of Joce and Carla's out-of-state marriage. Mississippi law causes them other substantial harms affecting not only their lives, but the lives of their children as well.

The tangible injuries alleged by the plaintiffs include the denial of tax benefits and denial of the protection of the State's estate laws. Docket No. 1, at 10-11; *see, e.g.*, Miss. Code Ann. §§ 27-7-31(2) (allowing married persons to file joint tax returns); 27-7-21(c) (giving married couples a $12,000 joint income tax exemption each year); 41-37-25(b) (providing that surviving spouses are among the individuals authorized to consent to the performance of an autopsy); 91-5-25 (granting surviving spouses the right of election if the will does not contain satisfactory provisions); 91-5-27 (granting surviving spouses rights to share in the deceased spouse's estate where the will does not provide for them); 91-7-63 (granting surviving spouses first preference to serve as administrator of intestate estate).

Plaintiffs also claim intangible harms, stating that "Defendants stigmatize gay couples, their children, and their families by denying them the dignity and stature afforded to married couples through governmental recognition of their most cherished relationships." Docket No. 1, at 15. "Stigmatic injury stemming from discriminatory treatment is sufficient to satisfy standing's injury requirement if the plaintiff identifies some concrete interest with respect to which he or she is personally subject to discriminatory treatment and that interest independently satisfies the causation requirement of standing doctrine." *Bostic v. Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014) (citation, quotation marks, brackets, and ellipses omitted). Perhaps the most significant stigmatic injury suffered by the plaintiffs arises from the fact that one plaintiff in each couple lacks parental rights over the children she loves and is raising. *See* Docket No. 1, at 9.

When Becky and Andrea sought a marriage license from the Hinds County Circuit Clerk, they were denied because they are a same-sex couple. The denial of this license constitutes an

injury for standing purposes. *See Bostic*, 760 F.3d at 371. Becky and Andrea's denial can be traced to Mississippi's marriage laws, defended here by the Attorney General. Declaring those laws unconstitutional and enjoining their enforcement would redress their injuries.

Joce and Carla's situation is slightly different because they were married in Maine. Nevertheless, their economic and stigmatic injuries are otherwise identical to Becky and Andrea's, and they too would see those injuries remedied if the defendants were enjoined from enforcing Mississippi's same-sex marriage ban.

CSE also has standing to sue on behalf of its members. Its members allegedly suffer the same injuries as the plaintiffs, plus some of the injuries imposed by State law which do not appear to be imposed upon the plaintiffs. *See, e.g.*, Miss. Code Ann. §§ 21-29-329(1) (authorizing municipalities "to allow those spouses who are receiving retirement benefits . . . to continue to receive the spouse retirement benefits for life even if the spouse remarries."); 25-11-114 (granting certain benefits to surviving spouses of public employees who die prior to retirement); 25-15-13 (providing life and health insurance coverage eligibility to spouses of state employees). At oral argument, counsel for plaintiffs stated that she is aware of gay and lesbian Mississippians who are denied the benefits Mississippi law affords spouses of public employees, due to their inability to marry their partner. *See infra* Part IV.C.

Associational standing is satisfied when "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citation omitted).

The allegations in the complaint support that CSE's members would independently have standing to seek the relief described in this suit alongside the individual plaintiffs, and would be satisfied by a judgment against these defendants. It also is evident that CSE's mission is aligned with its goals in this suit. Additional members need not participate because the questions presented are legal, not factual.

Accordingly, all of the plaintiffs have standing to bring these claims.

**B.**    ***Baker v. Nelson***

The State argues that the plaintiffs' claims are foreclosed by *Baker v. Nelson*. In that case, Richard Baker claimed that his constitutional rights were violated when he was denied a license to marry a man. 191 N.W.2d 185 (Minn. 1971). The Supreme Court of Minnesota found that he had no such right under the Due Process or the Equal Protection Clauses of the Fourteenth Amendment. *Id.* at 186. The United States Supreme Court dismissed his appeal, stating in a one-sentence order that it failed to present "a substantial federal question." 409 U.S. 810 (1972).

The Supreme Court has instructed that summary dismissals "do not . . . have the same precedential value here as does an opinion of this court after briefing and oral argument on the merits." *Washington v. Confederated Bands and Tribes of Yakima Indian Nation*, 439 U.S. 463, 476 n.20 (1979) (citation omitted). It has also instructed that "unsubstantial" federal questions remain so "*except* when doctrinal developments indicate otherwise." *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (citation omitted and emphasis added).[3] This suggests that when summary

---

[3] The Supreme Court has regularly revisited issues it once considered unsubstantial, finding them to be quite significant on further review. The Second Amendment is one recent example. *Compare Burton v. Sills*, 394 U.S. 812 (1969) *with District of Columbia v. Heller*, 554 U.S. 570 (2008). Sunday Blue Laws were deemed unsubstantial "only a few years before" the Court found "200 pages worth" of legal issues in which to sink its teeth. *Port Auth. Bondholders Protective Comm. v. Port of New York Auth.*, 387 F.2d 259, 262 n.3 (2d Cir. 1967) (citations omitted). Laws criminalizing sodomy are another example. *Compare Crawford v. Missouri*, 409 U.S. 811 (1972) *with Lawrence*, 539 U.S. at 567. A challenge to interracial marriage bans was also summarily denied 11 years before the Supreme Court took up *Loving v. Virginia*, 388 U.S. 1 (1967). *See Naim v. Naim*, 350 U.S. 985 (1956) (refusing to disturb ruling by Virginia's highest court applying anti-miscegenation law to void marriage between a white woman

dismissals are challenged, lower federal courts should examine subsequent Supreme Court decisions issued after full briefing and oral argument, if any, and consider whether they have cast doubt upon the summary dismissal.

A review of the last four decades of constitutional law shows that *Baker* has effectively been preempted by major doctrinal developments in anti-discrimination law and same-sex rights. When *Baker* was decided in 1972, sex classifications did not receive heightened scrutiny and gay and lesbian citizens were not entitled to equal dignity under the law. Forty-two years later, the law in these areas has changed fundamentally. *See Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982); *United States v. Virginia*, 518 U.S. 515 (1996); *Romer v. Evans*, 517 U.S. 620, 635 (1996) ("We must conclude that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do."); *Lawrence*, 539 U.S. at 567 ("When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring. The liberty protected by the Constitution allows homosexual persons the right to make this choice."); *Windsor*, 133 S. Ct. at 2694 (finding DOMA unconstitutional in part because "it humiliates tens of thousands of children now being raised by same-sex couples").

*Windsor* is the most illustrative example. When the case was before the Second Circuit, that court looked at the doctrinal developments and concluded that *Baker* lacked "resonance." *Windsor v. United States*, 699 F.3d 169, 178 (2d Cir. 2012). A dissent argued that "*Baker* is the last word from the Supreme Court regarding the constitutionality of a state law limiting marriage to opposite-sex couples under the Equal Protection Clause and thus remains binding on this Court." *Id.* at 194 (Straub, J., dissenting). *Windsor*'s opponents then asked the Supreme Court to

---

and an Asian man). The Supreme Court summarily dismissed *Naim* even though the California Supreme Court had taken a forward-looking view of the Fourteenth Amendment two decades before *Loving*. *See Perez v. Lippold*, 198 P.2d 17, 29 (Cal. 1948) (concluding that California's anti-miscegenation law violated the Federal Constitution).

reverse, in part by emphasizing *Baker*'s "precedential effect." Brief on the Merits for Respondent the Bipartisan Legal Advisory Group of the U.S. House of Representatives at 26, United States v. Windsor, No. 12-307 (U.S. Jan. 22, 2013). The case presented a prime opportunity to discuss the ongoing relevance of *Baker* to same-sex marriage rights.

Not a single Justice, however, thought the case worthy of engagement. It was not cited in the majority opinion or any of the three dissenting opinions. Instead, the Court explained in great detail the harmful effects marriage restrictions have on gay and lesbian citizens and their children. *Windsor*, 133 S. Ct. at 2694-95. This reasoning is fundamentally contrary to *Baker*. If *Baker* lacked resonance when the Second Circuit resolved Edith Windsor's case, it was dead in the water when the Supreme Court was finished with it.

Here, the State argues that the Supreme Court has never explicitly overruled *Baker*. But that is not the standard. The Court's instruction was to examine "doctrinal developments." *Hicks*, 422 U.S. at 344. They are legion. At oral argument, despite its valiant effort, the State could not persuasively explain otherwise. Nor could it explain what further doctrinal developments could possibly be necessary to render *Baker* irrelevant.

Four decades of major changes in this area of the law are enough. *Baker* does not prevent this Court from reaching the merits of the plaintiffs' claims.

This conclusion aligns with decisions from four out of the five circuit courts of appeal to consider the constitutionality of same-sex marriage bans post-*Windsor*. *Bostic*, 760 F.3d at 375; *Baskin v. Bogan*, 766 F.3d 648, 660 (7th Cir. 2014); *Latta v. Otter*, --- F.3d ---, 2014 WL 4977682, at *3 (9th Cir. Oct. 7, 2014); *Kitchen v. Herbert*, 755 F.3d 1193, 1208 (10th Cir. 2014). *But see DeBoer v. Snyder*, --- F.3d ---, 2014 WL 5748990, at *7 (6th Cir. Nov. 6, 2014). As

Judge Posner wrote, "*Baker* was decided in 1972 – 42 years ago and the dark ages so far as litigation over discrimination against homosexuals is concerned." *Baskin*, 766 F.3d at 660.

This issue merits a final aside. Last month, the Supreme Court allowed same-sex marriage to proceed in Idaho, Indiana, Nevada, Oklahoma, Utah, Virginia, and Wisconsin. Adam Liptak, *Supreme Court Allows Same-Sex Marriage in Idaho*, N.Y. Times, Oct. 10, 2014; *see Rainey v. Bostic*, 135 S. Ct. 286 (2014) (declining to review the Fourth Circuit's decision finding Virginia's same-sex marriage ban unconstitutional); *Walker v. Wolf*, 135 S. Ct. 316 (2014) (declining to review the Seventh Circuit's decision finding Indiana and Wisconsin's same-sex marriage bans unconstitutional); *Herbert v. Kitchen*, 135 S. Ct. 265 (2014) (declining to review the Tenth Circuit's decision finding Utah's same-sex marriage ban unconstitutional). Even more recently it has declined to stay same-sex marriage in Kansas and South Carolina. Robert Barnes, *Supreme Court Clears Way for Same-Sex Marriage in S.C.*, Wash. Post, Nov. 20, 2014.

Several of these States asked the Supreme Court to rule against same-sex marriage based on *Baker*. *E.g.*, Petition for a Writ of Certiorari at 4, Herbert v. Kitchen, No. 14-124 (U.S. Aug. 5, 2014) ("the panel majority's decision contravenes this Court's own decision in *Baker v. Nelson*"); Emergency Application of Governor C.L. "Butch" Otter to Stay Mandate Pending Disposition of Applications for Stay Pending Rehearing And Certiorari at 16-17, Otter v. Latta, No. 14A374 (U.S. Oct. 8, 2014) [*hereinafter* Idaho Brief] ("Another indication of a good prospect of reversal by this Court is that the Ninth Circuit's decision conflicts with this Court's decision in *Baker v. Nelson*, 409 U.S. 810 (1972). . . . *Baker* will be highly relevant because it decided the very issue presented here.").

The Court could have granted these petitions and issued short, per curiam decisions reversing the Fourth, Seventh, Ninth, and Tenth Circuits. The Justices have not hesitated to use

that device in the past. *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346 (2014) (per curiam); *Tolan v. Cotton*, 134 S. Ct. 1861 (2014) (per curiam). But they did not correct same-sex marriage. The fact that the Court declined to halt same-sex marriage in so many states has no legal meaning in and of itself, but casts further doubt on the continued relevance of *Baker*.

The undersigned will proceed to the motion for preliminary injunction.

## III.    The Plaintiffs' Motion for Preliminary Injunction

### A.    Legal Standard

To receive a preliminary injunction, the movant must show "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant; and (4) that the injunction will not disserve the public interest." *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012) (citation omitted). "Each of these factors presents a mixed question of fact and law." *Id.* (citation omitted).

"A preliminary injunction is an extraordinary remedy. It should only be granted if the movant has clearly carried the burden of persuasion on all four . . . prerequisites." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

### B.    Substantial Likelihood of Success on the Merits

The movant's likelihood of success is determined by substantive law. *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

Under the Fourteenth Amendment, a state may not "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Although this text has not changed in

nearly 150 years, our understanding of it has changed dramatically. Before turning to today's issue, then, it is worth considering some of those historical changes.

In 1896, the Supreme Court found that "separate schools for white and colored children" did not violate the Fourteenth Amendment. *Plessy v. Ferguson*, 163 U.S. 537, 544 (1896). In 1954, though, the Court ruled that racially segregated schools were inherently discriminatory and unconstitutional. *Brown v. Board of Education*, 347 U.S. 483 (1954).

In 1872, a woman was denied a law license solely because she was a woman.[4] *Bradwell v. Illinois*, 83 U.S. 130 (1872). The Equal Protection Clause was essentially irrelevant when it came to women. Ninety-nine years passed before the Court "ruled in favor of a woman who complained that her State had denied her the equal protection of its laws." *Virginia*, 518 U.S. at 532 (citation omitted).

In 1986, the Supreme Court said a state could criminalize consensual sex between two men in the privacy of their home. *Bowers v. Hardwick*, 478 U.S. 186, 188-89 (1986).[5] The Court reversed course within two decades. "*Bowers* was not correct when it was decided, and it is not correct today," it explained. *Lawrence*, 539 U.S. at 578.

These are just a few examples. There are others.[6] Even an abbreviated history shows that millions of Americans were once deemed ineligible for full Fourteenth Amendment protection.

---

[4] As one Justice put it, "in view of the peculiar characteristics, destiny, and mission of woman," the legislature of Illinois could "ordain what offices, positions, and callings shall be filled and discharged by men, and shall receive the benefit of those energies and responsibilities, and that decision and firmness which are presumed to predominate in the sterner sex." *Bradwell*, 83 U.S. at 142 (Bradley, J., concurring).

[5] In 1986, while *Bowers* was pending, Justice Powell reportedly told his colleagues that he had never met a homosexual. Adam Liptak, *Exhibit A for a Major Shift: Justices' Gay Clerks*, N.Y. Times, June 8, 2013. He did not know that several of his prior law clerks (and one of his current law clerks) were gay. *Id.*

[6] Historically, the exercise of peremptory challenges by prosecutors was not subjected to judicial scrutiny, but in 1986, the same year the Supreme Court decided *Bowers*, the Court held that a prosecutor's right to unfettered use of peremptories is subordinate to the equal protection rights of African American jurors. *Batson v. Kentucky*, 476 U.S. 79 (1986). The equal protection right of the criminal defendant had been extended to the equal protection right of citizens to sit on a jury regardless of race. *Id.*; *see Powers v. Ohio*, 499 U.S. 400 (1991); *Hernandez v. New York*, 500 U.S. 352 (1991) (discriminatory use of peremptory challenges to exclude Latino from jury due to ethnicity is improper). The guarantee since has been expanded to include potential jurors in civil cases where there is no "state"

But we now take for granted that racial discrimination is wrong, that women cannot be excluded from the professions, and that gay and lesbian citizens are entitled to the same privacy in their sex lives that heterosexual citizens enjoy. We changed. These issues have faded into the background of everyday life.

The judiciary plays a unique role in this process. The above cases were not put to a vote of the American people. The votes had already been counted; the legislatures had already acted. Most voters thought nothing wrong with the status quo, unconstitutional as it may be.

This was always a risk of our representative democracy. James Madison wrote that "measures are too often decided, not according to the rules of justice and the rights of the minor party, but by the superior force of an interested and overbearing majority." The Federalist No. 10. He and his colleagues "knew times can blind us to certain truths." *Lawrence*, 539 U.S. at 579. Mistakes would be made.

In their wisdom, though, they created a co-equal branch of government where aggrieved persons could try to show "that the laws once thought necessary and proper in fact serve only to oppress." *Id.* The judiciary has been charged with hearing these claims for more than two centuries. The will of the majority is usually affirmed. Every now and then, however, the majority has done an injustice to a person's rights, and the case must be resolved in his or her favor.

---

action. In other words, private litigants may not exercise peremptory challenges in a racially discriminatory manner. *Edmondson v. Leesville Concrete Co.*, 500 U.S. 614 (1991). Nor may criminal defendants. *See Georgia v. McCollum*, 505 U.S. 42 (1992). And of course, we know today that parties are prohibited from using their peremptory challenges on the basis of gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994). This view of the power of the Equal Protection Clause was a far cry from what the Supreme Court had allowed in years past. *See Strauder v. West Virginia*, 100 U.S. 303 (1879); *Swain v. Alabama*, 380 U.S. 202 (1965).

Through our independent judiciary, we now know that the government cannot systematically exclude women from jury service.[7] *Taylor v. Louisiana*, 419 U.S. 522 (1975). The government cannot deny citizens their right to possess handguns, even if most people in certain cities disagree. *District of Columbia v. Heller*, 554 U.S. 570 (2008). And the government cannot ban library books the majority finds objectionable. *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853 (1982). "An *elective despotism* was not the government we fought for." Thomas Jefferson, Notes on the State of Virginia, Query 13 (1785).

The judiciary enforces individual rights against the tyranny of the majority. It does not matter how political the issue; how reviled the individual; or how vocal, politically savvy, and passionate the majority. That is its duty under Article III of the United States Constitution.[8]

It is with this understanding that the court considers same-sex marriage.

### 1.    Due Process

The plaintiffs claim that Mississippi's same-sex marriage ban "impinge[s] on the fundamental right to marry" guaranteed by the Due Process Clause. Docket No. 1, at 15. They assert that "Defendants stigmatize gay couples, their children, and their families by denying them the dignity and stature afforded to married couples through governmental recognition of their most cherished relationships." *Id*.

The defendants respond that there is no fundamental right to same-sex marriage. Docket No. 22, at 17. Defendants' argument is predicated on specific language in *Washington v.*

---

[7] Fewer than 50 years ago, our State Supreme Court held that "[t]he legislature has the right to exclude women so they may continue their service as mothers, wives, and homemakers, and also to protect them . . . from the filth, obscenity, and noxious atmosphere that so often pervades a courtroom during a jury trial." *State v. Hall*, 187 So. 2d 861, 863 (Miss. 1966).

[8] Judge Arenda Wright Allen eloquently explained the court's role when she was faced with this issue in Virginia: "While ever-vigilant for the wisdom that can come from the voices of our voting public, our courts have never long tolerated the perpetuation of laws rooted in unlawful prejudice. One of the judiciary's noblest endeavors is to scrutinize laws that emerge from such roots." *Bostic v. Rainey*, 970 F. Supp. 2d 456, 460 (E.D. Va. 2014); *see also Baskin*, 766 F.3d at 671 ("Minorities trampled on by the democratic process have recourse to the courts; the recourse is called constitutional law.").

*Glucksberg*, in which the Supreme Court stated that substantive due process analysis has two primary features: "specially protect[ing] those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition," and requiring "a careful description of the asserted fundamental liberty interest." 521 U.S. 702, 720-21 (1997) (citations and quotation marks omitted).

The court sees it differently. Relying on Supreme Court case law, the court concludes that there is no new fundamental right at issue. The question is not whether there is a right to same-sex marriage; it is whether gay and lesbian people, like any other group of people, have "the freedom of choice to marry." *Kitchen*, 755 F.3d at 1210 (quoting *Loving v. Virginia*, 388 U.S. 1, 12 (1967)). This court follows the view of the majority of circuits—the Fourth, Ninth, and Tenth—in holding that same-sex couples have the right to marry. Supreme Court jurisprudence on the fundamental right to marry sheds light on how the court reaches its conclusion.

Again, the Due Process Clause prohibits a state from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has not precisely defined "liberty." *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). The term includes a broad range of interests intrinsic to the meaning of freedom. These interests include "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, . . . [and] to worship God according to the dictates of his own conscience." *Id.* (citations omitted). In short, liberty embraces those rights which are fundamental to a free society. *See Poe v. Ullman*, 367 U.S. 497, 541 (1961) (Harlan, J., dissenting) (arguing that due process protects "those concepts which are considered to embrace those rights which are fundamental; which belong to the citizens of all free governments") (quotation marks, citation, and ellipses omitted).

The Supreme Court has made clear that "liberty" extends beyond an enumerated list of constitutional guarantees.

> The full scope of the liberty guaranteed by the Due Process Clause cannot be found in or limited by the precise terms of the specific guarantees elsewhere provided in the Constitution. This 'liberty' is not a series of isolated points pricked out in terms of the taking of property; the freedom of speech, press, and religion; the right to keep and bear arms; the freedom from unreasonable searches and seizures; and so on. It is a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints, and which also recognizes, what a reasonable and sensitive judgment must, that certain interests require particularly careful scrutiny of the state needs asserted to justify their abridgment.

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 848 (1992) (quoting Justice Harlan's dissent in *Poe*) (brackets and ellipses omitted). "At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Id.* at 851.

One of the fundamental rights included in the idea of liberty is the right "to marry, establish a home and bring up children, . . . and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer*, 262 U.S. at 399. Marriage is "one of the basic civil rights of man." *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942).

The right to marry is related to other rights, including the right to privacy. In *Griswold v. Connecticut*, for example, health professionals were prosecuted when they helped a married couple secure contraceptives in violation of a Connecticut statute. 381 U.S. 479 (1965). The Supreme Court ruled that the statute violated the right to privacy implicit in marital relations.

> We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects.

> Yet it is an association for as noble a purpose as any involved in our prior decisions.

*Id*. at 486. As others have pointed out, the Court has also "described marriage as an associational right" which is "of basic importance in our society." *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1197 (D. Utah 2013) (citation and quotation marks omitted).

As society's notion of liberty has changed, the scope of the right to marry has changed with it. *Griswold* stands for the proposition that the right to marry also protects the couple's choice on when to have children, if ever. In *Zablocki v. Redhail*, the Court held that the right to marry extends to fathers with outstanding child support payments who cannot support their children.[9] 434 U.S. 374 (1978). In *Turner v. Safley*, the Court held that the right to marry extends to incarcerated persons who have no children and *no opportunity* to conceive children. 482 U.S. 78 (1987). These cases illustrate that the right to marry cannot be limited to those who want to procreate, those who are able to procreate, or those society perceives to be the model family unit.[10] *See Kitchen*, 755 F.3d at 1210-11; *Latta*, 2014 WL 4977682 at *12 n.1 (Reinhardt, J., concurring).

Perhaps the most significant case demonstrating the evolving conception of the right to marry is *Loving v. Virginia*. There, the Supreme Court ruled that Virginia's law banning interracial marriage violated the Due Process Clause. 388 U.S. 1 (1967). The law deprived couples of "liberty without due process of law" and denied them the "freedom to marry," which "has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Id*. at 12.

---

[9] The opinion suggests that the father might have avoided the State of Wisconsin's marriage restriction by moving to another State. *Zablocki*, 434 U.S. at 377. But a citizen is not required to move to protect his constitutional rights.
[10] That said, the right to marry is not absolute. *Zablocki*, 434 U.S. at 374 ("reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed"). Under current law, for example, a state may ban polygamy. *See Reynolds v. United States*, 98 U.S. 145 (1878).

*Loving* did not redefine marriage or create a new "right to interracial marriage." Rather, it struck down a law limiting an *existing* fundamental right on account of race, a governmental classification which is subject to judicial review. *Id.*; *see also Lawrence*, 539 U.S. at 577-78 ("neither history nor tradition could save a law prohibiting miscegenation from constitutional attack"). *Loving* means that fundamental rights like the right to marry are presumptively shared by all persons, and laws restricting these rights are subject to strict scrutiny when the government attempts to limit other groups' access to them. *Accord Glucksberg*, 521 U.S. at 721 (applying strict scrutiny to laws "infring[ing]" on "fundamental liberty interests").

*Loving* also stands for the proposition that marital rights are articulated broadly. As the Tenth Circuit put it,

> *Loving* was no more about the 'right to interracial marriage' than *Turner* was about the 'prisoner's right to marry' or *Zablocki* was about the 'dead-beat dad's right to marry.' Even in cases with such vastly different facts, the Supreme Court has consistently upheld the right to marry, as opposed to a sub-right tied to the facts of the case.

*Kitchen*, 755 F.3d at 1210-11 (quoting *Latta*, 2014 WL 4977682, at *12-13). These cases "speak of a broad right to marry that is not circumscribed based on the characteristics of the individuals seeking to exercise that right." *Bostic*, 760 F.3d at 376.

Given these precedents, the court concludes that the right at issue today is the right *to marry*, not the right to marry *a person of the same gender*. While the latter articulation is more precise, certainly, such a narrow reading is inconsistent with the Supreme Court's decisions in *Meyer, Zablocki, Turner*, and *Loving*. *See also Glucksberg*, 521 U.S. at 720 ("the 'liberty' specially protected by the Due Process Clause includes the right[] to marry").

The court's conclusion is buttressed by two decisions that recognized the rights of gay and lesbian citizens.

In *Lawrence*, the Court held that the "right to liberty under the Due Process Clause gives [homosexuals] the full right to engage in their conduct without intervention of the government." 539 U.S. at 578. In so doing, the Court recognized that the Due Process Clause "afford[s] constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education. . . . Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do." *Id*. at 574. The Court's reasoning indicates that gay and lesbian persons have the same liberty interests as heterosexuals.

In dissent, Justice Scalia declared that the Court's reasoning opened the door for gay and lesbian persons to claim a constitutionally-protected right to marry. *Id*. at 600-05 (Scalia, J., dissenting). That proved true.

The second case is *Windsor*, where the Court struck down part of DOMA because it "impose[d] a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages made lawful by the unquestioned authority of the States." 133 S. Ct. at 2693. The opinion described in great detail why the government was not justified in "demean[ing] the [same-sex] couple, whose moral and sexual choices the Constitution protects," or in "humiliat[ing] tens of thousands of children now being raised by same-sex couples." *Id.* at 2694. Although *Windsor* does not address State statutes and constitutional amendments banning same-sex marriage, its language leaves no room to allow homosexual citizens, and the children they love and rear, to be treated as second-class citizens. *Windsor* compels us to recognize gay and lesbian couples' substantive due process right to marry.[11]

---

[11] *Windsor* is also a case about federalism and States' traditional authority to regulate marriage. 133 S. Ct. at 2689-90 ("By history and tradition the definition and regulation of marriage . . . has been treated as being within the authority and realm of the separate States."). Mississippi maintains that traditional authority. But *Windsor* did not say that a State's power to regulate marriage is now unlimited and without constitutional supervision. *See id.* at 2692 (recognizing that the state interest in regulating marriage is limited by constitutional guarantees); *Loving*, 388 U.S. at 7 (holding that the States' power to regulate marriage is limited by the "commands of the Fourteenth Amendment").

This conclusion is reinforced by Justice Scalia's dissent in *Windsor*, where he again observed that the majority's reasoning would open the door to strike down state bans on same-sex marriage. *Id.* at 2709-11 (Scalia, J., dissenting). When read in conjunction with *Loving* and *Lawrence*, the undersigned must agree.

Gay and lesbian persons are full citizens that share the same rights as other citizens, including the right to marry. This conclusion does not conflict with *Glucksberg*. The right to marry is rooted in history and tradition, but history shows that tradition does not dictate who gets to exercise certain rights. (Any doubt could be resolved by asking Mildred and Richard Loving, Estelle Griswold, William Baird, John Lawrence and Tyron Garner, and Edith Windsor and Thea Spyer.) The State's narrow interpretation of this right diminishes the importance it has continuously been given by the Supreme Court, contrary to applicable case law. It also serves to undermine the dignity of gay and lesbian citizens by suggesting that they are unworthy of sharing rights fundamental to every free person. *See Zablocki*, 434 U.S. at 384 ("the right to marry is of fundamental importance for all individuals"); *Loving*, 388 U.S. at 12 ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men.").

Mississippi's marriage laws violate the plaintiffs' Due Process rights, unless defendants can show that the laws "are narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (citation omitted). The court need not discuss whether these laws withstand the strict scrutiny analysis required when a fundamental right is harmed, however, because the laws fail to survive rational-basis review, a less searching standard, under the Equal Protection Clause.

The court will now turn to that Clause.

2.        **Equal Protection**

The Equal Protection Clause directs that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982) (citation omitted). The "guarantee is both simple and wide–equal and uniform governmental classifications." *Town of Ball v. Rapides Parish Police Jury*, 746 F.2d 1049, 1056 (5th Cir. 1984). The Fourteenth Amendment ensures that citizens' rights to liberty and equality are the same whether you live in the Rocky Mountains or the Mississippi Delta.

"Notions of what constitutes equal treatment for purposes of the Equal Protection Clause do change." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 669 (1966). The Clause has been interpreted broadly for the last several decades. *See Town of Ball*, 746 F.2d at 1056-57.

"When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citations omitted). "But we would not be faithful to our obligations under the Fourteenth Amendment if we applied so deferential a standard to every classification. . . . Thus we have treated as presumptively invidious those classifications that disadvantage a suspect class, or that impinge upon the exercise of a fundamental right." *Plyler*, 457 U.S. at 216-17 (quotation marks omitted).

As explained earlier, case law establishes a fundamental right to marry the person of one's choice. Mississippi's decision to exclude same-sex couples from exercising that choice violates that fundamental right.

The Court will nevertheless consider whether Mississippi's same-sex marriage ban operates to disadvantage a suspect or quasi-suspect class, which if true "may call for a

26

correspondingly more searching judicial inquiry." *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938). Governmental discrimination "against a minority, when based on an immutable characteristic of the members of that minority (most familiarly skin color and gender), and occurring against an historical background of discrimination against the persons who have that characteristic, makes the discriminatory law or policy constitutionally suspect." *Baskin*, 766 F.3d at 654 (citations omitted).

Under the customary framework, laws with racial classifications are subject to strict scrutiny, laws with sex-based classifications are subject to heightened or intermediate scrutiny, and laws making other classifications are subject to rational basis review.[12] *E.g.*, *Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411, 2417 (2013) ("Any racial classification must meet strict scrutiny."); *Miller v. Albright*, 523 U.S. 420, 434 n.11 (1998) ("heightened scrutiny . . . normally governs gender discrimination claims"); *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (applying rational basis review to state taxation scheme).

The circuit courts of appeal are divided on which level of review to apply to sexual orientation classifications. In the Second Circuit, "homosexuals compose a [quasi-suspect] class that is subject to heightened scrutiny." *Windsor*, 699 F.3d at 185. In this circuit, sexual orientation classifications are subject to rational basis review. *Johnson v. Johnson*, 385 F.3d 503, 532 (5th Cir. 2004).

It is here that we encounter two analytical difficulties. First, as the plaintiffs observe, Mississippi's same-sex marriage ban facially classifies on the basis of sex, not sexual orientation. *See* Docket No. 1, at 14. This creates some confusion about which level of review to apply. Second, despite having to evaluate sexual orientation classifications under rational basis review,

---

[12] Other classifications also are subject to strict or intermediate scrutiny. They are not relevant to this decision.

history suggests that gay and lesbian Mississippians are a discrete minority group that lacks political power and has long been subjected to discrimination, warranting heightened scrutiny.

Each of these issues will be taken up below.

### a.      Sex-Based Classification

Nothing in the text of Mississippi's laws banning same-sex marriage speaks to sexual orientation. A circuit clerk need not inquire into sexual orientation to issue or withhold a marriage license. Mississippi's same-sex marriage ban is plainly a sex-based classification.[13]

When the legislature wrote the laws in 1997 and 2004, it could have framed the issue in terms of sexual orientation. It would not have been difficult to find the right words; just a few years earlier, Colorado had passed a constitutional amendment repealing all governmental protection for persons of "homosexual, lesbian or bisexual orientation." *Romer*, 517 U.S. at 624 (quoting Colo. Const. art. II, § 30b). The absence of sexual orientation-related language in Mississippi's ban confirms that it is a sex-based classification.

And yet, common sense tells us that the application of Mississippi's same-sex marriage ban discriminates on the basis of sexual orientation. The title of the bill which amended the Mississippi Code to outlaw same-sex marriage said it was "An Act . . . to Prohibit Homosexual Marriages and to Provide that Homosexual Marriages Recognized in Another State Shall not Be Recognized in this State and Shall Be Declared Void in this State." S.B. 2053, 112th Leg., Reg. Sess. (Miss. 1997). Contemporaneous reporting confirms that Mississippi's constitutional amendment banning same-sex marriage was passed in response to an expansion of same-sex rights in Massachusetts, *not* women's rights. *See* Gordon, *supra* (quoting Rep. Barnett); *see also* Forest Thigpen, *Approving Amendment Doesn't Restrict Rights of Same-Sex Partners*, The

---

[13] Judge Berzon has persuasively explained why the same is true of Idaho and Nevada's same-sex marriage bans. *Latta*, 2014 WL 4977682, at *14 (Berzon, J., concurring). She thought intermediate scrutiny appropriate. *Id.* at *23.

Clarion-Ledger, Oct. 24, 2004 ("in Massachusetts, . . . a bare majority . . . of that state's supreme judicial court declared same-sex marriage to be a fundamental right").

Legal analysis is supposed to focus on the plain language of the authoritative text. To take a statute as an example, if its plain language "is unambiguous and does not lead to an absurd result, our inquiry begins and ends with the plain meaning of that language." *Sealed Appellee 1 v. Sealed Appellant 1*, 767 F.3d 418, 421 (5th Cir. 2013). Judges "should not be required to divine arcane nuances or to discover hidden meanings" buried within a text. Scalia & Garner, Reading Law: The Interpretation of Legal Texts 69 (2012). Context is certainly relevant to that inquiry; courts are to focus on plain language "in context with its design, object and policy." *Sealed Appellee 1*, 767 F.3d at 421; *see* Scalia & Garner at 56 ("words are given meaning by their context, and context includes the purpose of the text"). But there is reason to believe that the context is to be gleaned from *within* the authoritative text itself – adjacent paragraphs and the like – "not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires." Scalia & Garner at 56.

On one hand, since the plain language of Mississippi's same-sex marriage ban is a sex classification, and there is not enough contextual information within the text to identify sexual orientation as the issue, then this court should apply intermediate scrutiny. That means the ban survives only if the State can meet a "demanding" burden to show that "the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Virginia*, 518 U.S. at 533 (quotation marks, citations, and brackets omitted).

On the other hand, if the court is permitted to use common sense and examine the true purpose, history, and effect of Mississippi's same-sex marriage ban, it is obvious that the ban

29

discriminates on the basis of sexual orientation. In such case rational basis review must be applied, with the customary inferences in the State's favor.

Justice Kennedy called this "a difficult question that I've been trying to wrestle with." Transcript of Oral Argument, Hollingsworth v. Perry, No. 12-144, 2013 WL 1212745 at *13 (U.S. Mar. 26, 2013) [hereinafter *Hollingsworth* Transcript]. Like other district courts presented with this dilemma, the undersigned need not resolve the conflict at this time. *See Wolf v. Walker*, 986 F. Supp. 2d 982, 1009 (W.D. Wis. 2014). It is noted for further review.

### b.      Suspect or Quasi-Suspect Class

This brings us to the second problem. Race, sex, and a handful of other classifications are subject to either strict or intermediate scrutiny. In this circuit, sexual orientation is not. That conclusion is binding on this Court. The question is whether it remains a fair conclusion given what we now know about gay and lesbian citizens.

Courts consider a number of factors when deciding whether a group is a suspect or quasi-suspect class. One of the most important is whether the group has "suffered discrimination in our society." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 218 (1995); *see Frontiero v. Richardson*, 411 U.S. 677, 684 (1973) ("our Nation has had a long and unfortunate history of sex discrimination"). Another is whether the characteristic at issue has any bearing on one's "ability to perform or contribute to society." *Cleburne*, 473 U.S. at 441 (citation omitted). A third is whether the classification "threaten[s] to stigmatize individuals by reason of their membership," *Johnson v. California*, 543 U.S. 499, 507 (2005), or perpetuates stereotypes of "legal, social, and economic inferiority," *Virginia*, 518 U.S. at 534. Additional considerations include whether the group "exhibit[s] obvious, immutable, or distinguishing characteristics," or is "a minority or

politically powerless." *Lyng v. Castillo*, 477 U.S. 635, 638 (1986) (citation omitted). These factors are not exhaustive.[14] *See Windsor*, 699 F.3d at 181.

The State did not address these factors in its response brief. At oral argument, in fact, it conceded that some of them were "inarguable," without stating which factors were not satisfied. The Court has conducted an independent review of the factors without the benefit of the government's input.

### i.      History of Discrimination[15]

A "strong objection to homosexual conduct . . . has prevailed in Western culture for the past seven centuries." *Baker v. Wade*, 769 F.2d 289, 292 (5th Cir. 1985) (en banc); *accord Lawrence*, 539 U.S. at 571. This objection took many forms.

It was common for state laws to call for "sterilization or castration of moral degenerates and sexual perverts, usually for homosexual behavior." Dale Carpenter, *Windsor Products: Equal Protection from Animus*, 2013 Sup. Ct. Rev. 183, 253 (2013). "In an effort to 'treat' homosexuals, hospitals performed prefrontal lobotomies, injected massive doses of male hormones, and administered electric shock and other aversion therapy." *Id.* at 253-54 (citation omitted).

In 1952, Congress labeled homosexuals psychopathic personalities and passed a law "prohibit[ing] gay men and women from entering the country." *De Leon v. Perry*, 975 F. Supp. 2d 632, 651 (W.D. Tex. 2014) (citations omitted). "In 1953, President Eisenhower issued an executive order requiring the discharge of homosexual employees, among others, from all federal

---

[14] *Cleburne* indicates that courts should "look to the likelihood that governmental action premised on a particular classification is valid as a general matter, not merely to the specifics of the case before us." 473 U.S. at 446. Application of this factor would not change the court's ruling, since governmental actions based on sexual orientation are unlikely to be valid in the vast majority of instances.

[15] What follows is not "a definitive historical judgment." *Lawrence*, 539 U.S. at 568. The history of discrimination against homosexuals in Mississippi may be an appropriate issue to resolve at trial.

employment, and this policy remained in place until 1975." *Id.* (citations omitted). Senator Joseph McCarthy's crusade against Communists involved keeping an eye out for "flagrant homosexuals," which contributed to "more State Department employees . . . fired for homosexuality than for alleged Communist sympathies in 1951 and 1952, the height of McCarthy-era red-hunting." Carpenter, 2013 Sup. Ct. Rev. at 254. Gay and lesbian citizens could not openly serve in the military until September 2011. Matthew L. Wald, *Woman Becomes First Openly Gay General*, N.Y. Times, Aug. 12, 2012.

"Perhaps the most telling proof of animus and discrimination against homosexuals in this country is that, for many years and in many states, homosexual conduct was criminal." *Windsor*, 699 F.3d at 182. (In that case, the group of United States Congressmen which opposed Edith Windsor's claim conceded that "homosexuals have endured discrimination in this country since at least the 1920s." *Id.*) "Between 1946 and 1961, as many as one million gays and lesbians were arrested and punished for crimes related to their sexuality." Cary Franklin, *Marrying Liberty and Equality: The New Jurisprudence of Gay Rights*, 100 Va. L. Rev. 817, 837 (2014) (citing William N. Eskridge, Jr., Gaylaw: Challenging the Apartheid of the Closet 60 (1999)).

Earlier federal courts have not hesitated to say that "a homosexual act is immoral, indecent, lewd, and obscene." *Schlegel v. United States*, 416 F.2d 1372, 1378 (Ct. Cl. 1969). Much has changed. Today, even courts upholding same-sex marriage bans have had to acknowledge "the lamentable reality that gay individuals have experienced prejudice in this country, sometimes at the hands of public officials." *DeBoer*, 2014 WL 5748990, at *18. "Within our lifetime, gay people have been the targets of pervasive police harassment, including raids on bars, clubs, and private homes; portrayed by the press as perverts and child molesters;

32

and victimized in horrific hate crimes." *Whitewood v. Wolf*, 992 F. Supp. 2d 410, 427 (M.D. Pa. 2014).

When its same-sex marriage ban was challenged, the State of Pennsylvania conceded that there was a history of discrimination against gay and lesbians in America, but disputed the record of anti-gay discrimination *in Pennsylvania*. *Id*. at 427-28. The State of Mississippi has wisely made no such claim. To avoid all doubt, though, the court will discuss Mississippi's unique experience.

Historian John Howard, a native of Rankin County, contends that Mississippi was quietly accommodating of gay and lesbian persons during the 1940s and 1950s. John Howard, Men Like That xvii (1999). When John Murret, a gay man, was murdered in a Jackson hotel in July 1955, the police and the prosecution pursued the case vigorously. *Id.* at 129-42. The jury rejected the defendants' "gay panic" defense, disregarded the defense lawyers' repeated insinuations that Murrett was "a sex pervert," and convicted the defendants. *Id.* The conviction is remarkable considering that in that same year, a jury acquitted the men who tortured and murdered Emmitt Till.[16] *Id.* at 141. Apparently, being gay was more acceptable than being black.

Any claim that Mississippians quietly accommodated gay and lesbian citizens could no longer be made in the 1960s, when prejudice against homosexuals (and other groups) became more visible during the civil rights movement. Segregationists called their opponents "racial perverts," while U.S. Marshals – summoned to enforce civil rights – were labeled "sadists and perverts." *Id.* at xv, 147. Klan propaganda tied together "Communists, homosexuals, and Jews, fornicators and liberals and angry blacks – infidels all."[17] *Id.* at 149. One Klan photo showed a black man touching the crotch of the white man sitting next to him, attempting to make the link

---

[16] The composition of both juries were all male and all white. Howard at 142.
[17] In 1981, a Klan leader speaking at a rally in downtown Jackson advocated caging homosexuals. Howard at 238.

between racial equality and homosexuality explicit. *Id.* at 147. Howard concludes that by 1965, "homosexuality was linked to the specter of racial justice – what white authorities understood as the most serious threat to the status quo." *Id.* at xvii, 170.

Civil rights leaders had predicted the attack. In selecting the Freedom Riders, James Farmer had conducted interviews to weed out "Communists, homosexuals, [and] drug addicts." Gary Younge, No Place Like Home: A Black Briton's Journey Through the American South 271 (2002). "We had to screen them very carefully because we knew that if they found anything to throw at us, they would throw it," he explained. *Id.* This reflected society's notion that homosexuals were "undesirables." Taylor Branch, Parting the Waters: America in the King Years 1954-63 862 (1988). It also placed civil rights leaders in the position of seeking rights for one disenfranchised group while simultaneously seeking to avoid association with another disenfranchised group.

Mississippians opposed to integration harassed several civil rights leaders for their homosexuality. Bill Higgs was a prominent gay Mississippi civil rights lawyer. He was targeted for his activism, convicted *in absentia* of delinquency of a minor, and threatened with "unlimited jailings" should he ever return to Mississippi. Howard at 150-57. He never did. *Id.*

Another person targeted for his homosexuality was longtime civil rights organizer Bayard Rustin. Rustin, an African American, had been active in the Communist movement, was a conscious objector to World War II, and helped guide the Montgomery bus boycott – all of which made him suspect. Diane McWhorter, Carry Me Home 105 (2001). When he drew attention in Mississippi, the Clarion-Ledger called him a "sex criminal" owing to a 1953 conviction for being caught in a gay sex encounter in California. *Id.*; Howard at 147.

The most interesting part of Rustin's story, though – and the reason why he merits more discussion here – is that he was subjected to anti-gay discrimination by both white and black people, majority and minority alike.

Congressman Adam Clayton Powell, a black Democrat, threatened to feed the media a false story that Rustin was having an affair with Martin Luther King, Jr., unless Dr. King canceled a protest at the Democratic National Convention. *See* Branch at 314. "The mere assertion would be extremely damaging."[18] *Id.* at 315. Other persons within the civil rights movement were similarly "put off by Rustin's homosexuality." *Id.* at 329. Roy Wilkins, an NAACP executive, "was particularly nasty to Bayard Rustin – very hostile," in part because he "was very nervous about Bayard's homosexuality." John Lewis, Walking With the Wind: A Memoir of the Movement 207-08 (1998). Dr. King eventually had Rustin resign "because of persistent criticism of Rustin's homosexuality and Communist ties and because of Congressman Adam Clayton Powell's threat." Mary Frances Berry, And Justice for All: The United States Commission on Civil Rights and the Continuing Struggle for Freedom in America 47 (2009).

Rustin reemerged years later as one of the principal organizers of the March on Washington for Jobs and Freedom. A. Philip Randolph and Dr. King wanted Rustin as the march's chief organizer, but Wilkins pushed back "because [Rustin] was gay . . . something which in particular would offend J. Edgar Hoover." David Halberstam, The Children 450 (1998). The group ultimately "decided Randolph would be in charge of the march, that Rustin would be the principal organizer, but that he would stay somewhat in the background." *Id.*

The concern about offending Hoover was prescient, as the FBI Director and other top officials soon moved to use Rustin's homosexuality against him. In August 1963, FBI Director J.

---

[18] "King, however, held steady, and vowed that the picketing would go on as planned, which it did." Wil Haygood, King of the Cats: The Life and Times of Adam Clayton Powell, Jr. 265 (1993).

Edgar Hoover, Attorney General Robert F. Kennedy, and President John F. Kennedy urgently reviewed the transcript of a FBI wiretap in which Dr. King acknowledged Rustin's homosexuality. Branch at 861. A day later, Senator Strom Thurmond of South Carolina "rose in the Senate to denounce Rustin for sexual perversion, vagrancy, and lewdness." *Id.* FBI "headquarters badgered the field offices for new details" of Rustin's sex life for months. *Id.* at 862.

Rustin's story speaks to the long tradition of Americans from all walks of life uniting to discriminate against homosexuals. It did not matter if one was liberal or conservative, segregationist or civil rights leader, Democrat or Republican; homosexuals were "the other." Being homosexual invited scrutiny and professional consequences.[19]

These consequences befell quite a few Mississippians. Ted Russell, the conductor of the Jackson Symphony Orchestra, lost his job and his Belhaven College faculty position after he was caught in a gay sex sting by the Jackson Police Department. Howard at 168.[20] In the early 1980s, Congressman Jon Hinson drew scrutiny for frequenting an X-rated gay movie theater in Washington, D.C., and although he won reelection, he resigned when he returned to Washington and was caught performing gay sex acts in a Capitol Hill bathroom.[21] Jere Nash & Andy Taggart, Mississippi Politics: The Struggle for Power, 1967-2006 122-26 (2006); Howard at 263-74. As

---

[19] "Formal disapproval of overt homosexuality was arguably more rigorous among middle-class blacks than among comparable whites. . . . Incensed by white stereotypes denigrating black morals and partial to biblical condemnations of unconventional behavior, well-bred blacks were given to extreme execrations of what they perceived as deviant sexual practices." David Levering Lewis, W.E.B. Du Bois: The Fight for Equality and the American Century, 1919-1963, 224 (2000).

[20] Sting operations were a common technique used by police departments across the country to ensnare homosexuals. *See* Jordan Blair Woods, *Don't Tap, Don't Snare, and Keep Your Hand to Yourself! Critiquing the Legality of Gay Sting Operations*, 12 J. Gender Race & Just. 545, 548-53 (2009). Such operations are not relegated to the distant past. *See* Alana Chazan, *A Boy of Boise: In Defense of Idaho's Most Famous Toe-Tapper*, 11 N.Y. City L. Rev. 441 (2008).

[21] Hinson was not the only Mississippi politician to be associated with homosexual activity. When Attorney General Bill Allain was running for Governor, a mere two weeks before the election, supporters of his opponent accused Allain of consorting with black transgender prostitutes. Apparently the voters did not believe that Allain would do such a thing and must have viewed this as an act of desperation since Allain was far ahead in the polls. Allain won the election. *See* Nash & Taggart (Mississippi Politics) at 154; Howard at 295.

early as 1950, the State's flagship institution of higher learning, the University of Mississippi, "forced three homosexual students and one faculty member to leave the university" because it "did not tolerate homosexuality."[22] Charles W. Eagles, The Price of Defiance: James Meredith and the Integration of Ole Miss 62-63 (2009). Lesbian instructors at Mississippi University for Women were pushed out of their jobs, while students at other Mississippi public universities were expelled for their homosexuality. Howard at 68-69, 72. A 1979 article on gay Jacksonians said "most" remained closeted because "they fear losing their jobs, friends and families." Carol Taff, *Jackson's Insular, Secret Society*, The Clarion-Ledger, Sept. 9, 1979, at 1G.

The Mississippi State Sovereignty Commission was engaged in the anti-gay effort.[23] Longtime gay rights leader Eddie Sandifer was both "a target of Sovereignty Commission surveillance in the 1960s and 1970s" and one of its paid informants. Howard at 256. (Because the payments were so small, Professor Howard speculates that Sandifer cooperated because Sovereignty Commission investigators could have charged him with sodomy. *Id.*) Sovereignty Commission "[i]nvestigators and local officials also targeted local blacks and outsiders involved in civil rights activities as being sexually deviant." Jenny Irons, Reconstituting Whiteness: The Mississippi State Sovereignty Commission 174 (2010). They singled out Rust College, a private historically black institution, on reports that instructors there were "homosexuals and racial agitators." *Id.* at 175.[24,25]

---

[22] This may cut against Howard's "quiet accommodation of the 1950s" theory.

[23] For the uninitiated, the Sovereignty Commission was a State agency created in 1956. "The true purpose of the Sovereignty Commission was to maintain racial segregation in the State of Mississippi . . . by any means necessary despite contrary rulings of the United States Supreme Court." *ACLU of Mississippi v. Fordice*, 56 F. Supp. 2d 712, 713 (S.D. Miss. 1999). It has been described as "an abominable and unsavory segregationist enterprise staged by leading Mississippi white officials" who "used the constitutional mantle of 'state sovereignty' to try to perpetuate white Mississippi's inhumane treatment of the state's black citizens." Yasuhiro Katagiri, The Mississippi State Sovereignty Commission: Civil Rights and States' Rights xiv (2001).

[24] Bill Higgs, the gay civil rights attorney mentioned earlier, was a plaintiff in a lawsuit seeking to defund the Sovereignty Commission. Katagiri at 72-73. He "would have to pay dearly for his involvement in the case" – it led to the "phony moral charge" and eventual exile. *Id.* at 73.

Those with power took smaller, yet meaningful, actions to discourage gay organizing and association in Mississippi. The State refused to let gay rights organizations incorporate as nonprofits. Howard at 232, 239. The newspaper at Mississippi State University – student-led, with an elected editor – refused to print a gay organization's advertisement notifying gay and lesbian students of an off-campus "Gay Center" offering "counseling, legal aid and a library of homosexual literature. *Miss. Gay Alliance v. Goudelock*, 536 F.2d 1073 (5th Cir. 1976).[26] An advisor to the U.S. Commission on Civil Rights concluded that the Jackson Police Department took "a series . . . of maneuvers to harass members of Jackson's gay community." Howard at 237. "As of 1985 not a single university campus in Mississippi recognized a lesbian and gay student group." *Id.* at 68.

At times, gay and lesbian Mississippians were successful in protecting their rights in state courts. When a group of lesbians started Camp Sister Spirit, "a feminist education and cultural retreat center in rural Jones County," their homosexuality led to fierce opposition from local "religious conservatives and family values groups." *Founder of Camp Sister Spirit Dies*, Hattiesburg American, Feb. 13, 2008. An opposition group sued, claiming that the camp was a public nuisance. *College Students Spend Spring Break at Camp Sister Spirit*, Assoc. Press, Mar. 24, 1995. (The objections were not personal, said a leader of the opposition group: "We wouldn't want a house of prostitution, or a neo-Nazi training camp, or a porno shop, or a KKK meeting hall in our neighborhood, either." Michael Browning, *Uncivil War Pits Lesbians Against*

---

[25] The FBI also infiltrated gay rights groups in the 1950s and 1960s. Carpenter, 2013 Sup. Ct. Rev. at 255-56.
[26] In denying the organization's appeal, Judge Coleman described the Mississippi Gay Alliance as "this off-campus cell of homosexuals." *Goudelock*, 536 F.2d at 1075.

*Mississippi Townsfolk*, The Miami Herald, Mar. 6, 1994, at A1.) The group lost their suit; the camp remained. *See* Hattiesburg American, *supra*.[27]

Other successes touch on the issues in today's case. In 2001, a lesbian couple that had adopted a (Mississippi-born) child in Vermont struggled to get the State of Mississippi to issue a birth certificate listing both female parents. Complaint at 1-2, *Perdue v. Miss. State Bd. of Health*, No. G-2001-1891-S/2 (Miss. Ch. Ct. Oct. 25, 2001) . Although at the time Mississippi law did not prohibit same-sex adoptions, that did not prevent the State from claiming that adoption was reserved for heterosexual parents. Def.s' Mot. for Summ. J. at 3 (Feb. 14, 2003). The judge found that Mississippi law recognized lawful adoptions completed in other states. Opinion of the Court at 3 (Miss. Ch. Ct. Mar. 18, 2003). He ordered the State to issue a revised birth certificate listing each woman as "Parent" within 10 days. *Id.* The State complied.

That said, some court losses left open the possibility that gay and lesbian citizens were treated less favorably than others due to their sexuality. In 1990, the Mississippi Supreme Court affirmed a trial judge who declared that a mother, who was a lesbian, could not visit her children in the presence of her female partner. *White v. Thompson*, 569 So. 2d 1181, 1185 (Miss. 1990). In *Weigand v. Houghton*, the Mississippi Supreme Court affirmed a trial judge who refused residential custody to a father in large part because he was in a long-term relationship with another man. 730 So. 2d 581, 586 (Miss. 1999). A dissent complained that the father's sexuality had impaired the court's judgment, since the child would now have to live with "the unemployed stepfather [who] is a convicted felon, drinker, drug-taker, adulterer, wife-beater, and child-threatener, and . . . the mother [who] has been transitory, works two jobs, and has limited time with the child." *Id.* at 588 (McRae, J., dissenting).

---

[27] Brenda Hudson, the primary founder, died in 2008. According to her obituary, her proudest moment was not starting Camp Sister Spirit, but rather "[c]onsecrating in holy matrimony her 20-year committed relationship with her wife in the Great State of Massachusetts on May 24, 2004." *Henson*, Miss. Press, Feb. 14, 2008.

In 2002, one of Mississippi's justice court judges, frustrated with advances in gay rights in California, Vermont, and Hawaii, "opined that homosexuals belong in mental institutions." *Miss. Comm'n on Judicial Performance v. Wilkerson*, 876 So. 2d 1006, 1008 (Miss. 2004). Although he was reprimanded and fined by the Mississippi Commission on Judicial Performance, the Mississippi Supreme Court vacated the sanctions. It was more important for gay citizens to know that their judge was biased and seek his recusal than to "forc[e] judges to conceal their prejudice against gays and lesbians," it wrote. *Id.* at 1015. The "Commission urges us to 'calm the waters' when, as the guardians of this state's judicial system, we should be helping our citizens to spot the crocodiles." *Id.* at 1016.[28]

As the court discussed earlier, gay and lesbian Mississippians also found little refuge in the State legislature. *See supra* Part I.B (explaining what led to the passage of the laws currently at issue). The bills defining marriage and placing the constitutional amendment on the ballot passed with overwhelming support from politicians in both parties.[29] *See* Gordon, *supra* ("The [2004] bill easily passed through the Legislature"); Nash & Taggart (Mississippi Politics) at 392 (noting that the 2004 gay marriage legislation was approved in the House by a vote of 97-17 and in the Senate by a vote of 51-0); *see also* Dennis J. Mitchell, A New History of Mississippi 528 (2014). These laws are still on the books, of course, but they are not the only ones which establish different rights for gay and lesbian citizens.

---

[28] This would not be remarkable if the Mississippi Supreme Court had also vacated sanctions against Judges who displayed bias against other groups. But case law suggests that homosexuals were treated differently than white people, black people, and women. *See Miss. Comm'n on Judicial Performance v. Boland*, 975 So. 2d 882, 898 (Miss. 2008) (sanctioning a white justice court judge who made racially disparaging remarks about African Americans); *Miss. Comm'n on Judicial Performance v. Osborne*, 11 So. 3d 107, 114 (Miss. 2009) (suspending an African American county court Judge for making disparaging remarks about Caucasians, despite the Judge's resignation); *Miss. Comm'n on Judicial Performance v. Brown*, 37 So. 3d 14, 20, 24 (Miss. 2010) (sanctioning Judge for making racially derogatory remarks and touching employee in an inappropriate manner); *Miss. Comm'n on Judicial Performance v. Spencer*, 725 So. 2d 171 (Miss. 1998) (removing Judge in part for making sexually harassing comments).

[29] DOMA also passed with broad support. The vote in the House was 342-67 and the vote in the Senate was 85-14. Carpenter, 2013 Sup. Ct. Rev. at 194.

Mississippi law, for example, permits a single person to adopt a child, but prohibits gay or lesbian couples from adopting. Miss. Code Ann. § 93-17-3(5).[30] This kind of restriction was once supported by pseudoscience. *See infra* Part III.B.2.b.iii. We now recognize that it actually "harms the children, by telling them they don't have two parents, like other children, and harms the parent who is not the adoptive parent by depriving him or her of the legal status of a parent." *Baskin*, 766 F.3d at 671. Judge Posner thought it to be the "most arbitrary feature of Wisconsin's treatment of same-sex couples." *Id.*

Mississippi law also requires school districts to teach its pre-*Lawrence* sodomy law (along with all other State laws regarding homosexuality) to schoolchildren, including children of gay couples. Miss. Code Ann. § 37-13-171(e); *see* Jonathan Cohn, *Mississippi's Sex-Ed Classes Teach Kids That Homosexuality Is Illegal, Even Though It Isn't*, The New Republic, Apr. 7, 2014.

Discrimination against gay and lesbian Mississippians is not ancient history. The last five years reveals a number of complaints and lawsuits alleging discriminatory treatment at the hands of State and local governments. *See McMillen v. Itawamba Cnty. Sch. Dist.*, 702 F. Supp. 2d 699 (N.D. Miss. 2010) (finding First Amendment violation where female high school student's request to bring her girlfriend to prom, and wear a tuxedo at the event, was denied by the assistant principal); *Sturgis v. Copiah Cnty. Sch. Dist.*, No. 3:10-CV-455, 2011 WL 4351355, at *1 (S.D. Miss. Sept. 15, 2011) (denying school district's motion to dismiss where plaintiff, "who identifies as a female but prefers conventionally masculine clothing," challenged high school's removal of her senior portrait because she wore a tuxedo); Holbrook Mohr, *Lesbian Demands Ceremony at Mississippi Museum*, Assoc. Press, July 12, 2012 ("A Mississippi lesbian . . . is

---

[30] This prohibition states, in its entirety, "[a]doption by couples of the same gender is prohibited." Miss. Code Ann. § 93-17-3(5). This too is a classification based on sex, not sexual orientation.

now calling for a state museum to allow a commitment ceremony for her and her partner. . . . The state-owned museum in Jackson refused to permit a similar ceremony for two men earlier this year."); Holbrook Mohr, *Lesbian Sues Miss. Town for Denying Gay Bar Permit*, Assoc. Press, Oct. 1, 2013.

Same-sex marriage and partner health benefits have been two of the most prominent skirmishes. In 2012, the Attorney General's office issued an opinion finding "little question but that same-sex marriages are contrary to the public policy as set forth in Mississippi's statutes and constitution." Department Grounds and Use of Property, Miss. Att'y Gen. Op. No. 2012-411, 2012 WL 6128480, at *4 (Oct. 12, 2012) (citations omitted). The next year, that office opined that State employees could not enroll a same-sex spouse in the State's life and health insurance plans. Insurance Eligibility of Same Sex Spouse and Child of a Same Sex Marriage Under the State and School Employees' Life and Health Insurance Plan, Miss. Att'y Gen. Op. No. 2013-504, 2013 WL 7020577 (Dec. 20, 2013).

Just a few months ago, the city of Starkville granted health insurance benefits to same-sex partners. The city's religious base opposed the change. Carl Smith, *Starkville Revokes Same-Sex Insurance*, The Dispatch, Sept. 17, 2014. Lee Brand, Jr., a pastor and the President of the Starkville School District Board of Trustees, spoke against the measure, declaring that he is in favor of insuring single parents, children, and family, but family is "comprised of one man and one woman in a marriage covenant as given in Genesis 2:18-25." Mary Kate McGowan, *One Plus One: Starkville's Fight for LGBT Equality, Change*, Starkville Free Press, Oct. 12, 2014. Brand then read a list of other religious leaders who agreed with him. *Id.* Because of the backlash, the city reversed course. It now claims to "follow the Mississippi constitution." Kate

Royals, *Starkville Revokes Insurance Option for Same-Sex Partners*, The Clarion-Ledger, Sept. 17, 2014.

"The past is never dead. It's not even past." William Faulkner, Requiem for a Nun 92 (Random House, 1951). That is as true here as anywhere else. Seven centuries of strong objections to homosexual conduct have resulted in a constellation of State laws that treat gay and lesbian Mississippians as lesser, "other" people. Thus, it is easy to conclude that they have suffered through a long and unfortunate history of discrimination. *Accord Windsor*, 699 F.3d at 182.

### ii.      Bearing on Ability to Contribute to Society

"There are some distinguishing characteristics . . . that may arguably inhibit an individual's ability to contribute to society, at least in some respect. But homosexuality is not one of them." *Id.* In striking down Wisconsin's same-sex marriage ban, the U.S. District Court for the Western District of Wisconsin wrote that it was "not aware of *any* cases in which a court concluded that being gay hinders an individual's ability to contribute to society." *Wolf*, 986 F. Supp. 2d at 1012. This factor is satisfied.

### iii.      Stigmatization and Perpetuation of Inferiority

Stigma is defined as "a mark of shame or discredit" or "a mark or label indicating a deviation from the norm." Webster's Third New International Dictionary Unabridged 2243 (1993). There is little question that gay and lesbian citizens have been stigmatized by reason of their sexual orientation. They were, and to a certain extent are, labeled as deviant and forced to repress their sexuality to avoid personal and professional retribution. Bayard Rustin's homosexuality was a "stigma[] that would burden him throughout his career," Congressman

Lewis wrote. Lewis at 90. The Mississippians who lost their jobs (Russell), ability to return home (Higgs), or full custody rights (Weigand) knew firsthand the consequences of being gay.

The stigmatization of sexual orientation was aided by the dissemination of false stereotypes about gay and lesbian citizens. This took various forms.

One powerful message was the idea that homosexuals were criminals because sodomy was criminalized. "Certainly if a person is committing felonies, it reflects poorly on their potential as a lawyer," said one University of Mississippi law student who opposed his law school's anti-discrimination policy. Jerry Mitchell, *Ole Miss Law Professors Vote to Keep Policy Protecting Homosexual Rights*, The Clarion-Ledger, Mar. 6, 1987, at A1; *see also* Editorial, *Privacy Limited*, The Clarion-Ledger, July 2, 1986 ("Even behind locked doors, child beating, sale of narcotics and countless other activities are as illegal as they would be on the street."). Continuing the theme, one Jackson religious leader argued that "a church for those who engage in homosexual acts is the equivalent of a church for practicing adulterers, prostitutes, murderers, drunkards or thieves." Rev. Michael Schneider, *Is it Possible to be Homosexual and Still be a Christian? "No"*, The Clarion-Ledger, June 5, 1983.[31]

A related charge insinuated that gay sex was related to incest or other sex crimes. The head of the Mississippi Center for Public Policy argued that "[i]f we adopted the logic of same-sex marriage proponents . . . there could be no limits on incest or polygamy." Thigpen, *supra*. Reverend Blair Bradley, pastor of Covenant of Peace in Gulfport, said that post-*Lawrence*, there is now no legal restriction on any activity that would be done in private, "including bestiality,

---

[31] Perhaps because of this deep-rooted association, the decriminalization of consensual gay sex was not well received here. One State Senator "compared the court striking down sodomy laws to the 'loss of a good friend.'" Wilson Boyd, *U.S. High Court Strikes Law Banning Gay Sex*, The Clarion-Ledger, June 27, 2003. A Gulfport City Councilman said *Lawrence* was "the worst thing to happen to this country since they took prayer out of schools." Assoc. Press, *City Council Votes Against Sodomy Law*, The Clarion-Ledger, July 24, 2003.

drug use, child molestation and any other aberrant activity." *High Court Throws Out Sodomy Ban*, Sun Herald, June 27, 2003, at D-1.

Another oft-repeated allegation was that homosexuals were "deviant." In 1996, Governor Fordice called homosexual relationships "perverse." Gina Holland, *Mississippi Bans Homosexual Marriage*, Assoc. Press, Feb. 13, 1997. Said one Clarion-Ledger columnist, "Homosexuality is a deviant lifestyle. . . . Homosexuality isn't normal. It is, rather, abnormal to assume that same-sex fornicators who seem proud of the designation are fit for parenthood." Matt Friedeman, *Cells Jam Capitol Phones, Back Bill to Ban Gay Adoption*, The Clarion-Ledger, Mar. 17, 2000.

A final stereotype was that gay and lesbian citizens were unfit parents who would harm children. The Executive Director of the American Family Association, a family values group in Tupelo, argued that children raised in same-sex households have "problems in relationships with members of the opposite sex," are 29 times more likely to be the victim of incest, suffer a variety of psychological problems, and are at "greater risk of becoming homosexual" themselves. Mike Crook, *Should Gay Adoption Be Banned? "Yes"*, The Clarion-Ledger, Mar. 26, 2000.

Proponents of the above notions have had the opportunity to prove these theories in court, but failed. Two of the trials in which these proponents' theories were debunked are summarized here.

The champions of California's same-sex marriage ban promised to show 23 "specific harmful consequences" that families, children, and society would suffer if same-sex marriage was allowed to recommence in that state. *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 931 (N.D. Cal. 2010). At trial, however, they "provided no credible evidence to support any of the claimed adverse effects proponents promised to demonstrate." *Id.* The expert testimony that was

presented showed that "gays and lesbians are no more likely than heterosexuals to pose a threat

to children"; "children raised by gay or lesbian parents are just as likely to be well-adjusted as

children raised by heterosexual parents"; "same-sex couples are in fact indistinguishable from

opposite-sex couples in terms of relationship quality and stability"; and adoptive parents

"actually on some outcomes outstrip biological parents in terms of providing protective care for

their children." *Id.* at 935.[32] The court concluded that "children of same-sex couples benefit

when their parents can marry." *Id.* at 973.

The State of Michigan also had an opportunity to prove, at trial, the harms that would

develop from same-sex marriage. *See DeBoer v. Snyder*, 973 F. Supp. 2d 757, 761-68 (E.D.

Mich. 2014). Its main expert witness presented testimony that was "entirely unbelievable and not

worthy of serious consideration." *Id.* at 766. The state's other experts were no better: the court

concluded that they all "clearly represent a fringe viewpoint that is rejected by the vast majority

of their colleagues across a variety of social science fields." *Id.* at 768. As to the alleged harm to

children presented by homosexuals, the court noted that the American Medical Association,

American Academy of Pediatrics, American Psychological Association, and other professional

organizations concerned for the welfare of children have expressed "support for parenting,

adoption, and/or fostering by lesbian and gay couples" *Id.* at 763.

No trial has been held in this case yet. The evidence and testimony may ultimately point

in another direction. The lesson from these two trials, though, is that the most common claims

made against gay and lesbian citizens have not held up. The claims appear to be untrue

stereotypes intended to disparage and demean an unpopular group.

---

[32] The proponents of California's same-sex marriage ban *withdrew* two of their expert witnesses upon discovering
that their testimony actually supported same-sex marriage. *Perry*, 704 F. Supp. 2d at 944-45.

Mississippi law perpetuates the false notion of gay inferiority by denying equal marriage rights to gay and lesbian citizens, prohibiting gay and lesbian couples from adopting children together, and requiring schools to teach the idea that gay sex is criminal. *See Virginia*, 518 U.S. at 534. Even as public opinion changes in America, Mississippi law sends a plain message that gay and lesbian citizens are less deserving than other citizens.

For these reasons, this factor is met.

### iv.    Obvious, Immutable, or Distinguishing Characteristics

Unlike race, which is identifiable at birth and obvious throughout one's lifetime, sexual orientation has no visible manifestation. A gay or lesbian person can move throughout daily life without revealing his or her sexual orientation. It is not obvious.

Sexual orientation is, however, immutable. In reviewing the evidence, Judge Posner found "little doubt that sexual orientation . . . is an immutable (and probably an innate, in the sense of in-born) characteristic rather than a choice. . . . The American Psychological Association has said that most people experience little or no sense of choice about their sexual orientation." *Baskin*, 766 F.3d at 657 (quotation marks and citations omitted).

The State does not argue otherwise. This factor is satisfied.

### v.    Minority or Politically Powerless[33]

Gay, lesbian, bisexual, and transgendered Mississippians are a distinct minority group. A 2013 Gallop poll suggested that they constitute approximately 2.6% of the State's population. Dustin Barnes, *For Better or Worse?*, The Clarion-Ledger, June 16, 2013, at 1A.

A common argument against homosexual equality is that the gay and lesbian community is so popular that it needs no judicial protection from the will of the majority. In this vein, the

---

[33] This element likely carries little weight. Women are far from politically powerless – they constitute 50% of the voting population – but gender classifications are afforded intermediate scrutiny.

U.S. District Court for Nevada, which upheld that state's same-sex marriage ban until the Ninth

Circuit reversed, found that "the public media are flooded with editorial, commercial, and artistic

messages urging the acceptance of homosexuals." *Sevcik v. Sandoval*, 911 F. Supp. 2d 996, 1008

(D. Nev. 2012). He noted that the President now supports same-sex marriage.[34] *Id.*

But pointing to statements of popular support, those of individual politicians, or even the

national 'climate' is not the standard. The standard is whether homosexuals in Mississippi have

"the strength to politically protect themselves from wrongful discrimination." *Windsor*, 699 F.3d

at 184. Much of that discrimination, of course, happens, at the state and local levels, far from

celebrities and national politicians.

On this question, it can only be concluded that Mississippi's gay and lesbian community

does not have the requisite political strength to protect itself from wrongful discrimination. In

2004, it lost the same-sex marriage ban by a considerable margin. That year, "every member of

Mississippi's congressional delegation," Democrats and Republicans, supported the Defense of

Marriage Act. Ana Radelat, *Calls Sway Thompson's Vote to Ban Gay Marriage*, The Clarion-

Ledger, Oct. 7, 2004. As recent as this year, gay and lesbian Mississippians were unable to halt a

bill in the State legislature that was perceived to condone sexual orientation discrimination. *See*

Reid Wilson, *Mississippi Passes Arizona-style Religious Freedom Bill*, Wash. Post, Apr. 1, 2014

("Supporters of the measure say it would protect religious freedoms, while opponents say it

could be used to discriminate against gays and lesbians."); Neal Broverman, *Mississippi's*

*Modern 'Jim Crow' Law Now In Effect*, Advocate, July 6, 2014.

---

[34] In a sign of just how far national opinion has come, last year the President honored Bayard Rustin with the Presidential Medal of Freedom alongside former President Bill Clinton, Sally Ride, Dean Smith, Arturo Sandoval, and Oprah Winfrey. The White House, President Obama Names Presidential Medal of Freedom Recipients, Aug. 8, 2013.

The parties have not suggested when the gay and lesbian population's minority status and political incapacity in this State may end. At present, there is no end in sight. This factor is met.

~  ~  ~

"The experience of our Nation has shown that prejudice may manifest itself in the treatment of some groups." *Plyler*, 457 U.S. at 216 n.14. The experience of our State shows that gay and lesbian Mississippians are one of those groups to have been treated differently due to prejudice. They constitute a quasi-suspect class.

The immediate question is whether strict or intermediate scrutiny should apply. Mississippi's history of linking race with sexual orientation complicates this question.[35] Being gay and being black are tied up in overlapping stories of discrimination.

Despite their recent convergence in modern Mississippi history, though, race and sexual orientation are profoundly different.[36] Sexual orientation did not arise out of slavery or hundreds of years of discrimination. Unlike one's race, one can conceal sexual orientation upon demand, if only by refusing to publicly show love or seeking to marry.

There is a further complication inherent in the reality that homosexuals have been discriminated against by white and black people acting together. That is not limited to Bayard Rustin. The fact that 17 out of 20 Mississippians approved the same-sex marriage ban in 2004 is suggestive of some agreement among white and black voters. This implies a different source of

---

[35] If the seed of Mississippi's overt discrimination against gay and lesbian citizens was inspired by race discrimination, then the fruit of the poisonous tree we find ourselves grappling with today is also in part a problem of race.

[36] Counsel for plaintiffs made it very clear that they are in no way arguing "that the discrimination suffered by gay people is in any way equivalent to the discrimination suffered by African Americans." Transcript of Oral Argument at 29, Campaign for Southern Equality v. Bryant, No. 3:14-CV-818 (Nov. 12, 2014). "There has been violence against gay people, clearly," she noted, "but it doesn't arise even close to the levels of the violence that existed in the South, sadly, many years ago against [black] people." *Id*. The court agrees.

discriminatory motivation, one stemming not from color prejudice and slavery, but from longstanding religious prohibitions on homosexuality in white and black churches.[37]

At the end of the day, because gay and lesbian citizens are not bound up in the same history of slavery and discrimination as African Americans, this court is not inclined to apply strict scrutiny to sexual orientation classifications. Intermediate scrutiny is most appropriate. If this court had the authority, it would apply intermediate scrutiny to government sexual orientation classifications.

Although circuit precedent forecloses this finding, "it is safe to say that there is some doctrinal instability in this area" which merits renewed consideration by the en banc Fifth Circuit or the Supreme Court.[38] *Windsor*, 699 F.3d at 181.

The undersigned will now consider Mississippi's same-sex marriage ban under rational basis review.

### c.    Rational Basis Review

Under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440 (citations omitted). Courts generally should not "closely scrutinize legislative choices as to whether, how, and to what extent" the State's interests are pursued; "the Equal Protection Clause requires only a rational means to serve a legitimate end." *Id.*

---

[37] *See, e.g.*, Russell K. Robinson, *Marriage Equality and Postracialism*, 61 UCLA L. Rev. 1010, 1030 (2014) (arguing against the popular notion that black voters can be directly blamed for the passage of California's Proposition 8, which halted same-sex marriage in California for several years, because the biggest difference between the white vote and the black vote was not race, but religion); Sabrina Haake, *"The M Word"*, 4 Hum. Rts. & Globalization L. Rev. 3, 36 (2011) ("African-Americans are virtually the only constituency in America that has not become more supportive of homosexuals" and are "more likely than any other group to believe that homosexuality is wrong"); Randall Kennedy, *Marriage and the Struggle for Gay, Lesbian and Black Liberation*, 2005 Utah L. Rev. 781, 798-99 (2005) (concluding that African American hostility to gay and lesbian equality flows from a variety of sources including certain conservative Christian values, and quoting one African American minister as saying, "if the KKK was opposing same-sex marriage, [I] would ride with them").

[38] Earlier this month, for example, the Sixth Circuit found that same-sex marriage is "not a setting, most pertinently, in which the local, state, and federal governments historically disenfranchised the suspect class, as they did with African Americans and women." *DeBoer*, 2014 WL 5748990, at *20.

"Despite its deference, however, the rational basis test is not a toothless one." *Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Hous., Tex.*, 660 F.3d 235, 239 (5th Cir. 2011) (citation omitted). "[E]ven the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321 (1993).

A "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Furthermore, some objectives – such as a bare desire to harm a politically unpopular group – are not legitimate state interests." *Cleburne*, 473 U.S. at 446-47 (citations, quotation marks, and ellipses omitted). The public's "mere negative attitudes, or fear" of a minority group "are not permissible bases" for differential treatment, since the law cannot give effect to private biases. *Id.* at 448.

In this case, Mississippi says it has three legitimate interests in defining marriage as exclusively between one man and one woman. Each will be considered in turn. The court will then take up the plaintiffs' argument that Mississippi's same-sex marriage ban is unconstitutional because it was motivated by impermissible animus toward homosexuals.

### i.       Responsible Procreation

The State first argues that "defining marriage as between a man and woman steers opposite sex couples' potentially procreative conduct into stable and enduring family relationships and thereby furthers the legitimate state interest of connecting children to stable families formed by their biological parents." Docket No. 22, at 23. This is known as the responsible procreation theory.

This theory is somewhat misleading. Mississippi law makes marriage licenses available without regard to a couple's procreative capacity. Marriage licenses are issued to couples too old

to bear children, couples biologically incapable of having children, couples incapable of having sex due to incarceration[39], and couples who do not want to be parents.[40] If responsible procreation were the reason for State recognition of marriage, thousands of couples in Mississippi would not be married today. There is no relationship between this "interest" and the State's actual criteria for issuing marriage licenses.

However inarticulate the theory, the State is describing an interest in encouraging strong, long-lasting families, and healthy children supported by two parents.[41] The plaintiffs agree that this is an appropriate and noble governmental objective. *Accord Baskin*, 766 F.3d at 661 ("encouraging marriage is . . . about enhancing child welfare by encouraging parents to commit to a stable relationship in which they will be raising the child together"). This is a legitimate end.

The problem is that the State's *limitation* of marriage to opposite-sex couples is not a *rational means* of achieving that end. Gay and lesbian couples can form stable family units just as well as opposite-sex couples. Gay and lesbian couples can also love and care for children just as well as opposite-sex couples. It makes no sense to exclude them from an institution that promotes stable families and strengthens children. If the purpose of State-recognized marriage is to protect families and children, then the State should expand marriage rights to gay and lesbian couples, not bar them from it.

There's another reason why the State's limitation is irrational. Permitting same-sex marriage allows the State to continue to meet its articulated interest in encouraging "stable and enduring family relationships and . . . connecting children to stable families formed by their

---

[39] The Mississippi Department of Corrections ended conjugal visits on February 1, 2014. Press Release, MDOC Ends Conjugal Visits, Mississippi Department of Corrections, Dec. 15, 2013.
[40] The State also permits a panoply of miscreants to marry. *See* Courtney M. Cahill, *"If Sex Offenders Can Marry, Then Why Not Gay and Lesbians?": An Essay on the Progressive Comparative Argument*, 55 Buff. L. Rev. 777, 784-85 (2007) (noting that murderers, rapists, pedophiles, sadists, masochists, actual sexual deviants, wife-beaters, and even "the wildest, most beast-like heterosexual male" can marry).
[41] The State may argue that its articulation speaks only to *biological* parents. If biological parents were the real interest, stepparents would not be afforded full parental rights.

biological parents." Same-sex marriage doesn't impede that goal at all. There is no reason to believe that opposite-sex couples will *not* marry because a same-sex couple can marry. White couples did not call off their marriages when the Supreme Court made interracial marriages lawful. Free-world couples did not cancel their weddings when the Supreme Court permitted incarcerated persons to marry. There is no harm to anyone else.[42]

The situation is reminiscent of the Supreme Court's historic ruling in *West Virginia Board of Education v. Barnett*.

> The freedom asserted by these appellees does not bring them into collision with rights asserted by any other individual. It is such conflicts which most frequently require intervention of the State to determine where the rights of one end and those of another begin. But the [desire] of these persons to participate in the ceremony does not interfere with or deny rights of others to do so. Nor is there any question in this case that their behavior is peaceable and orderly. The sole conflict is between authority and rights of the individual.

319 U.S. 624, 630 (1943).[43]

A further consideration merits discussion. Like many states, Mississippi suffers when heterosexual parents have unprotected sex, bear children, and cannot take care of them. A number of those children end up in the foster care system, the juvenile justice system, and the children's mental health system. These children need homes and caretakers that love them.

Same-sex couples can help. As one Mississippi mom explained, "Children are precious to gay people because they are so hard to come by. We have to plan for them; they don't come unexpectedly. And we are blessed to have them, we love them dearly."[44] Charlotte Graham, *Religion and Same-Sex Marriages*, The Clarion-Ledger, Sept. 14, 1996.

---

[42] The State may actually *benefit* from same-sex marriage. A recent study estimated that "[e]xtending marriage to same-sex couples in Mississippi would generate an estimated $10.8 million in spending to the state economy." O'Neill et al., Estimating the Economic Boost of Marriage for Same-Sex Couples in Mississippi, The Williams Institute, Oct. 2014.

[43] A substitution has been made to complete the analogy, but the Supreme Court's eloquence speaks for itself.

[44] This is the essence of "responsible procreation."

Given the number of children in our State – or any state – awaiting placement in a stable family environment, it is irresponsible to deny those children the shelter and enrichment that same-sex families can provide.[45] There is no link between the State's legitimate interest in promoting strong families and healthy children, and its decision to prohibit same-sex marriage.

## ii.    Tradition

The State next claims it has an interest "in exercising caution and rationally declining to alter the man-woman definition of marriage understood as the norm for centuries." Docket No. 22, at 26. The argument is an appeal to tradition.

This is a profoundly ahistorical view of the two laws at issue. Mississippi's statute defining marriage was enacted in direct response to the Hawaii decision on same-sex marriage. *See supra* Part I.B.1. DOMA also was passed in response to that Hawaiian decision. *Id.* Mississippi's constitutional amendment banning same-sex marriage was enacted within 12 months of a Massachusetts court decision finding same-sex marriage constitutional in that state. *See supra* Part I.B.2. There is nothing "cautious" about what happened; these laws were reactionary. They targeted same-sex couples.

The appeal to tradition also reveals little understanding of the history of marriage. *Traditionally*, "a woman had no legal existence separate from her husband," and was "incapable, without her husband's consent, of making contracts which shall be binding on her or him." *Bradwell*, 83 U.S. at 141 (Bradley, J., concurring). *Traditionally*, "a wife was legally . . . her

---

[45] "Placement bans that prohibit adoption by gays and lesbians operate to prevent orphans, particularly special needs children, from enjoying the advantages of the most beneficial placement option—adoption." Tanya Washington, *Suffer Not the Little Children: Prioritizing Children's Rights in Constitutional Challenges to "Same-Sex Adoption Bans"*, 39 Cap. U. L. Rev. 231, 231-32 (2011) (citation omitted). "[E]nactment and enforcement of [same-sex] placement bans essentially ensures that some children, particularly special needs children, will experience the documented harms associated with extended temporary and institutional care." *Id.* at 234. A Mississippi law professor has discussed the need for altering the traditional adoption model in an insightful article. *See* Angela Mae Kupenda, *Two Parents Are Better Than None: Whether Two Single, African American Adults—Who Are Not In A Traditional Marriage or a Romantic or Sexual Relationship With Each Other—Should Be Allowed to Jointly Adopt and Co-Parent African American Children*, 35 U. Louisville J. Fam. L. 703, 720 (1997).

husband's property" and "it was legally impossible for a man to rape his wife." *Latta*, 2014 WL 4977682, at *20-21 (Berzon, J., concurring) (brackets omitted). *Traditionally*, "divorce was exceedingly difficult" and "a husband's prerogative to chastise his wife – that is, to beat her short of permanent injury – was recognized as his marital right." *Id.* at *21. No one argues for those traditions today.

The Supreme Court has made it "abundantly clear" that "the fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice." *Lawrence*, 539 U.S. at 577. Congress invoked tradition in passing DOMA; part of it was struck down. *Windsor*, 133 S. Ct. at 2693. Tradition was the basis for defending Texas's sodomy law; part of it too was rendered unenforceable. *Lawrence*, 539 U.S. at 572.

It would be a mistake to conclude that courts abolish time-honored traditions. Rather, courts resolve conflicts between "two conflicting traditions: the egalitarian one to which most official documents have paid lip service over the past century, and the quite different and malevolent one that in fact has characterized much official and unofficial practice over the same period (and certainly before)." John Hart Ely, Democracy and Distrust 61 (1980) (emphasis added). In *Loving*, *Lawrence*, and *Windsor*, the restrictions popular in those times yielded to our egalitarian traditions of marriage, privacy, and dignity.

Today's case is no different. "Tradition" will not suffice to uphold Mississippi's marriage ban.

### iii.     The Political Process

The State's final asserted interest in its same-sex marriage ban is its belief that "fundamental social change is better cultivated through democratic consensus." Docket No. 22,

at 26. Judge Feldman endorsed similar reasoning when he upheld Louisiana's same-sex marriage ban. *Robicheaux v. Caldwell*, 2 F. Supp. 3d 910, 926-27 (E.D. La. 2014).

In this case, the State asks this Court to either (1) wait and see if the voters will undo the constitutional amendment they enacted in 2004, or (2) simply defer to the voters. Neither request is cognizable on rational basis review.

The first request explains how a governmental classification could be remedied, not how the classification achieves a legitimate government purpose. If rational basis review were satisfied by the government's explanation of how a problem could be fixed, though, every classification would survive rational basis review. That cannot be the case. *See Romer*, 517 U.S. at 632.

The second request also is no defense of the law. As explained earlier, the judiciary does not defer to the voters' decision to deprive others of constitutional rights. James Meredith was admitted to the University of Mississippi over the will of the voters.[46] Edith Windsor was not told to send a strongly worded letter to her Congressman. The political process does not enforce individual constitutional rights. The judiciary does. *See Barnette*, 319 U.S. at 638.

This is especially true in the Supreme Court's marriage and sexual privacy cases. In *Loving*, Virginia asked the Court to let it and 15 other states – approximately the same number of states which today outlaw same-sex marriage – keep their interracial marriage bans, in part by arguing that the plaintiffs "must look to the polls and not to the courts" for relief. Brief and Appendix on Behalf of Appellee at *38, Loving v. Virginia, No. 395, 1967 WL 113931 (U.S. Mar. 20, 1967); *see Loving*, 388 U.S. at 6. The Court disagreed. The Lovings could live in Virginia without awaiting legislative approval.

---

[46] "The truth is that 90 percent of the white people of the state of Mississippi were opposed to Meredith entering the University of Mississippi." Jere Nash & Andy Taggart, Mississippi Fried Politics 16 (2008) (quoting C.B. "Buddie" Newman, former Speaker of the Mississippi House of Representatives).

Another example is found in an early constitutional challenge to sodomy, when the Fifth Circuit said it was "bound by the decision of the lawmakers of Texas" to criminalize sodomy in every setting. "Moral issues should be resolved by the people, and the laws pertaining thereto should be written or rescinded by the representatives of the people." *Baker*, 774 F.2d at 1287. A few years later, this reasoning was rejected in *Lawrence*. The majority could not "use the power of the State to enforce these views on the whole society through operation of the criminal law." *Lawrence*, 539 U.S. at 571.

The same-sex marriage cases have also suggested, albeit indirectly, that the political process argument lacks merit. Last month, the Ninth Circuit struck down Idaho's same-sex marriage ban, which the voters enacted in 2006. *Latta*, 2014 WL 4977682. The Governor of Idaho then sought an emergency stay from the Supreme Court, arguing that "[e]ach same-sex marriage performed will be an affront to the interests of the State and its citizens in being able to define marriage through ordinary democratic channels." Idaho Brief at 3. That was not enough. The stay was denied. *Otter v. Latta*, 135 S. Ct. 345 (2014).

There is no principled reason to think that Mississippi's argument will be resolved any differently than Virginia's, Texas's or Idaho's. No Supreme Court precedent suggests that today's plaintiffs are entitled to less rigorous constitutional protections than the plaintiffs in those cases, or that Mississippi's voters are entitled to more rights than voters in other states.

The Sixth Circuit disagrees. In upholding four states' same-sex marriage bans, it expressed optimism that voters would change their minds on same-sex marriage, and argued that the courts should give them that opportunity. As that court wrote, "from the claimants' perspective, we have an eleven-year record marked by nearly as many successes as defeats and a

widely held assumption that the future holds more promise than the past—*if the federal courts will allow that future to take hold*." *DeBoer*, 2014 WL 5748990, at *20 (emphasis added).

The undersigned sees the judicial role differently. The courts do not wait out the political process when constitutional rights are being violated, especially when the political process caused the constitutional violations in the first place.[47] The framers did not set up Article III to yield to "the superior force of an interested and overbearing majority." The Federalist No. 10, *supra*. By honoring its obligation conferred by Article III, the court does not diminish the political process. Rather, the court holds fast to the fundamental belief that constitutional principles that safeguard liberty and guarantee equality are not subject to the ballot.

Still, assume that the Sixth Circuit is right about the voters in that part of the country. There remains a distinct possibility that it may be wrong about voters elsewhere. Some research suggests that although "non-southerners respond to increased contact with gays and lesbians with warmer attitudes, this is not true in the Southern states." Barth & Overby, *Are Gay Men and Lesbians in the South the New "Threat"?: Regional Comparisons of the Contact Theory*, 31 Politics & Policy 452 (Sept. 2003). Another study casts doubt on that conclusion, finding that "the amount and effect of contact [with LGBT persons] in the South was similar to that in other regions of the country." Dawn M. Baunach et al., *Southern (Dis)comfort: Sexual Prejudice and*

---

[47] The court is reminded of a decision of one of its colleagues, Judge William Barbour, a little more than 25 years ago. In *ACLU of Miss. v. The Miss. State Gen. Servs. Admin.*, 652 F. Supp. 380, 381 (S.D. Miss. 1987), the question was "whether the display of a lighted cross on a state owned building during the Christmas season is unconstitutional under the Establishment Clause of the First Amendment." Of course that litigation brought out the religious passions of many Mississippians. But Judge Barbour noted that an injunction was appropriate, reasoning that "it is immaterial that the majority of [the] taxpayers would approve the expenditure [of illuminating the cross]." *Id.* at 383. He explained, "[t]he public interest must fall on the side of Constitutional rights of individuals over the will of the majority. That is the underlying fundamental of the Bill of Rights of our Constitution." *Id.* Though the issue Judge Barbour faced was different, his words are appropriate in addressing the issue here today. The Constitution cannot yield to the passions of the majority.

*Contact with Gay Men and Lesbians in the South*, 30 Sociological Spectrum 30, 58 (2010)[48]; *see also* Barth & Perry, *2 > 1 + 1? The Impact of Contact with Gay and Lesbian Couples on Attitudes About Gays/Lesbians and Gay-Related Policies*, 37 Politics & Policy 31, 43-47 (2009). The conflict cannot be resolved at the preliminary injunction stage.

Mississippi nonetheless remains unique in relevant ways. The 86% percent of Mississippi voters who opposed same-sex marriage in 2004 constituted the largest pro-traditional marriage vote in the country that year. Dustin Barnes, *For Better or Worse?*, The Clarion-Ledger, June 16, 2013. The size of the margin, in relation to the size of the gay community, casts doubt on the idea of using the political process to remove an unconstitutional law.

There also is the uncomfortable reality that a couple Southern states have taken decades to recognize interracial marriage. In Alabama, voters decided to remove their interracial marriage ban from the books only in 2000, 33 years after *Loving* was decided. Suzy Hansen, *Mixing It Up*, Salon, Mar. 8, 2001. Mississippi voters repealed this State's ban on interracial marriage in 1987 – a mere 21 years post-*Loving* – and only then by a margin of 52%-48%. Miss. Official and Statistical Register 1998-1992 579. Despite this achievement, a poll released *in 2011* suggested that "nearly half" of our State's majority political party thought interracial marriage should be unlawful. J.F., *Small Government, Then and Now*, The Economist, Apr. 8, 2011.

If the passage of 50 years has had such negligible impact on the public's opinion of interracial marriage in the Deep South, it is difficult to see how gay and lesbian Mississippians can depend on the political process to provide them any timely relief. And while they wait and see how the political process will play out, their legal rights and those of their children will

---

[48] This study surveyed a relatively liberal group of college students (for the region), in a college town with a significant population of same-sex couples and multiple, large gay pride festivals. Baunach et al. at 39, 56.

continue to be denied. As Justice Kennedy said in another same-sex marriage case, "[t]he voice of those children is important in this case, don't you think?" *Hollingsworth* Transcript, at *21.

For these reasons, the State's interest in achieving democratic consensus, laudable as it is, is insufficient to uphold Mississippi's same-sex marriage ban.

### iv.    Animus

"The Constitution's guarantee of equality must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot justify disparate treatment of that group." *Windsor*, 133 S. Ct. at 2693 (citation omitted). Laws motivated by "an improper animus" toward a distinct class of persons require special scrutiny. *Id.*

Animus is a legal term of art. It does attempt to discern the subjective motivation of the legislators or voters who passed the laws at issue. Instead, courts evaluating animus arguments are to look at "the design, purpose, and effect" of the challenged laws. *Windsor*, 133 S. Ct. at 2689; *see also Romer*, 517 U.S. at 627-28.

The Supreme Court's interpretation of a federal law "is highly persuasive to understand a similar state" law. Singer & Singer, Statutes and Statutory Construction § 51:6 (7th ed. 2012). *Windsor*'s interpretation of DOMA, a law both historically and substantively similar to Mississippi's same-sex marriage ban, is therefore highly relevant to this analysis.[49]

The *Windsor* court considered only the title of the bill, one House Report from the bill's legislative history, and the law's "operation in practice." *Windsor*, 133 S. Ct. at 2693-94. From these it concluded that DOMA has a "principal purpose . . . to impose inequality," places same-sex couples in second-tier relationships, "demeans the couple, whose moral and sexual choices

---

[49] Although the Mississippi legislature has no formal legislative history, it is very likely that Mississippi's 1997 marriage bill was influenced by DOMA. *See* Singer & Singer, Statutes and Statutory Construction § 48:3 (7th ed. 2014) ("courts generally turn to a law's pre-enactment history to discover its purpose, or object, or the mischief at which it was aimed, when the statute's language is inadequate to reveal legislative intent"). The State admits the 1997 bill was enacted "in light of developments afoot elsewhere." Docket No. 22, at 1.

the Constitution protects," and "humiliates tens of thousands of children now being raised by same-sex couples." *Id.* at 2694.[50]

Here, the design, purpose, and effect of Mississippi's same-sex marriage ban is to single out same-sex couples and ensure that they cannot marry in Mississippi or have their out-of-state marriages recognized in Mississippi. As explained earlier, Mississippi's 1997 "mini-DOMA" statutory definition of marriage and its 2004 constitutional amendment were passed in direct response to judicial decisions expanding our conception of same-sex rights. The 1997 bill was entitled, in relevant part, "An Act . . . to Prohibit Homosexual Marriages and to Provide that Homosexual Marriages Recognized in Another State Shall not Be Recognized in this State and Shall Be Declared Void in this State." S.B. 2053, 112th Leg., Reg. Sess. (Miss. 1997). And the effect of the bill was (and is) to label same-sex couples as different and lesser, demeaning their sexuality and humiliating their children. The unrebutted testimony of the plaintiffs shows the deleterious effects of the ban on them and their children. They range from taxation to health care to the stigma imposed on their children.

As with DOMA, the "avowed purpose and practical effect" of Mississippi's same-sex marriage ban "are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages ." *Windsor*, 133 S. Ct. at 2693. That is something the voters cannot do.

~   ~   ~

For these reasons, the plaintiffs are substantially likely to succeed on their claim that Mississippi's same-sex marriage ban violates the Fourteenth Amendment.

---

[50] Although the Supreme Court did not point to the debate, arguments, and conversations emanating from the halls of Congress, the vitriol which is recorded is unsettling. *See, e.g.*, Carpenter, 2013 Sup. Ct. R. at 262-81; Franklin, 100 Va. L. Rev. at 845-50. That record demonstrates why the Supreme Court was empowered to use the words "injure," "disapprov[e]," "disadvantage[]," "stigma[tize]," and "degrade" when describing what Congress did to same-sex couples in enacting DOMA, and why the Court could conclude that Congress "humiliate[ed]" children of same-sex couples. *Windsor*, 133 S. Ct. at 2693-95; *see* Daniel O. Conkle, *Evolving Values, Animus, and Same-Sex Marriage*, 89 Ind. L.J. 27, 40 (2014).

**B.**      **Irreparable Harm**

To succeed on their motion, the plaintiffs are also required to demonstrate "a substantial threat of irreparable harm if the injunction is not granted." *Opulent Life Church,* 697 F.3d at 288. They must show "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). "An injury is irreparable only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (citation omitted).

The plaintiffs direct the court's attention to some of the basic rights enjoyed by married couples. Mississippi's laws prohibiting same-sex marriage touch many aspects of the plaintiffs' lives, "from the mundane to the profound." *Windsor*, 133 S. Ct. at 2694. They divest the plaintiffs and their families of rights and benefits that opposite-sex married couples are entitled to, including healthcare visitation and decision-making; adoption, custody, and other parental rights; and tax, wills, estates and probate benefits; among others. *See supra* Part II.A (compiling certain rights and benefits available to married couples under Mississippi law); *Windsor*, 133 S. Ct. at 2694-96 (discussing federal protections, benefits, and obligations available to married couples). The plaintiffs also claim that they suffer inestimable injuries because of the stigmatizing effects of Mississippi's discriminatory laws.

The State responds that although the denial of government benefits may be injurious to same-sex couples, these injuries can be rectified. For example, it argues that "tax returns could be re-filed or amended" if the plaintiffs prevail in this lawsuit. Docket No. 22, at 29.

While that example may be true, it is equally true that amending paperwork cannot rectify every right or benefit presently denied to the plaintiffs. Suppose that next month, Joce

becomes terminally ill and her local hospital denies Carla the visiting rights it grants married couples. The emotional damage would be profound and irreparable. The same can be said for Becky and Andrea, other members of the CSE, and every other committed same-sex couple without a State-recognized marriage.

The State then contends that any stigmatization is speculative, under the unfortunate theory that a preliminary injunction "would not alter" the public's negative perceptions of gay and lesbian couples. But the court has already explained how the stigma faced by same-sex couples has very real personal and professional consequences. And although the public may or may not change its views, the government can be enjoined from enforcing laws which perpetuate the idea that same-sex couples are second-class citizens.

Finally, the State quotes out-of-circuit law to charge the plaintiffs with "unexcused delay" in filing this suit and seeking a preliminary injunction, saying it reflects a lack of urgency and an absence of irreparable harm. *Id.* at 30. The plaintiffs' actions, however, reasonably track when they were actually denied marriage licenses, and in fact closely follow the Supreme Court's decision to deny *certiorari* and stays of decisions from four appellate decisions striking down marriage bans indistinguishable from Mississippi's, which may have led the plaintiffs to believe that the issue was decided as a matter of law. The tidal wave of post-*Windsor* litigation has resulted in more than 30 states with legal same-sex marriage, so plaintiffs' timing in filing this suit can hardly come as a surprise.

In any event, it is well-established that the deprivation "of constitutional rights constitutes irreparable harm as a matter of law." *Cohen v. Coahoma Cnty., Miss.*, 805 F. Supp. 398, 406 (N.D. Miss. 1992) (citations omitted); *see also Deerfield*, 661 F.2d at 338.

Because the plaintiffs are being deprived of constitutional rights, they are suffering irreparable injury and will continue to be harmed without a preliminary injunction.

## C.    Balance of Hardships

The plaintiffs must next show that the injuries they are suffering outweigh any harm that an injunction may do to the defendants. If a court has made a finding of irreparable harm, a party opposing injunctive relief "would need to present powerful evidence of harm to its interests" to prevent the scales from weighing in the movant's favor. *Opulent Life Church*, 697 F.3d at 297. On the other hand, "the injunction usually will be refused if the balance tips in favor of defendant." 11A Charles A. Wright et al., Fed. Prac. & Proc. Civ. § 2948.2 (3d ed.).

The State contends that granting an injunction will result in the "irreparable harm of denying the public interest in the enforcement of its laws." Docket No. 22, at 30 (quoting *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013)). This argument merges with the public interest factor and will be taken up below.

The State also claims it will be "tremendously" burdened by having to overhaul administrative systems used by various state, county, and local officials tasked with accommodating same-sex couples seeking to obtain marriage licenses and have their out-of-state marriages recognized.

The Circuit Clerk of Hinds County evidently disagrees. After the hearing, she reportedly suggested that "the only foreseeable major change would be wording on marriage license paperwork, which her office has the authority to change in 'under two minutes.'" Adam Ganucheau, *Miss. Circuit Clerks Prepare for Gay Marriage Ruling*, The Clarion-Ledger, Nov. 14, 2014. Other circuit clerks apparently told the newspaper that they could reprint their forms in

two to 14 days. *Id*. Common sense tells us that reprinting forms to replace the words "husband" and "wife" with "spouse" and "spouse" is a minor inconvenience at best.

The circuit clerks, in fact, are likely to benefit from the revenue same-sex marriage licenses would bring to their offices. "Those licenses cost $21 a piece. We'll make a lot more money if we have people lined up outside," the Circuit Clerk of Hinds County was reported to have said. *Id.*

The State presses that its computer databases will also need to be modified to amend the "husband" and "wife" titles. The latter modifications will probably cost the government money. But that is not "powerful evidence of harm to its interests" that would preclude injunctive relief. *Opulent Life Church*, 697 F.3d at 297. Until the labels are changed, one spouse's name can go in the "husband" field, and the other can go in the "wife" field. There is no reason to believe that the databases could not accommodate that kind of workaround. And, obviously, the burden on front-line government employees in processing marriage-related paperwork is exactly the same burden they incur when processing paperwork for opposite-sex couples.

On this record, there is nothing to suggest that any State or local government office will have to undertake extraordinary or Herculean efforts to comply. The harm that would result from denial of the requested injunction outweighs any harm the injunction might cause the State.

### D.      Public Interest

Lastly, the plaintiffs must show that a preliminary injunction will not disserve the public interest. "Focusing on this factor is another way of inquiring whether there are policy considerations that bear on whether the order should issue." Wright et al., at § 2948.4.

The defendants argue that the public interest is served by enforcing its democratically adopted laws. Docket No. 22, at 31-32. They also argue that "at best there would be confusion

and at worst there would be chaos" if this Court orders a preliminary injunction only to be reversed on appeal. *Id.* at 32. "Licenses may be voided. Benefits could be withdrawn," it says. *Id.*

The State absolutely has an interest in enforcing the law. That is undeniable. But that interest yields when the law at issue violates the constitution.

Fifth Circuit precedent instructs that where laws violate a constitutional right, "the public interest is not disserved by an injunction preventing its implementation." *Opulent Life Church*, 697 F.3d at 298 (citations omitted). This is true regardless of how the law was enacted. *See Barnette*, 319 U.S. at 638 ("fundamental rights may not be submitted to vote; they depend on the outcome of no elections"). The public's interest in enforcing the law is always satisfied when the constitution is properly administered.

The idea that "chaos" will ensue if same-sex marriage commences, moreover, is contrary to the experience of more than 30 states which today recognize same-sex marriage. As plaintiffs observe, "so far, since *Windsor*, no fewer than twenty states have managed to do what was necessary to vindicate the equal rights of their gay citizens in marriage without breaking the bank in terms of the state budget or collapsing from the burden of administrative inconvenience." Docket No. 28, at 7.

At oral argument, counsel for the State focused on the "chaos" he claimed was experienced in Utah, where the public was arguably subjected to whiplash in deciphering various stay rulings from the district court, Tenth Circuit, and Supreme Court.[51] Any weight this argument had at oral argument, however, evaporated when the newspaper reported the following after the hearing:

---

[51] The State of Utah had failed to ask for a stay in advance of the District Court's ruling. *Evans v. Utah*, --- F. Supp. 2d ---, No. 2:14-CV-55, 2014 WL 2048343, at 1 (D. Utah May 19, 2014).

> Sherrie Swenson, county clerk for Salt Lake County, which is Utah's most populated county, told The Clarion-Ledger Thursday her office did not witness "chaos" at all when the federal judge struck down Utah's ban.
>
> "We had hundreds of people lined up for multiple days, but 'chaos' isn't an appropriate way to describe it," she said. "Everyone was so courteous and friendly and excited. We were able to issue about 150 licenses the first afternoon (after the ban was lifted) and about 350 that next Monday." . . .
>
> Swenson said her office had the same "bride" and "groom" terminology on forms when the Utah ban was struck down, but she allowed the couples to scratch out whatever terminology they wanted, and the marriages were still deemed legal by the county and state.

Ganucheau, *supra*.[52]

Because the laws at issue are unconstitutional, the public interest defendants seek to protect would be harmed far more if enforcement were allowed to continue. Accordingly, the court concludes that the public interest would not be disserved by granting a preliminary injunction.

## IV.   The State's Motion to Stay

The State has filed a conditional motion to stay this Preliminary Injunction so that it can appeal. It seeks an immediate and indefinite pause on same-sex marriage, or at minimum, a 14-day stay. *See* Docket No. 24, at 21.

### A.   Legal Standard

> A stay pending appeal simply suspends judicial alteration of the status quo. We consider four factors in deciding a motion to stay pending appeal: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. The first two factors . . . are the most critical.

*Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (quotation marks and citation omitted). "A stay is an intrusion into the ordinary processes of administration and judicial review, and

---

[52] Newspaper articles aren't evidence – but neither is argument of counsel.

accordingly is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (quotation marks and citation omitted).

"There is substantial overlap between these and the factors governing preliminary injunctions; not because the two are one and the same, but because similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined." *Id.* at 434 (citation omitted).

For purposes of this motion, the State "need not always show a 'probability' of success on the merits; instead, [it] need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981) (citations omitted).

### B.    Discussion

The State has not shown that it presents a substantial case on the merits. Approximately one-quarter of its brief opposing same-sex marriage was spent arguing *Baker v. Nelson*, the application of which has been rejected by nearly every circuit court of appeal to consider same-sex marriage after *Windsor*. The State's primary articulated interest in preserving its same-sex marriage ban was deemed "so full of holes that it cannot be taken seriously" by one of those courts. *Baskin*, 766 F.3d at 656. Its remaining asserted interests summarily called for deference to tradition and the ballot box without grappling with the counter-majoritarian difficulty this case presents. There may be other cases making their way through the judiciary which present a substantial case on the merits, but this is not one of them.

As to the second factor, the State will not be irreparably harmed absent a stay. The "confusion and practical difficulties" it claims will occur are speculative and in fact discredited by other facts. Over 10 years ago, the Mississippi State Board of Health showed that it was

capable of amending birth certificates within 10 days, and at the moment some circuit clerks are ready to issue same-sex marriage licenses within "two minutes." It is not credible to think that our State would find itself unable to process a technical change which already has been implemented in over 30 states.

This leads us to the third factor. The plaintiffs *will* be harmed by a stay. The Utah decision shows the specific rights same-sex couples in Mississippi are presently denied: joint adoption of children currently being raised by one same-sex couple, hospital visitation rights for another who previously had not been afforded that opportunity, and a third couple's discovery "that they could save approximately $8,000.00 each year on health insurance." *Evans v. Utah*, --- F. Supp. 3d ---, No. 2:14-CV-55, 2014 WL 2048343, at *3 (D. Utah May 19, 2014). These are obviously important interests.

Of particular salience is the reality that the plaintiffs' children have a strong interest in their parents being married. The State's brief crassly suggests that this is entitled to no weight because Mississippians are unlikely to stop stigmatizing gay and lesbian citizens. The court is unpersuaded.

Finally, the public interest lies in enforcing the constitution. The State's interest in the "stability" of laws outlawing same-sex marriage is entitled to no more deference than Virginia's earlier interest in keeping its interracial marriage ban, the District of Columbia's earlier interest in continuing to violate the Second Amendment, or Idaho's interest in preserving its same-sex marriage ban.

### C.   Other Considerations

That said, the State is likely correct that a race to the courthouse – with same-sex couples rushing to the circuit clerk's office, and the State rushing to the Fifth Circuit – does not serve

anyone's interests. This is especially true with the Fifth Circuit scheduled to hear Louisiana and Texas's same-sex marriage cases in just a month and a half.

The Louisiana court upheld that state's same-sex marriage ban, so no stay pending appeal was necessary. Texas is another matter.

According to plaintiffs' counsel, the preliminary injunction striking down Texas's same-sex marriage ban was stayed by consent of the parties. Transcript of Oral Argument at 157, Campaign for Southern Equality v. Bryant, No. 3:14-CV-818 (Nov. 12, 2014). At the hearing, she went on to explain that the Texas attorney "is not a happy camper right now," since he has "a client who's about to give birth, and she really, really, really wants to be the mother of the child and have her spouse or her partner be the other mother of the child when that child is born." *Id.* Counsel then added,

> I know for a fact that there are gay couples in Mississippi, some of whom were public employees, who face life-threatening injuries or life-threatening illnesses. And if they die in the next few days, God for – again, God forbid, they won't have the benefits that they would get under state law . . . for pension benefits, et cetera. So this isn't some theoretical thing.

*Id.* at 157-58.

The equities present a difficult question. A stay pending appeal risks harming some number of same-sex couples and their children, and the State has not met the most important factors required to receive a stay pending appeal. It *will* appeal, though, and the Fifth Circuit may want to consider the appeal alongside the parallel Louisiana and Texas cases. It is impossible to predict how the appellate court will weigh the deprivation of constitutional rights (by plaintiffs who oppose a stay) against the interest in circuit-wide uniformity.

On balance, although no indefinite stay will issue today, the State will have time to present its arguments to the Fifth Circuit and let that court decide whether to dissolve or continue a stay pending appeal. This Preliminary Injunction will be stayed for 14 days.

## V.    Conclusion

The Fourteenth Amendment operates to remove the blinders of inequality from our eyes. Though we cherish our traditional values, they must give way to constitutional wisdom. Mississippi's traditional beliefs about gay and lesbian citizens led it to defy that wisdom by taking away fundamental rights owed to every citizen. It is time to restore those rights.

Today's decision may cause uneasiness and concern about the change it will bring. But "[t]hings change, people change, times change, and Mississippi changes, too." The man who said these words, Ross R. Barnett, Jr., knew firsthand their truth.[53]

Mississippi continues to change in ways its people could not anticipate even 10 years ago. Allowing same-sex couples to marry, however, presents no harm to anyone. At the very least, it has the potential to support families and provide stability for children.

This court joins the vast majority of federal courts to conclude that same-sex couples and the children they raise are equal before the law. The State of Mississippi cannot deny them the marriage rights and responsibilities it holds out to opposite-sex couples and their children. Mississippi's statute and constitutional amendment violate the Fourteenth Amendment to the United States Constitution. Accordingly,

**IT IS HEREBY ORDERED** that the State of Mississippi and all its agents, officers, employees, and subsidiaries, and the Circuit Clerk of Hinds County and all her agents, officers, and employees, are hereby preliminarily enjoined from enforcing Section 263A of the Mississippi Constitution and Mississippi Code Section 93-1-1(2).

---

[53] Katagiri at 231-32.

**IT IS FURTHER ORDERED** that this decision is stayed for 14 days. The Circuit Clerk of Hinds County shall continue to issue marriage licenses to opposite-sex applicants and only those applicants until further word from the United States Court of Appeals for the Fifth Circuit or the United States Supreme Court.

**SO ORDERED**, this the 25th day of November, 2014.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE
